**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**RICHARD COOPER,**

> **Petitioner,**

v.                                                   **Case No. 8:04-CV-1447-T-27MSS**

**WALTER A. MCNEIL[1],**

> **Respondent.**
_____/

## ORDER

Petitioner, a State of Florida inmate under sentence of death, seeks habeas corpus relief

pursuant to 28 U.S.C. § 2254.  Petitioner challenges the validity of his three convictions for first

degree murder and resulting death sentences (Dkt. 1).  Respondent argues that some of Petitioner's

claims are procedurally defaulted and that the remaining claims either fail to state a federal

constitutional claim or fail to meet the threshold requirements of 28 U.S.C. § 2254(d) and (e).  Upon

consideration, Petitioner's request for federal habeas relief (Dkt. 1) is DENIED.

Petitioner was convicted in 1984 and sentenced to death for the 1982 execution style murders

of three men in Pinellas County, Florida.  Petitioner's convictions and sentences were affirmed by

the Florida Supreme Court. *See Cooper v. State,* 492 So. 2d 1059 (Fla. 1986), *cert. denied*, 479 U.S.

1101 (1987).  Petitioner initiated state court post conviction proceedings in 1989.  Evidentiary

---

[1] Walter A. McNeil, Secretary of the Florida Department of Corrections, is substituted as the party respondent.
Fed. R. Civ. P. 25(d).

hearings were conducted over the course of eight months, from September 1999 to June 2000.[2]
Petitioner's state court post conviction proceedings concluded in 2004, fifteen years after Petitioner
filed his Florida Rule 3.850 motion.  The state trial court's denial of Petitioner's Florida Rule 3.850
post conviction motion was affirmed by the Florida Supreme Court. *See Cooper v. State*, 856 So. 2d
969 (Fla. 2003), *cert. denied,* 540 U.S. 1222 (2004).

In his petition, Petitioner raises fifteen grounds for relief, designated as Grounds A-O.
Ground A includes five sub-claims of ineffective assistance of counsel, designated (a)-(f).  Ground
N includes eight sub-claims of ineffective appellate counsel.  Several of Petitioner's claims are
procedurally defaulted.  The federal nature of some claims was not presented to the state courts.  The
remaining claims, addressed on the merits, do not warrant federal habeas relief.

## Facts [3]

In the early morning of June 18, 1982, the Clearwater Police Department and the Pinellas
County Sheriff's Department received calls from eight-year-old Chris Fridella.  Several officers were
dispatched to his residence.  They found three men, one being Chris' father, Steven, lying face down
on the living room floor with duct tape binding their hands behind their backs.  All were dead from
gunshot wounds.  Medical testimony at trial established that the deaths resulted from shotgun

---

[2]  The state court ordered an evidentiary hearing on six of the claims presented in Petitioner's Amended Rule
3.850 motion, which was conducted  nearly sixteen years after Petitioner's trial.  The hearing was conducted in a series
spanning approximately eleven months, from September 1999 through June 2000: September 3, 1999 (Attorney Koch
and defense witnesses Ralph Palmeroy, Donnie Cooper and Peggy Jo Kirby); November 5, 1999 (defense witnesses Lisa
Harville and Dr. Brad Fisher); December 21, 1999 (Attorney Crider); January 14, 2000 (defense witnesses and
codefendants Jeffrey McCoy and Terry Van Royal; State witness Paul Skalnik); January 21, 2000 (defense witness and
codefendant Jeffrey McCoy; State witness Paul Skalnik); January 26, 2000 (no witnesses); April 28, 2000 (State witness
Dr. Sidney Merin); and June 23, 2000 (State witnesses Ken Driggs, Elizabeth Wells and Doug Crow) (Dkt. 10, Ex. D15,
pp. 2252-53).

[3]  The facts are taken from the Florida Supreme Court's opinion affirming Petitioner's convictions on direct
appeal.  *Cooper v. State*, 492 So. 2d 1059, 1060 (Fla. 1986).

wounds from the range of three to six feet.  The house had been ransacked, the victims' wallets emptied, and the television volume was turned to the maximum.

Information received on January 15, 1983 from Robin Fridella, Steven Fridella's ex-wife, led police to Petitioner, Terry Van Royal and Jason Dirk Walton.  During his interview with police on January 20, 1983, Petitioner confessed.  According to Petitioner, he, Walton, Royal, and Walton's younger brother, Jeff McCoy, had planned the robbery for a week.  On June 17, 1982, they set out with ski masks, gloves and firearms in the trunk of the car, including two shotguns.  When they arrived at the house, McCoy stayed in the car while the other three entered the residence.[4]  One of the victims was asleep on the couch, one was in a bedroom, and Steven and Christopher Fridella were sleeping in the back bedroom.  The adult victims were put on the living room floor and their hands taped.  Chris Fridella was bound and locked in a bathroom.  Petitioner and Royal guarded the victims while Walton ransacked the house.  When one of the victims recognized Walton, he told the others they would have to kill the adults.  Walton's gun misfired and he ordered the others to shoot.

After Petitioner and Royal shot the victims, they ran from the house.  Walton told Petitioner that one of the victims was not dead.  Petitioner returned and shot Fridella a second time.  Petitioner stated that he had been drinking and smoking marijuana that day but that he was aware of what he was doing.  Petitioner was convicted on three counts of first degree murder.  The jury recommended the death penalty on all three counts, voting 9-3, 7-5, and 7-5.  The trial judge followed the jury's recommendation, finding five aggravating and no mitigating factors.

---

[4] In a second statement given on January 24, 1983, Petitioner stated that McCoy accompanied the others into the house but was ordered to return to the car before the shootings.

**Unexhausted and Procedurally Barred Claims**

Respondent contends that Grounds A(b) and (f), D, and F-M and attendant sub-claims are unexhausted and procedurally barred.  Those claims are:

A(b):   trial counsel was inattentive to and failed to investigate Petitioner's mental health, allowing Petitioner to be tried while Petitioner was incompetent;

A(f):[5]   trial counsel failed to object to the trial court's penalty instruction concerning the need for a majority vote to recommend a life sentence; trial counsel failed to object to the prosecution's comment during *voir dire* and its penalty phase argument that the jury could not consider sympathy for Petitioner during its deliberations on punishment, even that generated by evidence

D:   Petitioner was incompetent to stand trial

F:   denial of a non-arbitrary and individualized sentencing proceeding and failure of the Florida Supreme Court to provide meaningful appellate review of the adequacy of Petitioner's sentencing proceeding

G:   denial of a jury trial on all elements of capital murder

H:   jury instructions at the penalty phase were constitutionally flawed

I:   improper argument by the prosecutor

J:   trial court improperly permitted the prosecution to assert and present evidence on Petitioner's lack of remorse as a non-statutory aggravating factor

K:   improper diminution of jury role at sentencing

L:   trial court improperly relied upon the statutory aggravating circumstance that the murders were cold, calculated and premeditated

M:   execution is cruel and unusual given Petitioner's intellectual and neurological impairments

---

[5]  Ground A, sub-claim (f) contains three separate arguments for relief (Dkt. 1, p. 35).  Respondent contends that the two arguments summarized above are procedurally barred.  The remaining argument is addressed on the merits.

## Exhaustion of Available State Court Remedies

A federal habeas petitioner must exhaust available state court remedies, either on direct appeal or by state post-conviction motion. 28 U.S.C. § 2254(b)(1)(A),(c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003). The petitioner must present the state court with the federal constitutional basis for relief, in addition to the facts supporting the claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *Duncan v. Henry*, 513 U.S. 364, 365 (1995). The prohibition against raising an unexhausted claim in federal court extends to both the legal theory of relief and the specific factual contention supporting relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

## Procedural Default

"If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice "but that they worked to his *actual* and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). In other words, he must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892; *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

A petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). "A 'fundamental miscarriage of justice' occurs in an extraordinary case where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson*, 353 F.3d at 892; *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (petitioner must show that it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence.").

### Grounds which Petitioner concedes are procedurally barred

Petitioner concedes that Grounds A(f)(in part), F (in part), H, I, J, K and M are procedurally barred. He presented those grounds to the state court in his Amended Florida Rule 3.850 motion for post-conviction relief (Dkt. 10, Vol. D2, pp. 269-322; 328-33). The state trial court did not address the merits of Grounds A(f) and F, H, I, J, K and M when it denied Petitioner's Amended Rule 3.850 motion, finding each of these grounds procedurally barred (Dkt. 10, Vol. D5, pp. 814-17).[6] Generally, a claim is barred from federal habeas review when a state court has rejected that claim as procedurally barred. *Coleman v. Thompson*, 501 U.S. 722 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001). A federal habeas petitioner's failure to abide by a state procedural rule does not, standing alone, prevent a federal court from reaching the federal claim. The state court

---

[6] Petitioner presented these claims to the state court in his Amended 3.850 motion:

| | |
|---|---|
| Ground A(f): | presented as claim V |
| Ground F: | presented as claim VII |
| Ground H: | presented as claims IX, XII, XIV and XVII |
| Ground I: | presented as claim XI |
| Ground J: | presented as claim XIII |
| Ground K: | presented as claim XV |
| Ground M: | presented as claim XVIII |

(Dkt. 10, Exs. D1, D2).

must have relied on the procedural bar as an independent basis for its disposition of the case. *Harris v. Reed*, 489 U.S. 255, 262 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)).  If the state court declined to address a federal claim because the defendant failed to meet a state procedural requirement, the independent and adequate state ground doctrine bars federal habeas review of that claim.  *Eagle v. Linahan*, 279 F.3d 926, 936 (11th Cir. 2001).

These claims were found to be procedurally defaulted based on Petitioner's failure to present these claims on direct appeal.[7]  In Florida, issues that either were raised or could have been raised on direct appeal are not cognizable on collateral review. *Sullivan v. Wainwright*, 695 F.2d 1306, 1310 (11th Cir. 1983), *cert. denied*, 464 U.S. 922 (1983).  The Florida Supreme Court's affirmance, to the extent the court agreed that these claims were procedurally barred, rests on independent and adequate state procedural grounds, precluding federal habeas review.

Petitioner concedes in his Reply to Respondent's response that part of Ground A(f) (trial counsel's failure to object to the penalty instructions and the argument related to the "sympathy" instruction), part of Ground F (failure of Florida Supreme Court to conduct a sufficient appellate review of Petitioner's sentencing proceeding), and Grounds H, I, J, K, and M are procedurally barred because appellate counsel failed to raise these claims on direct appeal (Dkt. 18, Attach. 3, pp. 53-54). Petitioner neither asserts nor demonstrates that the cause and prejudice or fundamental miscarriage of justice exceptions apply.  Accordingly, Grounds A(f) (in part), F (in part), H, I, J, K and M are procedurally barred from federal review. *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996).

---

[7] (Dkt. 10, Ex. D15, pp. 2262-63; Ex. D2, pp. 814-17.)

## GROUND G

In Ground G, Petitioner contends that he was denied a jury trial on all elements of capital murder.  Petitioner presented Ground G as Claim X in his Amended Rule 3.850 motion.[8]  The state court found that this claim was procedurally barred (Dkt. 10, Ex. D5, p. 815).[9]  The Florida Supreme Court affirmed the trial court's application of the procedural bar but alternatively determined that the claim lacked merit.  *See Cooper v. State*, 856 So. 2d at 977 n.6, n.8.  Respondent argues that because the Florida Supreme Court's ruling was in the alternative to the trial court's application of a procedural bar, federal review of Ground G is barred.  In his reply, Petitioner argues that the

---

[8]  Petitioner presented this claim to the state court in his Amended Rule 3.850 motion, in relevant part, as follows:

> On the authority of *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988)], and given Florida law requiring unanimous jury verdicts in capital cases, Richard was deprived of his constitutionally guaranteed right to a unanimous jury determination on the aggravating factors necessary to establish the elements of the offense of capital murder.  On two counts, five members of his jury, while finding him guilty of first degree murder, <u>never</u> found him guilty of first degree <u>capital</u> murder, while on the third count three members never found him guilty of <u>capital</u> murder.

> The trial court - - not a unanimous jury - - found that Cooper committed First Degree Capital Murder.  Under the reasoning and holding of the court in <u>Adamson</u> this was an unconstitutional deprivation of Cooper's Sixth and Fourteenth Amendment rights to a unanimous jury determination on the existence of all elements necessary to prove the crime of First Degree Capital Murder.  This court should adopt the analysis set forth in <u>Adamson</u>, and under that analysis, vacate Cooper's death sentence in favor of a life sentence.  (Double jeopardy principles would bar the impanelling [sic] of a new advisory jury at sentencing, since in the absence of a unanimous jury recommendation of death, there has been a factual acquittal of an element of the offense. <u>E.G.</u>, <u>Arizona v. Rumsey</u>, 467 U.S. 203, 211 (1984); <u>Magill v. Dugger</u>, 824 F.2d 879, 894 n.17 (11th Cir. 1987).

(Dkt. 10, Ex. D2, p. 285) (emphasis in original).

[9]  Specifically, the state trial court held:

> The defendant claims his death sentence must be vacated because he was deprived of his right to a jury trial on the elements of capital murder.  In <u>Eutzy</u> the court held that this type of claim was not to be reviewed by a 3.850 motion because it could have been raised on appeal.

(Dkt. 10, Ex. D5, p. 815).

Florida Supreme Court's alternative ruling negates the trial court's application of the procedural bar

(Dkt. 18, Attach. 3, p. 53).

In its opinion, the Florida Supreme Court determined:

> Finally, our examination of the record leads us to conclude that the trial court properly denied a number of Cooper's claims in a summary fashion. As these claims were all without merit [FN6] or insufficiently pled, . . . we affirm the trial court's decision to deny the claims without a hearing. Because we conclude that the entirety of the trial court's order is supported by law and factual evidence contained in the record, we affirm the judgment below.

>> FN6. Cooper contends that Florida's capital sentencing scheme violates the United States and Florida Constitutions under the United States Supreme Court's holding in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in *Bottoson v. Moore*, 833 So. 2d 693 (Fla.), *cert. denied*, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and *King v. Moore*, 831 So. 2d 143 (Fla.), *cert. denied*, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002) and denied relief. We conclude that Cooper is likewise not entitled to relief on this claim.

*Cooper v. State*, 856 So. 2d at 977.

By affirming the "entirety of the trial court's order," the Florida Supreme Court necessarily affirmed  the trial court's application of the state procedural bar to Petitioner's claim.  The merits of ground G were not addressed.  This application of a state procedural bar therefore renders the claim procedurally defaulted, precluding federal review.  *Baldwin v. Jackson*, 152 F.3d 1304, 1317 (11th Cir. 1998), *cert. denied*, 526 U.S. 1047 (1999).  Petitioner neither asserts nor demonstrates that the cause and prejudice or fundamental miscarriage of justice exception applies.  Ground G is procedurally defaulted under Florida's rules and therefore federal review is barred.

Alternatively, as Petitioner concedes, federal review of this claim is also barred under *Teague v. Lane*, 489 U.S. 288 (1989).  *Teague* bars retroactive application of a new constitutional rule of criminal procedure which had not been announced when a defendant's conviction became final. 489

U.S. at 310-13.[10]  *Ring v. Arizona*, 536 U.S. 584 (2002), on which Petitioner relies, was decided after

Petitioner was sentenced.  The rule announced in *Ring*, which extended the holding in *Apprendi v.*

*New Jersey*, 530 U.S. 466 (2000), to facts increasing a defendant's sentence from life imprisonment

to death, does not apply retroactively to cases on review.  *Schriro v. Summerlin*, 542 U.S. 348, 358

(2004).  As noted, Petitioner concedes that *Teague* bars federal habeas review of Ground G. (Dkt.

18, Attach. 3, p. 53).

## GROUND L

In Ground L, Petitioner contends that the state trial court improperly relied on the statutory

aggravating circumstance that the murders were cold, calculated and premeditated.  Although

Petitioner presented Ground L to the state appellate court, the federal component of this claim was

not presented.[11]  Consequently, Petitioner did not present to the state court a "full opportunity to

resolve any constitutional issues by invoking one complete round of the State's established appellate

---

[10]  Two narrow exceptions to the *Teague* rule exist, neither of which applies to Petitioner's Ground G.  *See Teague v. Lane*, 489 U.S. at 307.

[11]  Petitioner presented this claim to the state court on direct appeal as follows:

It is well settled that "the cold, calculated and premeditated factor applies to a manner of killing characterized by a heightened premeditation beyond that required to establish premeditated murder." Hardwick v. State, 9 F.L.W. 484 (Fla. 1984, decided November 21, 1984); Washington v. State, 432 So. 2d 44 (Fla. 1983); Caruther v. State, 10 F.L.W. 114 (Fla. 1985, decided February 7, 1985).  In that case as in the instant case, "the trial court erred in finding as alternative aggravating circumstances, that the murder was committed for the purpose of avoiding or preventing a lawful arrest and that the capital felony was cold, calculated and premeditated."  There, as here, the victim recognized one of the co-perpetrators and the court reasoned that the defendant killed her to avoid identification.

In the instant case, the co-perpetrators went to the trouble of obtaining ski masks and gloves.  They even sewed the eye holes closed and altered the mouth area to avoid being identified by the victims. If murder, rather than robbery had been planned, why go to the trouble of wearing a disguise?  The evidence presented supported the position that robbery was intended, but that once J.D. Walton shouted "shoot 'em, shoot 'em," then everyone lost control.  The premeditation to commit robbery cannot be transferred to a murder which occurs in the course of that robbery for purposes of this aggravating factor.  Hardwick v. State, 9 F.L.W. 484 (Fla. 1984, decided November 21, 1984).  Even the fact that the victims were shot more than once does not support the finding that the murder was cold, calculated and premeditated.  See Cannady v. State, 427 So. 2d 723 (Fla. 1983).

(Dkt. 10, Ex. A12, pp. 20-21).

review process." *O'Sullivan v. Boerckel*, 526 U.S. at 845.  In his state court direct appeal, Petitioner

relied exclusively on state law in support of Ground L.  Petitioner's reliance on state law, without

reference to a federal constitutional component of this claim, does not satisfy the exhaustion

requirement.  *Duncan v. Henry*, 513 U.S. at 365-66; *see also Baldwin v. Reese*, 541 U.S. 27, 32

(2004).  Ground L remains unexhausted and is therefore barred from federal review.

Petitioner cannot return to state court to present the federal constitutional component of this

claim.  Since he could have raised the federal constitutional issue on direct appeal, Petitioner is now

precluded from doing so collaterally in a second Rule 3.850 motion.  *See, e.g.*, *Childers v. State*, 782

So. 2d 946, 947 (Fla. 4th DCA 2001) ("The law is clear that where an issue could have been raised

on direct appeal, it is not the proper subject for a rule 3.850 motion.")(citations omitted).  Petitioner

concedes that Ground L is procedurally barred.  Petitioner fails to argue that either the cause and

prejudice or manifest injustice exceptions apply to excuse his default of Ground L (Dkt. 18, Attach.

3, p. 54).  This ground is procedurally barred from federal review.

**Grounds Petitioner contends are not procedurally barred**

**<u>GROUND A(b) (ineffective assistance</u>):**

In Ground A(b), Petitioner contends that his trial attorneys were ineffective in failing to

investigate Petitioner's mental health and allowing Petitioner to be tried while he was incompetent.

Petitioner presented this argument as claim III in his Amended Rule 3.850 motion (Dkt. 10, Ex. D1,

pp. 156-60).  The state trial court denied relief:

> This claim is barred because it was raised for the first time in the defendant's
> Amended Motion which was filed after the two year limitation imposed by Florida
> Rule of Criminal Procedure 3.850 had expired.  The defendant does not allege that
> his case meets the requirements for the exceptions to the two year limitation,
> therefore this court finds the claim is untimely.

(Dkt. 10, Ex. D5, p. 811).

The Florida Supreme Court affirmed. *Cooper v. State*, 856 So. 2d at 977.   In his reply, Petitioner argues that because the state court accepted his Amended Rule 3.850 motion, the state court "should not later be allowed to summarily reject a claim therein as untimely" (Dkt. 18, Attach. 3, p. 49).   To the extent Petitioner challenges the state court's application of Florida's two-year limitation period to this claim of ineffective assistance of counsel, federal review is unavailable. Whether this claim is barred by Florida's statute of limitations is a matter of state law, not  subject to federal habeas review.  *See* 28 U.S.C. §2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Eagle v. Linahan*, 279 F.3d at 936.   Accordingly, federal review of this claim is available only if Petitioner makes a showing of cause excusing the default and prejudice arising therefrom. *Eagle v. Linahan*, 279 F.3d at 936.   Petitioner fails to demonstrate either cause and prejudice or a fundamental miscarriage of justice to overcome the state court procedural bar.   Federal review of this claim is therefore precluded.

## **GROUND F (in part)**

Petitioner contends that the remaining argument in Ground F, the denial of a non-arbitrary and individualized sentencing proceeding, is not procedurally barred.  Petitioner argues:

> On direct appeal, Mr. Cooper challenged the trial court's application of the aggravating factors and rejection of mitigating factors without specifically referencing constitutional concerns.  In his 3.850 motion, Mr. Cooper raised the constitutional deficiencies arising out of sentencing.  Claim VII of the Amended 3.850 argues, in part, that Mr. Cooper was deprived of a constitutionally required individualized sentence because the trial judge used virtually the same sentencing order for co-defendant J.D. Walton.  Thus he contended, it appeared that the State Attorney was improperly permitted to draft the order for the court.  The trial court found this claim procedurally barred because it believed that it could have been raised on direct appeal.  However, as Mr. Cooper noted in his appeal from the denial of the 3.850, this matter could not have been raised on direct appeal because the facts underlying it were unknowable at the time of the appeal.  Accordingly, the trial

court's decision to find the matter procedurally barred was erroneous and this Court should consider the matter on the merits.

(Dkt. 18, Attach. 3, p. 52).[12]

In rejecting this argument and denying relief, the state court found this claim procedurally barred:

> The defendant claims that the court did not weigh the aggravating and mitigating factors before it imposed the death sentence. This claim could have been raised on direct appeal and can not [sic] be raised in a 3.850 proceeding. *Swafford v. Dugger*, 569 So. 2d 1264 (Fla. 1990).

(Dkt. 10, Ex. D5, p. 814).

As it did with respect to claim III of Petitioner's Amended Rule 3.850 motion, the Florida Supreme Court affirmed the denial of this claim in the same summary paragraph:

> [O]ur examination of the record leads us to conclude that the trial court properly denied a number of Cooper's claims in a summary fashion. As these claims were all without merit . . . or insufficiently pled [FN7], we affirm the trial court's decision to deny the claims without a hearing. Because we conclude that the entirety of the trial court's order is supported by law and factual evidence contained in the record, we affirm the judgment below.

*Cooper v. State*, 856 So. 2d at 977.[13]

---

[12] This argument appears to be a combination of various claims Petitioner raised in his Amended Rule 3.850 motion and his state habeas petition. Petitioner specifically references claim VII of his Amended Rule 3.850 motion in his argument. Given this reference by Petitioner, the Court assumes that he asserts here the same argument presented in claim VII of his Amended Rule 3.850 motion.

[13] Petitioner asserted in his state habeas petition (Dkt. 10, Ex. 40) a claim that appellate counsel rendered ineffective assistance by failing to raise on appeal this substantive claim of trial court error. The Florida Supreme Court, in its discussion of Petitioner's state habeas petition, again denied this underlying claim that the trial court failed to provide Petitioner with an individualized sentencing proceeding:

> Finally, Cooper's claim that the trial court failed to independently weigh the mitigating and aggravating circumstances of each victim's murder individually is contradicted by the face of the court's sentencing order itself. Th[is] claim[] do[es] not warrant relief.

*Cooper v. State*, 856 So. 2d at 979.

In his appeal from the denial of his Amended Rule 3.850 motion (Dkt. 10, Ex. D37, p. 96), as in his federal reply (Dkt. 18, Attach. 3, p. 52), Petitioner contends that he could not have presented this ground on direct appeal because he could not have known the facts supporting this ground when he filed his direct appeal. Petitioner's argument does not satisfy the cause and prejudice or fundamental miscarriage of justice exception. Petitioner fails to explain why or how he could not have known the facts supporting his ground and cites no authority to support his argument.

The state court expressly applied Florida's procedural rules in denying relief. The Florida Supreme Court affirmed. That decision rests on an independent and adequate ground barring federal habeas review. *Eagle v. Linahan*, 279 F.3d at 936; *Coleman v. Thompson*, 501 U.S. at 729. This argument in Ground F is not subject to federal review.

## Standard of Review on the Merits

The remaining grounds of Petitioner's federal habeas petition are reviewed on the merits. Because this habeas petition was filed after April 24, 1996, Section 2254(d) governs, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000). Section 2254(d) creates a highly deferential standard for federal court review of state court adjudications:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court discussed this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide.").  "[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to findings of fact, not to mixed determinations of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001).

### Ineffective assistance of trial counsel

Claims of ineffective assistance of counsel are difficult claims to sustain.  "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are

few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)). *Strickland v. Washington*, 466 U.S. 668 (1984) governs an ineffective assistance of counsel claim.   Under *Strickland,* a two-part test is utilized to analyze ineffective assistance of counsel claims.   First, a defendant must show that counsel's performance was deficient.   Counsel's errors must be so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment.   Second, a defendant must show that counsel's deficient performance prejudiced the defense.   Counsel's errors must be shown to have been so serious as to deprive the defendant of a fair trial and reliable result.   *See Strickland*, 466 U.S. at 687; *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

Proof of both deficient performance and resulting prejudice is required.   *Strickland v. Washington*, 466 U.S. at 697; *Sims v. Singletary*, 155 F.3d at 1305.   "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."   *Strickland v. Washington*, 466 U.S. at 690.   "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*.   *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."   *Id*.

Because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," Petitioner must demonstrate that his attorneys' deficient performance prejudiced the defense.   *Id.* at 691-92. Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Id.* at 694. *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

## GROUND A(a)

Petitioner contends that trial counsel rendered ineffective assistance by failing to adequately investigate impeachment evidence related to prosecution witness Paul Skalnik, and by failing to sufficiently cross examine Skalnik during a pretrial suppression hearing and the penalty phase of Petitioner's trial. Petitioner contends that defense counsel had a duty to investigate Skalnik's history of cooperation with the State and elicit details of his cooperation to demonstrate the likelihood that Skalnik acted as a State agent, that Skalnik had an incentive to fabricate his testimony to receive beneficial treatment from the State, and that Skalnik's motives for aiding the State were not credible. Petitioner argues that an adequate investigation would have enabled counsel to meaningfully confront Skalnik and "based on his extensive history of cooperation with the State, would have convinced the judge to suppress his statements, or the jury to distrust his testimony." Petitioner asserts that "[c]ounsel had reason to believe that this witness had a long history of dishonestly taking naive jail cellmates into his trust and then either or both providing information harmful to the cellmate's interests to law enforcement or testifying against these former cellmates at later trials or sentencing hearing[s]." (Dkt. 1, p. 33).

Contrary to Petitioner's contention, as the state trial court and ultimately the Florida Supreme Court found, the record establishes that Petitioner's attorneys conducted a thorough investigation

into Skalnik's background, brought out Skalnik's background during on cross examination and otherwise effectively cross-examined Skalnik. Petitioner has not shown that his attorney's performance in this regard was deficient or that he was prejudiced by any deficiency in counsel's performance. Petitioner has neither demonstrated that the state court's decision was contrary to or constituted an unreasonable application of the Supreme Court's decision in *Strickland* nor has Petitioner shown that the state court made an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Skalnik, a former police officer, was an inmate at the Pinellas County jail when Petitioner was housed there before trial.[14] Skalnik became known to jail personnel as a confidential informant on jail activities.[15] When Petitioner was transferred to the Pinellas County jail, he was placed in a cell adjacent to Skalnik. Two weeks later, Skalnik provided detectives with inculpatory statements he attributed to Petitioner. Prior to trial, Petitioner moved to suppress those statements (Dkt. 10, Ex. A2, p. 159). Following an evidentiary hearing during which Skalnik testified, the motion to suppress was denied (Dkt. 10, Ex. A2, p.169; Ex. A5, p. 531-32). During the penalty phase of Petitioner's trial, Skalnik testified about Petitioner's lack of remorse, that Petitioner bragged about the murders, and Petitioner's belief that the jury would not convict him because of his age.

Petitioner raised this ineffective assistance of counsel claim in his Amended Rule 3.850 motion. After an evidentiary hearing, during which Petitioner's trial attorneys testified, the state court denied relief:

---

[14] These facts are from Petitioner's brief on appeal of the denial of his Amended Rule 3.850 motion (Dkt. 10, Ex. D37).

[15] Skalnik testified during the penalty phase of Petitioner's trial that he had provided information to law enforcement about approximately thirty defendants, including several charged with first-degree murder (Dkt. 10, Ex. A11, p. 1456).

Next, Defendant contends that trial counsel was ineffective for failing to investigate Skalnik's prior history as a confidential informant.  The Court first notes that in his Memorandum, Defendant concedes that "defense counsel did get Skalnik to admit that he was a former police officer, that he was presently serving a state prison sentence for five counts of grand theft, that he had provided information to various law enforcement agencies about nearly thirty defendants, several of whom were charged with first-degree murder, and that he had previous charges involving masquerading as a lawyer."  The following excerpts reveal testimony that, taken as a whole, refutes this claim [FN1]:

> [FN1]:  There is mention in the excerpts reproduced above that trial counsel for Defendant, Ky Koch, personally represented Skalnik on a violation of probation charge previous to the trial in this case; however, it was later clarified that Ky Koch only *initially* represented Defendant on the violation charges, but that Robert Pope, Esquire, shortly thereafter became counsel of record.  Additionally, Ky Koch testified that he disclosed the potential conflict of interest to Defendant and Defendant assented to it.

| | |
|---|---|
| CCRC: | All right.  I was asking rather broadly what did you do as far as investigating Mr. Scallonik [sic]? |
| Ky Koch: | I don't recall that specifically.  I had a pretty good knowledge of who he was and what he was all about. |
| . . . | |
| CCRC: | Okay.  Were your efforts with regard to Mr. Scallonik [sic] as far as investigation, preparing Mr. Cooper's case, directed to learning as much as you could about Mr. Scallonik [sic]? |
| Ky Koch: | I hope so. |
| CCRC: | And it's your recollection now that you've obtained an NCIC and took a deposition of Mr. Scallonik [sic]? |
| Ky Koch: | Well yes.  But the way you're saying that, you intimate that that's all I did.  I don't want you to understand that because I am sure that's not true. |
| CCRC: | My next question would have been, what more did you do beyond that? |
| Ky Koch: | We knew Mr. Scallonik [sic] was either going to testify at the trial or at the penalty phase or both.  The information that Mr. Scallonik [sic] had regarding Richard was very damaging.  I am certain that we did a thorough search and found as much about Mr. Scallonik [sic] as we could find. |
| CCRC: | Do you remember with any more specificity how you did that? |
| Ky Koch: | No, sir. |
| . . . | |

| State: | Okay.  But you didn't hold back on Scallonik [sic] on questioning him, on asking him hard questions just because at some point in time you represented him and filed this document here that we just introduced into evidence, did you? |
| --- | --- |
| Ky Koch: | No, sir.  As I recall, in fact, . . . I went after Mr. Scallonik [sic]. |
| State: | Also, I think you had prepared something about, gosh, about two inches thick that contained the stuff that you were going to use to cross examine Scallonik [sic] in the trial.  Do you remember having a big thick folder like that? |
| Ky Koch: | Yes, sir. |

The unequivocal testimony offered by Ky Koch, which is reproduced in pertinent part above, refutes Defendant's claim that Skalnik was not properly investigated.  As this is an ineffectiveness claim, Defendant bears the burden to show deficient performance and prejudice, as originally articulated in *Strickland v. Washington*, 466 U.S. 688, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Both the performance and prejudice components must be satisfied.  In the event a defendant fails to satisfy one component, the inquiry ends, and the reviewing court need not determine if the defendant satisfied the other.  *See Maxwell v. Wainwright*, 490 So. 2d 927 (Fla. 1986).  In *Maxwell*, the Florida Supreme Court expounded on the *Strickland* ineffective assistance of counsel test and stated:

> First, the claimant must identify particular facts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards.  Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

*See Maxwell*, 490 So. 2d at 932 (citing *Strickland v. Washington*, 466 U.S. 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 687 (1984)).  Evaluation of an attorney's performance at the trial level requires a consideration of all the circumstances from the attorney's perspective at the time of trial.  *See Downs v. State*, 453 So. 2d 1102, 1106-07 (Fla. 1984). The legal standard for such an evaluation is "reasonably effective counsel, not perfect or error-free counsel."  *See Teffeteller v. Dugger*, 734 So. 2d 1009, 1022 n. 14 (Fla. 1999).

In conclusion, the Court finds that Defendant has failed to show that trial counsel's performance in investigating Skalnik was deficient.  The testimony adduced at the hearings, together with deposition testimony taken at or about the time of trial, reveals that Ky Koch was intimately familiar with Skalnik, his previous dealings in and out of prison, and his reputation, and sufficiently investigated him as a witness before trial.  For these reasons, this claim is denied.

(Dkt. 10, Ex. D15, pp. 2257-59).

The Florida Supreme Court affirmed:

> [FN4] As our review of the record on appeal causes us to conclude that Koch's pretrial investigation and cross-examination of Skalnik at trial were both adequate and effective, Cooper's allegations of ineffective assistance of counsel impugning his attorney's method of addressing Skalnik's testimony must fail. *See Valle v. State*, 778 So. 2d 960, 965 (Fla. 2001) (noting that to prevail on an ineffectiveness claim, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment").

*Cooper v. State*, 856 So. 2d at 975 n.4.

To obtain relief on this claim, Petitioner must establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his Amended state Rule 3.850 motion. Petitioner has done neither.

A.     <u>Skalnik's testimony at the pretrial suppression hearing</u>

The state court conducted a pretrial suppression hearing on Petitioner's motion to suppress the statements attributed to Petitioner by Skalnik. Petitioner contended that Skalnik was acting as a state agent when he elicited damaging statements from Petitioner. In his federal petition, Petitioner contends that defense counsel conducted only a cursory review of Skalnik's background during the suppression hearing, preventing the judge from properly assessing Skalnik's testimony. Petitioner contends that "Koch let Skalnik's testimony go unchallenged when Skalnik testified (misleadingly) that Cooper was the first person whom he had testified against" (Dkt. 1, p. 19). Petitioner cites the prosecutor's testimony during the Rule 3.850 evidentiary hearing, in which he described having sought out Koch after the hearing to remind him that Skalnik had testified against other defendants prior to November 1982. The prosecutor offered to re-open the hearing to enable Koch to bring this out, which Koch declined to do (Dkt. 1, pp. 19-21). It is not apparent from the record why Koch declined Crow's offer.

Petitioner argues that because of Skalnik's misleading testimony, "uncorrected by Koch or Crow, the trial court erroneously believed that Cooper was the first person against whom Skalnik had testified when it denied the motion to suppress." (Dkt. 1, p. 21).  Petitioner argues that "it is probable that the outcome of the suppression hearing would have been different if counsel had brought out to the judge's attention that Mr. Skalnik provided information to the State on a continuous basis during his incarceration in 1981-1982, that he served as a confidential informant after his release, and that he resumed his relationship with the State as soon as he was incarcerated again in November 1982, in an effort to receive favorable treatment" (Dkt. 18-2, pp. 40-41).

Initially, as to whether Skalnik's testimony was "misleading," the Florida Supreme Court found that it was not.  Discussing Skalnik's testimony in the context of an alleged *Giglio*[16] claim, that court found that "the scope of Skalnik's comment that this case 'was the first occasion that [he] provided information to law enforcement' is properly limited by preceding questions." *Cooper v. State*, 856 So. 2d at 973.  That court found that that Koch "introduced this line of questioning by asking, 'Mr. Skalnik, on how many instances and in how many different cases have you provided information to law enforcement agents *since your incarceration in November 1982?*'" *Id*. (emphasis in original).  The court concluded that "[w]hen taken in conjunction with this time parameter, Skalnik's subsequent testimony was neither false nor misleading." *Id.*  The Florida Supreme Court's factual findings are supported by the record, presumptively correct, and are not, therefore, unreasonable.

Petitioner's complaint about Koch's cross examination of Skalnik is necessarily premised on his contention that Koch's cross examination did not effectively challenge Skalnik's credibility

---

[16] *Giglio v. United States,* 405 U.S. 150 (1972).

as an informant.  "An adequate investigation would have enabled defense counsel to meaningfully

confront and examine Mr. Skalnik at both the suppression hearing and the penalty phase." (Dkt. 18-

2, p. 29).  Notwithstanding Koch's failure to accept the prosecutor's offer to reopen the suppression

hearing, it is clear from the record that Koch's cross examination of Skalnik during the hearing

brought out the necessary predicate for the defense's contention that Skalnik was acting as a State

agent when he spoke with Petitioner.  Additionally, Koch's cross examination of Skalnik brought

out matters bearing on Skalnik's credibility.

Petitioner asserts that Koch unreasonably limited his investigation and questioning of Skalnik

during the suppression hearing to Skalnik's cooperation after November 1982, because Koch labored

under a conflict of interest because Koch had previously represented Skalnik.  Specifically, Petitioner

argues that because of Koch's prior representation of Skalnik, "Mr. Koch felt that he could not

ethically question him regarding that time period" (Dkt. 18-2, p. 39).  Petitioner misconstrues Koch's

post conviction testimony and Koch's reason for limiting his cross examination of Skalnik.

Koch's ethical concerns had to do with his decision not to conduct a jail interview with

Skalnik because Skalnik was listed as a state witness, not because of his prior representation.  Koch

testified during the post conviction hearing that he did not conduct a jail interview of Skalnik

"[b]ecause of an ethical compromise I would have felt by doing that. . ." Koch would have had the

same concerns even if he had not previously represented Skalnik.  "He was on the States's witness

list.  He was in custody.  I would have felt awkward about doing that."  (Dkt. 10, Ex. D7, pp. 1026

-27).  Koch's ethical concerns had nothing to do with his prior representation of Skalnik but rather

the understandable ethical concerns a defense attorney would have about interviewing a person in

custody who was expected to testify on behalf of the prosecution.  Koch's testimony demonstrates

a reasoned tactical decision not to interview Skalnik in the jail, having nothing to do with his prior representation of Skalnik.

Koch did acknowledge that he restricted his cross examination of Skalnik during the pre-trial suppression hearing to the time period after Skalnik was incarcerated, believing that to be November 1982. (Dkt. 10, Ex. D7, pp. 1029, 1047). However, contrary to Petitioner's characterization of his testimony, Koch could not recall his reason for doing so. Koch's recollection confirmed that he prefaced his questioning of Skalnik with events occurring after Skalnik's incarceration: "And the questions that I asked Mr. Scallonik [sic] were predicated upon since [sic] your incarceration in some month in 1982, what you have done to assist the State." (Dkt. 10, Ex. D7, pp. 1029-30).

On this record, it is unclear why Koch directed his questioning of Skalnik to the time period after he was re-incarcerated, only that he had a specific time frame in mind with respect to Skalnik's cooperative efforts. "[T]actical decisions do not render assistance ineffective simply because in retrospect it is apparent that counsel chose the wrong course." *Baldwin v. Blackburn*, 653 F.2d 942, 946 (5th Cir. 1981).[17] Petitioner has not shown Koch's decision to limit his cross examination of Skalnik to have been "so ill chosen" as to render Koch's overall representation constitutionally defective. *Willis v. Newsome,* 771 F.2d 1445, 1447 (11th Cir. 1985).

Tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). Moreover, where, as here, the record is incomplete or unclear about counsel's actions, it is presumed that counsel exercised reasonable professional judgment. *Grayson v. Thompson,* 257 F.3d 1194, 1218 (11th Cir.

---

[17] *See  Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

2001), *cert. denied,* 536 U.S. 964 (2002).  As Koch's strategy is presumptively reasonable, the consideration is not "that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act."  *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000), *cert. denied*, 531 U.S. 1204 (2001).  Rather, it is whether "what the particular defense lawyer did at trial . . . were acts that some reasonable lawyer might do."  *Id.*

Petitioner asserts that Koch failed to discover the full nature of Skalnik's relationship with the State and failed to interview jail personnel about Skalnik's history of being placed with various inmates despite Koch's belief that Skalnik was intentionally housed with Petitioner.  This argument is belied by the record.  Koch conducted an appropriate investigation into Skalnik's background and was well aware of Skalnik's history of being a jailhouse informant.  He took Skalnik's pre-trial deposition.  Given Koch's knowledge of Skalnik's informant activities, Petitioner's criticism of Koch for not interviewing jail personnel is without merit.

During the suppression hearing, Koch questioned Skalnik about Skalnik's prior convictions, the number of cases and defendants about whom Skalnik had provided information to law enforcement since his incarceration in November 1982, and the circumstances surrounding Petitioner's statements about the murders (Dkt. 10, Ex. A5, pp. 480-96).  As demonstrated by the excerpts from the evidentiary hearing cited by the state court in its order denying Petitioner's Amended Rule 3.850 motion, Koch had investigated Skalnik and was aware of his history of cooperating with the authorities and attributing inculpatory statements to cell mates.  Koch thoroughly questioned Skalnik on those matters affecting Skalnik's credibility.

Petitioner's criticism of Koch's cross examination of Skalnik does not support relief.  This is not a situation where a defense attorney failed to challenge the testimony of a cooperating

informant. *See, e.g., Goodwin v. Balkcom*, 684 F.2d 794, 812 (11th Cir. 1982), *cert. denied,* 460 U.S. 1098 (1983).   The record confirms that Koch challenged Skalnik's testimony and attacked his credibility.   Even if Koch could have asked more probing questions of Skalnik, that does not support this claim of ineffective assistance. *See Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir. 1995), *cert. denied*, 516 U.S. 856 (1995) (counsel not ineffective in failing to elicit more testimony from the witnesses because perfection is not required).   "Our role in reviewing an ineffective assistance claim is not to 'grade' a lawyer's performance; instead, we determine only whether a lawyer's performance was within 'the wide range of professionally competent assistance.'" *Van Poyck v. Fla. Dep't of Corr.,* 290 F.3d 1318, 1322 (11th Cir. 2002) (quoting *Strickland*, 466 U.S. at 690).   "The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." *Id.* (citing *Chandler*, 218 F.3d at 1315).

Even if reasonable lawyers may not have conducted Skalnik's cross-examination as Koch did, no relief is warranted on Petitioner's claim of ineffective assistance unless it is shown that no reasonable lawyer, under the circumstances, would have conducted it as Koch did.  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).   Petitioner does not make this showing.   The state court neither unreasonably applied *Strickland* nor unreasonably determined the facts on this claim.

Even assuming that Koch's conduct was deficient with respect to his decision not to accept the prosecutor's offer to reopen the suppression hearing, Petitioner has not established prejudice. To establish prejudice, Petitioner must show "a reasonable probability that, but for [Koch's] unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S.

at 694.  As will be discussed, *infra*, the record does not establish that Skalnik's interaction with

Petitioner constituted a violation of Petitioner's Sixth Amendment rights under *United States v.*

*Henry,* 447 U.S. 264 (1980).  As the Florida Supreme Court found, "the record refutes Cooper's

contention that the State recruited Skalnik as an informant."  *Cooper v. State*, 856 So. 2d at 973.

That court likewise found that the record refuted "Cooper's claim that Skalnik was an agent of the

State at the time of their jailhouse conversation."  *Id.* at 978.  These findings are supported by the

record and presumptively correct.  It is not probable, therefore, even if Koch had delved into

Skalnik's activities as an informant prior to November 1982, that the result of the suppression

hearing would have been different.

      B.     <u>Skalnik's testimony at the penalty phase</u>

Petitioner contends that if counsel had adequately impeached Skalnik during the penalty

phase, he would have discredited Skalnik's "thoroughly remorseless and manipulative description"

of Petitioner.  Petitioner alleges that a thorough investigation and cross-examination would have

revealed that "Skalnik's motives for helping the State were disingenuous."  Petitioner argues that

counsel's inability to establish Skalnik's bias when relevant evidence was available prevented the

jury from adequately assessing Skalnik's testimony.

During the penalty phase, Koch questioned Skalnik about informing on other inmates:

| Koch: | Mr. Skalnik, you have provided information to various law enforcement agents about nearly thirty defendants, have you not? |
|---|---|
| Skalnik: | That's correct, sir. |
| Koch: | You are a former police officer? |
| Skalnik: | Yes, sir, I am. |
| Koch: | Presently in jail on five counts of grand theft? |

Skalnik:     Yes, I am.

Koch:        And it was a State prison sentence, was it not?

Skalnik:     Yes, sir, it was.

Koch:        Back almost a year ago you were sentenced to State prison?

Skalnik:     March and April of '83.

Koch:        You've remained in Pinellas County Jail at the request of your lawyer?

Skalnik:     That's correct, sir.

Koch:        And that [sic] of those near thirty defendants that you have provided information on several of those were charged with murder in the first degree, correct?

Skalnik:     That's correct, sir.

Koch:        Mr. Skalnik, the charges that you are in on involve among other things you masquerading as a lawyer, it that correct, sir?

Skalnik:     No, sir, I'm not in on charges at this time of masquerading of [sic] a lawyer.

Koch:        There was a charge in the past, though, that you were involved in that and that involved you masquerading as a lawyer, is that correct, sir?

Skalnik:     That's correct, sir.

Koch:        Telling someone you were a lawyer when, in fact, you were not?

State:       I'm going to objection [sic].   I believe that's improper impeachment.

Court:       Overruled.

Koch:        Mr. Skalnik, you enjoy people thinking that you are something that you are not?

Skalnik:     No, sir, that's not true.

Koch:        No further questions.

(Dkt. 10, Ex. A11, pp. 1455-58).

On re-direct examination, the State elicited from Skalnik that he received nothing in exchange for his testimony and that his sentence could not be reduced as a result of his testimony (Dkt. 10, Ex. A11, pp. 1458-59).  Contrary to Petitioner's assertion, Koch's cross-examination of Skalnik apprised the jury of Skalnik's background as an informant and his potential bias. Petitioner's contention that further questioning about Skalnik's cooperation in other cases against other defendants would have caused the jury to "have been skeptical of [Skalnik's] motivations" is at best, speculative, and certainly does not establish that Koch's performance was deficient or that any deficiencies in his performance prejudiced Petitioner.

Through his cross examination of Skalnik, Koch exposed relevant facts from which the jury could evaluate Skalnik's credibility and thereby created a sufficient evidentiary basis from which to argue that Skalnik's testimony was unreliable. "The sixth amendment confrontation clause is satisfied where sufficient information is elicited from the witness from which the jury can adequately gauge the witnesses' credibility." *United States v. Burke*, 738 F.2d 1225, 1227 (11th Cir. 1984) (citing *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)).

Cross examination of an adverse witness is inherently a matter of trial strategy.  Limiting the scope of cross examination of an adverse witness, particularly one like Skalnik, can be sound trial strategy.  Planting a single seed of doubt about a witness's credibility, rather than plowing the field with repetitive and cumulative cross examination, can certainly be as effective, if not more effective. Controlling and restricting the opportunity for a cooperating witness to repeat damaging testimony and explain away any inference of bias is surely within the range of reasonable trial strategy. "Considering the realities of the courtroom, more is not always better.  Stacking defenses can hurt

a case. Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Chandler v. United States,* 218 F. 3d at 1319.

While Koch could have brought out more details about Skalnik's relationship with law enforcement, that is not to say that Koch's cross examination of Skalnik was less than meaningful or that his strategy was unreasonable. In Koch's words, he did not hold back in his questioning of Skalnik: "As I recall, in fact, . . . I went after Mr. Scallonik [sic]." Like his decision to limit his cross examination of Skalnik during the suppression hearing, it is apparent that Koch purposely narrowed his cross examination of Skalnik during the penalty phase in an attempt to be effective. Under *Strickland,* Petitioner cannot establish that Koch's alleged deficient performance prejudiced him merely by showing that the avenue chosen by Koch proved to be unsuccessful:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992); *accord Chandler v. United States*, 218 F.3d at 1313 ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'")(quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Petitioner fails to demonstrate that Koch's performance was outside the bounds of reasonable professional judgment. *Chandler v. United States*, 218 F.3d at 1314 (counsel is not deemed incompetent for performing in a particular way as long as the approach taken "might be considered sound trial strategy") (quoting *Darden v. Wainwright*, 477 U.S. 168, 186 (1986)). The state court

applied the appropriate test under *Strickland* to this claim of ineffective assistance and made a reasonable determination of the relevant facts bearing on Koch's performance.  Petitioner fails to meet his burden of establishing that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts.  *See* 28 U.S.C. § 2254(d)(1), (2).

## GROUND A(c) and GROUND E

In Ground A(c), Petitioner contends that his attorneys were ineffective in failing to ensure that Petitioner received a thorough and reliable mental health evaluation before trial and failing to provide the defense's mental health professional with adequate information to properly evaluate Petitioner's mental health.  In Ground E, Petitioner alleges a substantive claim that he was denied his right to an independent, competent mental health expert.[18]  Following an evidentiary hearing on Petitioner's Amended Rule 3.850 motion, the state court denied these claims:

> Next, Defendant claims that he was denied a competent mental health evaluation under the standards announced in <u>Ake v. Oklahoma</u>, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).  <u>Ake</u> requires that a defendant whose competency is in issue has access to a "competent psychiatrist [mental health expert] who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."  <u>Id.</u> at 83, 105 S.Ct. 1087 (noting that "[a] defendant's medical condition is not necessarily at issue in every criminal proceeding."); <u>see also</u> <u>Hoskins v. State</u>, 702 So. 2d 202, 209 (Fla. 1997).  Defendant also claims that trial counsel rendered ineffective assistance for failing to ensure that Defendant received a competent mental health evaluation.  The Court finds that the testimony adduced at the evidentiary hearing conclusively refutes this claim, such that Defendant has failed to show deficient performance.
>
> First, the testimony establishes that trial counsel remembered Defendant to be fully alert at the time of trial, and that Defendant was specifically and repeatedly informed about the gravity of the charges.  Second, the testimony reflects that trial counsel

---

[18]  Respondent contends that Grounds A(c) and E remain unexhausted and procedurally barred because Petitioner failed to present these claims on appeal of the denial of his state post-conviction motion.  Petitioner challenges Respondent's contention, alleging that he properly presented these claims in his appeal.  A review of Petitioner's brief on appeal of the denial of his Amended Rule 3.850 motion shows that Petitioner presented these grounds to the Florida Supreme Court.  Consequently, the grounds are exhausted and are reviewed on the merits.

specifically retained Dr. Sidney Merin, Ph.D., a clinical and neuropsychologist, for several reasons, not the least of which was to determine Defendant's competency and soundness of mind. The testimony reflects the following, which was in the context of showing that Defendant's statements to Skalnik, the jailhouse informant, were similar if not identical to the statements he made to Dr. Merin:

> State:      But the problem was, wasn't it, that in this particular case the things that he [Skalnik] told law enforcement were verified by your own mental health expert, right?
>
> Ky Koch:    Yes, sir.
>
> State:      And that was Dr. Merin?
>
> Ky Koch:    Yes, sir.
>
> State:      By the way, at that time, if not today, I certainly wouldn't argue not today. But at that time, Dr. Merin was the top mental health expert in this area, wasn't he?
>
> Ky Koch:    In my opinion.
>            . . .
> State:      Okay. Thanks. And although you only remember one at this point, was there any question in your mind that he understood what the judge was saying and was able to communicate with the judge and make that decision?
>
> Ky Koch:    I have no reason to believe otherwise.
>
> State:      You had Dr. Merin take a look at this fellow. Did you have him look at him for all the possible issues, perhaps we use the word globally?
>
> Ky Koch:    Yes, sir. I remember for certain that we were looking at Dr. Merin to provide us assistance perhaps on the insanity defense, perhaps as competency to stand trial. And certainly at a minimum to assist us in the penalty phase if we were to get there.

Third, the testimony and the record establishes that Dr. Merin, who again testified on behalf of Defendant during the penalty phase and at the sentencing hearing on March 14, 1984, examined Defendant for purposes of a clinical evaluation on December 7-8, 1983, which was after a battery of psychological tests (i.e., six tests) were administered to Defendant. In terms of his diagnosis, Dr. Merin specifically testified at the hearing that his original diagnosis, which was conveyed to the judge at the sentencing hearing, remained unchanged - that is, he found that Defendant suffered from antisocial personality disorder, borderline personality disorder, substance abuse disorder, and isolated explosive disorder (no longer separate diagnosis in Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) but currently subsumed within antisocial personality disorder). Although Dr. Merin testified that, based on

information later discovered, his opinion regarding premeditation had changed somewhat, he unequivocally stated that his conclusions given during the penalty phase and the sentencing hearing regarding differentiation - that Defendant did not suffer from any substantive neurological impairment that would interfere with his ability to discern right from wrong - were accurate and were confirmed by a review of information later discovered. Dr. Merin testified that although some of the Pinellas County Jail records indicated that Defendant exhibited certain self-harming thoughts, Defendant did not subscribe to suicidal ideations because Defendant believed suicide to be morally wrong. Dr. Merin also testified that he found the allegation concerning a specific suicide attempt to be unfounded and unproven.

Dr. Merin testified that he formed his opinions and diagnosis based on his interviews with Defendant, the self-report forms, the psychological tests, and the other information he had available to him, which included Defendant's traumatic childhood history (i.e., physical abuse), substance abuse (alcohol), lack of education, and criminal history. Dr. Merin then countered Dr. Fisher's testimony - Dr. Brad Fisher was CCRC's forensic psychological expert hired for purposes of postconviction relief - by stating that he did not believe Defendant suffered from either dependent personality disorder or organic brain damage, and by admitting that he and Dr. Fisher disagree as to the suitableness of long-term rehabilitation for Defendant. Dr. Merin concluded his testimony by testifying that none of the new information he had received would have changed his original opinions and diagnosis.

The claims raised at present bear remarkable similarity to those raised in Johnson v. State, 769 So. 2d 990 (Fla. 2000). In Johnson, the defendant argued that he was denied a competent mental health evaluation under the standards announced in Ake. See id. at 1004. The defendant also argued that trial counsel was ineffective in failing to ensure an adequate and competent mental health evaluation. See id. In Johnson, Dr. Brad Fisher, retained by CCR and appearing on behalf of the defendant, testified at the postconviction evidentiary hearing that the defendant suffered from organic brain damage and could not differentiate between right and wrong. See Johnson, 769 So. 2d at 1003. The trial court denied the claim on the basis that the defendant was competently evaluated by trained mental health professionals, and on the basis that a finding that the defendant did suffer from organic brain damage was not of such import that it would have changed the jury's verdict or recommendation. See id. at 1005. In affirming the trial court on this point, the Supreme Court held the defendant failed to show any deficiency in the experts' examinations or on the part of counsel in hiring or providing information to these experts. See id.

The Court finds the same to be true here. Defendant has failed to show that Dr. Merin was negligent in his professional capacity, or that his psychological testing and assessment was lacking or fell below comparable testing performed by other mental health professionals at the time. Additionally, the State was correct in its closing argument when it observed that Dr. Fisher abandoned much of his report at the

evidentiary hearing - if not directly, he did so by his failure to reiterate or inform the Court of his findings and how they proved inconsistent with Dr. Merin's findings.

(Dkt. 10, Ex. D15, pp. 2259-62) (emphasis in original).

The Florida Supreme Court affirmed:

Cooper also takes issue with his trial counsels' failure to present evidence during the penalty phase regarding his mental state at the time of his crimes.  In support of the claim that his counsels' performance was constitutionally inadequate, Cooper presented the testimony of Dr. Brad Fisher below, who testified that Cooper suffered from a dependent personality disorder and organic brain damage which could have interfered with his ability to discern right from wrong.  Cooper contends that presentation of this evidence at trial could have been very persuasive, and his attorneys' failure to introduce the information constitutes ineffective assistance.

The record reflects that before Cooper's trial, his attorneys arranged an examination and evaluation by Dr. Sidney Merin, who administered a battery of psychological tests and concluded that Cooper suffered from an antisocial personality disorder, a borderline personality disorder, a substance abuse disorder, and an isolated explosive disorder-none of which would have affected his ability to differentiate between right and wrong at the time of his crimes.  Trial counsels' decision not to present Dr. Merin as a mitigation witness, because his conclusions regarding Cooper's culpability were potentially damaging, is precisely the type of strategic decision which *Strickland* protects from subsequent appellate scrutiny.  The issue before us is not "what present counsel or this Court might now view as the best strategy, but rather whether the strategy was within the broad range of discretion afforded to counsel actually responsible for the defense," *Occhicone v. State,* 768 So. 2d 1037, 1049 (Fla.2000); therefore, the attack upon trial counsels' performance on this basis fails. [FN5]

> FN5.  In connection with this ineffectiveness claim, it should be noted that this Court continues to hold that the presentation of testimony during postconviction proceedings of more favorable mental health experts does not automatically establish that the original evaluations were insufficient. *See Carroll v. State,* 815 So. 2d 601, 618 (Fla.2002); *see also Gaskin v. State,* 822 So. 2d 1243, 1250 (Fla.2002) (holding that "counsel's mental health investigation is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert").

*Cooper v. State*, 856 So. 2d at 976.

The record supports the state courts' findings, conclusions and denial of relief. The testimony at the evidentiary hearing conclusively refuted Petitioner's contentions. The Florida Supreme Court's factual findings were not unreasonable and its application of *Strickland* was not objectively unreasonable.

As to Petitioner's contention that his attorneys failed to ensure that Petitioner received a thorough and reliable mental health evaluation before trial and failed to provide Dr. Merin with adequate information to properly evaluate Petitioner's mental health, the record likewise refutes these contentions. Attorney Koch testified at the state post conviction hearing that they hired Dr. Merin to evaluate Petitioner "for all possible issues" (Dkt. 10, Ex. D7, p. 1061). Attorney Crider, who knew Dr. Merin from his work in other cases when Crider was a prosecutor, met with Dr. Merin at least once, possibly twice, and spoke with him by telephone. Crider recalled that Dr. Merin took a "significant history from Petitioner, was aware of Petitioner's extensive drug and alcohol use from the age of 11 and was aware of Petitioner's psychological history" (Dkt. 10, Ex. D9, pp. 1374-75).

Dr. Merin's testimony during the state post conviction hearing confirms that he conducted a thorough psychological evaluation of Petitioner. He administered a battery of psychological tests and spent two days with Petitioner conducting examinations and interviewing him. He considered Petitioner's self reporting to be "fairly complete, or very inclusive, certainly." He was familiar with Petitioner's background and family history, including the abuse Petitioner suffered at the hand of his father:

> State: Thank you, Your Honor. Dr. Merin, [CCRC] had mentioned a few of the things as far as the background of your involvement in the Cooper case going back to 1983 and he indicated that on March 29, 1983 you had an associate give some testing to Mr. Cooper; is that correct?

Dr. Merin:    Correct.

State:        How many tests were given at that time?

Dr. Merin:    Six.

State:        Six tests, okay.  Did you, yourself, have occasion to review the results of that test?

Dr. Merin:    I reviewed them.

State:        And then he indicated that on December 7, 1983 and December 8, 1983 you actually had a chance to talk to Mr. Cooper; is that correct?

Dr. Merin:    Correct.

State:        Where was that?

Dr. Merin:    That was in the Pinellas County jail.

                            . . .

State:        What about the psychologist examination?  Did you also have the benefit of the psychological testing in this case?

Dr. Merin:    Of course, I had the psychological testing many months before I even saw Mr. Cooper and that, of course, was helpful, as well.

State:        Claim four also makes reference to a cursory self report interview and pro form [sic] and discussion of the opinions gleaned from gross testing.  Do you, in fact, rely upon a cursory self report interview that you found?

Dr. Merin:    I don't think it was cursory.  I thought it was fairly complete, or very inclusive, certainly.  I went into, attempted to go into detail regarding the actual act itself.

State:        Claim four also makes reference to self report not being enough and falling far short of the requisite professional manner of care for a psychologist.

Dr. Merin:    Obviously, I couldn't accept that either. I did psychological examinations and I had an interview with him on two days. I considered what he told me in many respects was pretty credible. I listened to what he said and how he said it, and collated that with his psychological test.

State:          Okay.  Was the effect of collating the things he told you with psychological [sic] test?

Dr. Merin:      I'm sorry?

State:          What was the outcome of collating the things he told you with the psychological tests?

Dr. Merin:      The ultimate findings was [sic] that he was quite capable of reasoning, he was quite capable of thinking. I know there was a later illusion [sic] by Dr. Fisher - - not even an illusion [sic], a statement, that he was boarder [sic] line mentally retarded.

                I had some difficulty accepting that because of the nature of the words he used, Mr. Cooper's words and the syntax, and the fact that we're dealing with an individual who may not have had an academic type of high level of intelligence, but he was certainly street-wise.

State:          The [sic] claim four also makes reference to a lack of background information that you had available to you. Did you have any information from any source about the nature of the defendant's childhood as he was growing up?

Dr. Merin:      Very much so.  I had already indicated or I think I testified to it that he had a horrendous background. I'm sure I alluded to the difficulties ask [sic] the strife and the beatings and the conflict of his father, the nature of his mother's personality, so that all of the information that was gleaned later by another examiner didn't change anything. All it did was describe the events that I already knew in greater detail.

State:          Okay.  And the information you received was from the defendant; is that correct?

Dr. Merin:      That is correct.

State:          Later corroborated by other information received after 1984?[19]

Dr. Merin:      That's correct.

State:          Okay.   Did you also have information about the defendant's education?

_____

[19] Petitioner's sentencing hearing occurred on March 14, 1984.

Dr. Merin:     I got information about that.

State:         Okay.  That was from the defendant prior to 1984; is
               that correct?

Dr. Merin:     That's correct, from Mr. Cooper himself.

State:         Okay.  What did he say about his education?

Dr. Merin:     He, I think, he completed seventh grade.  If not, he
               completed the eighth grade.  He said that he had failed
               every grade which I think was an expansive type of
               statement.   Later I learned that he may have failed
               grades two and six.

               What I concluded from my results and talking with him
               were two things with regard to his education.  One was
               that he probably had a learning disability.  A learning
               disability should not be equated or cannot be equated
               with mental retardation.  That's a whole different area.

               You can be very, very bright and have a learning
               disability, as with Churchill and Tolstoy and Hans
               Christian Anderson.  They had learning disabilities and
               certainly were not dumb.

               The second thing was one of the characteristics, if an
               individual has a learning disability which can have very
               adverse affects in a school type situation, one of the
               best ways of dealing with, of course, if you grow up or
               lived with a family that understands it, that appreciates
               what this all means, he did not live in that type of
               family.  Consequently, there was no evidences [sic] of
               encouragement or opportunities to seek help in reading
               or overcoming the learning disability, so it was two-fold
               [sic] type of thing.

               Consequently, he grew up with a lesser degree of
               formal education, but learned how to live by his wits on
               the street.

State:         Okay.   Did you also have information from the
               defendant about his alcohol and drug abuse?

Dr. Merin:     Yes.  He had indicated that he started to drink about age
               11 or so and that he drank fairly heavily.   It was
               interesting to note too, and this is, of course, comes
               later in the jail reports that, of course, this may refer to
               the fact that he was in jail at the time, but he denied
               street drugs and would drink occasionally.

|  | I'm not sure just when that would apply, but certainly he indicated to me that he drank heavily and used a variety of drugs, street drugs. |
|---|---|
| State: | Okay.  Did he also tell you about had [sic] past criminal activity? |
| Dr. Merin: | Yes.  He indicated that early on he had been arrested on a B&E charge.   He had also been arrested on a disorderly conduct charge.  A petit theft [sic], I asked him how many times he may have taken things from stores and he said 150 times.  He said he wouldn't go into a store without stealing something. |
| State: | Ask him about any kind of psychological or psychiatric treatment in the past? |
| Dr. Merin: | He had some relative to conflicts with his parents had and also relative to his own school work or lack of school work. |
| State: | Okay.  When he talked to you about his background which you described as chaotic and horrendous, was he speaking to you freely and openly about his background? |
| Dr. Merin: | Yes.  He didn't have too much - - too many hesitations about it.   He said his father was a strict and hard-working man.  He always yelled and screamed at me.   If something happened around the house I automatically got the blame for it and most of the time when something happened it would be the fault of himself, and his father he said, quote, he just punched me out.   He'd knock me down and punch me in the - - I'm not sure where this is. |
|  | As a small child, when the father would be angry, he would refer to the defendant in obscene terms and he said quote, he'd beat our ass.  When the mother was around the father was not so abusive and when the defendant, himself, got older, he would run away and let the father yell obscenities or threatened [sic] to be abusive.  We have a very difficult parental relationship with his father. |

(Dkt. 10, Ex. D11, pp. 1652, 1662-68).

This testimony demonstrates that Dr. Merin was intimately familiar with Petitioner's background, including Petitioner's difficult family circumstances.  Petitioner fails to show that any

failure by Koch or Crider to provide Dr. Merin with additional information prevented Dr. Merin from performing a competent evaluation.  Significantly, Petitioner does not argue that additional information would have changed Dr. Merin's opinions.  Rather, Petitioner argues that "[b]ecause counsel did not provide sufficient background information to Dr. Merin, the trial judge did not credit his testimony," citing to the trial judge's sentencing order (Dkt. 18-2, p. 22 (citing Dkt. 10, Ex. D 16, p. 2495)).  Petitioner argues, again citing to the trial judge's sentencing order: "Lacking the critical support of social history information from credible third parties, the judge refused to credit Dr. Merin's testimony as presenting any mitigating factors." (Dkt. 18-2, p. 23 (citing Dkt. 10, Ex. D16, pp. 2495-96)).

Petitioner's argument that the trial judge discredited Dr. Merin's testimony because Petitioner's attorneys did not provide him with sufficient background information and because he lacked support from credible third parties is, at best, pure speculation and at worst, misrepresentative of the sentencing order.  No such causal connection between the information available to Dr. Merin and the trial judge's rejection of his testimony is reflected in the sentencing order.  The trial judge merely found that the mitigating circumstance of domination did not exist and rejected Dr. Merin's opinion that Petitioner was under "substantial domination"of Jason Walton.  The judge recited the evidence which demonstrated that ". . . Defendant thought about the shooting, intended to shoot, shot at least four times and intended to kill before he shot."  He did not comment on or otherwise criticize the information relied on by Dr. Merin.  As the trier of fact, the judge merely rejected Dr. Merin's testimony when considered in light of the other evidence in the case, an inherent prerogative the judge had as the trier of fact.

Petitioner fails to show that Koch or Crider performed deficiently or that he was prejudiced by any alleged deficient performance. Absent a demonstration of deficient performance and prejudice, Petitioner cannot prevail on this ineffective assistance claim. Petitioner fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts. *See* 28 U.S.C. § 2254(d).

In Ground E, Petitioner alleges a substantive claim that he was denied his right to an independent, competent mental health expert. For the reason discussed, the record conclusively refutes this contention. To the extent Petitioner asserts a claim under *Ake v. Oklahoma*, 470 U.S. 68 (1985), as he did in his Amended Rule 3.850 motion, that ground is without merit. *Ake* "requires the petitioner in all but the most unusual circumstances to show that he requested from the trial court something in the way of mental health expert assistance that the trial court refused to give him." *Provenzano v. Singletary*, 148 F.3d 1327, 1333-34 (11th Cir. 1998) (citing *Clisby v. Jones*, 960 F.2d 925, 934 (11th Cir. 1992)). In *Grayson v. Thompson*, 257 F.3d 1194, 1231 (11th Cir. 2001), the Eleventh Circuit rejected a federal habeas petitioner's *Ake* claim and, in discussing *Ake*, noted:

> The Court emphasized that the entitlement to psychiatric assistance exists only in cases where a defendant's mental condition is "seriously in question" and that the State's obligation did not go beyond providing the defense with the assistance of one competent psychiatric expert. Further, the Court found that the states could provide such assistance as they saw fit and that a defendant's constitutional right did not include the authority "to choose a psychiatrist of his personal liking or to receive funds to hire his own."

*Grayson v. Thompson,* 257 F.3d at 1231.(internal citations and quotations omitted)

*Ake's* requirements were met in Petitioner's case. The trial court granted Petitioner's motion for a mental health expert and appointed Dr. Merin. (Dkt. 10, Ex. A1, pp. 27-28, 32). Accordingly, Petitioner and his attorneys were afforded the assistance of a qualified mental health expert who

conducted a thorough psychological evaluation of Petitioner.  Dr. Merin reported no competency

concerns.  Based on Dr. Merin's findings, Petitioner's mental health was not "seriously in question."

Incident to Petitioner's state post conviction proceedings, Petitioner's attorneys engaged Dr.

Brad Fisher to review Dr. Merin's work and evaluate Petitioner.  In 1989, before Petitioner filed his

Amended Rule 3.850 motion, Dr. Fisher examined Petitioner (Dkt. 10, Ex. D3, pp. 342-57).  More

than ten years later, in November 1999, Dr. Fisher testified at the Amended Rule 3.850 hearing (Dkt.

10, Ex. D8, pp. 1228-1305).  Petitioner relies on Dr. Fisher's conclusions in support of his

contention that Dr. Merin's evaluation was less than credible and insufficient under *Ake*.  Dr.

Fisher's testimony does not support Petitioner's *Ake* claim.

According to Dr. Fisher, the testing he conducted was similar to that of Dr. Merin and his

findings were generally consistent with Dr. Merin's, even though Dr. Fisher had access to additional

records, affidavits, depositions and the testimony of the other witnesses at the evidentiary hearing:

> CCRC:     Let me ask you a bit about the testing.  You said that
> wasn't too critical here, but let me ask you a little about
> it anyway, about what you do.
>
> Dr. Fisher:   As I recall, my testing was not that different.  We may
> have - - different doctors do some different tests, but
> both Dr. Marin [sic] and myself gave some objective
> testing, some intellectual - - what's the I.Q. - - testing.
> I don't know if he gave the MMPI or not.

(Dkt. 10, Ex. D8, pp. 1228-32).

According to Dr. Fisher, "we didn't have any schizophrenic or psychotic or anything like

that." *Id*.  He testified that he believed Petitioner was the product of a physically abusive background,

had a dependent personality disorder, would adjust well to incarceration and was likely to have

neurological impairment (Dkt. 10, Ex. D8, pp. 1233-36).  When asked to compare his findings to

Dr. Merin's, Dr. Fisher acknowledged that Dr. Merin was aware of Petitioner's abusive family

history and had expressly addressed Petitioner's "dependency" with respect to the older co-defendant, J.D. Walton.  Dr. Fisher believed that Dr. Merin's perspective on Petitioner's abusive history was limited, because he "didn't have materials from the family."  He disagreed with Dr. Merin's opinion that Petitioner would have difficulties with rehabilitation, but acknowledged that he had the benefit of Petitioner's adjustment to incarceration when he conducted his evaluations. Although Dr. Fisher confirmed that Dr. Merin alluded to both Petitioner's drug abuse and physical beatings and that he understood Dr. Merin to have found "possible" neurological damage, Dr. Fisher "didn't quite understand the language" used by Dr. Merin.  While critical of the history provided to Dr. Merin and finding "deficiencies" in Dr. Merin's work, Dr. Fisher opined that "I don't think it has anything to do with him:"

> Dr. Fisher: I'll just take my four areas quickly.  Abuse, well he spoke to it, but he spoke to it to the extent that he was able to.  He didn't have materials from the family.  He didn't have information from Mr. Palmeroy.  All he had was what Richard had told him.  So he spoke to a chaotic - - and I'm not sure of his exact words, but he knew that the background had had it's difficulties, but he didn't have the data that would define the nature and extent of those difficulties.
>
> He certainly knew that it was not an optimal developmental environment and he spoke to that.  Dependency he spoke to the same way I did.  I think he gave a lot more.  I didn't speak to Richard in depth about the crime itself and apparently Dr. Marin [sic] did.  And the extent to which he did, it confirms it's just another instance of this dependency with JD [Walton] telling him what to do, and he describes that in great detail.
>
> As far as prison adjustment, I think we differ.  I believe he said that he did not - - he thought there would be difficulties with rehabilitation.  Again, I've forgot [sic] his exact wording.  I just plain disagree. I think I've got the advantage now of saying, well, yes, I'm right because he proved it.  But regardless, in 1989, with the data that I had, I had a different opinion.  My opinion is based on what I've said here today.

> As far as brain damage, he speaks to - - his words were
> kind of odd here.  He said it's possible because of both
> the drug abuse and I think he eluded [sic] to the
> physical beatings, and then he said something like that
> this would be connected with the deficit that would
> make other deficits worse or something like that.  I
> didn't quite understand the language, but where he
> didn't say, all right [sic], this person has neurological
> damage, he said that it would be possible and his basis
> [sic] for why it would be possible were similar to mine.
>
> . . .

Essentially, Dr. Fisher was critical not of the work done by Dr. Merin, but rather the history

on which he based his opinions and findings:

> CCRC:      You've already mentioned, do you believe that there
> were some deficiencies in Dr. Marin's [sic] work in this
> case for one reason or another, whether it was his fault
> or an attorney's fault?
>
> Dr. Fisher:  I think there were deficiencies.  I don't think it has
> anything to do with him.  The data that I got was useful
> to me - - critical to me.  You know it's not unusual.  It
> is, in fact, the norm that in a case like this you receive
> data about the family and the background and the - - the
> possibility of whether drugs have been abused, alcohol
> has been abused, and the nature and extent of all that.
>
> I have all that.  It's consistent.  I don't think he did.  I
> think all he had was - - I may be mistaken, but it was
> my understanding that all he had was the self-report
> from Richard and the conversations from his attorneys.

(Dkt. 10, Ex. D8, pp. 1237-39, 1240).

> State:       And I think the abuse is also something that Dr. Marin
> [sic] agrees with, obviously, in referring to his
> deposition and in his hearing testimony; isn't that
> correct?
>
> Dr. Fisher:  Right.  That's correct.
>
> State:       As a matter of fact, Dr. Marin [sic] refers to the
> horrendous background of the Defendant?
>
> Dr. Fisher:  That's probably a better description of it than I
> ventured.

| | |
|---|---|
| State: | Dr. Marin [sic] referred to it as an extremely abusive father. You certainly support that, don't you? |
| Dr. Fisher: | Yes, I do. |
| State: | And Dr. Marin [sic] also referred to his extremely abusive father, physically and verbally? |
| Dr. Fisher: | Yes. |
| State: | That the Defendant grew up in a chaotic and violent background? |
| Dr. Fisher: | Yes. |
| State: | That the Defendant's background was very chaotic, very domineering, authoritarian use [sic] of destructive father? |
| Dr. Fisher: | I would agree with each of those. |
| State: | In his deposition he indicated that the father was always yelling and screaming at the defendant? |
| Dr. Fisher: | Yes. |
| State: | And he also indicated that the Defendant would automatically get the blame for anything that went wrong in the family? |
| Dr. Fisher: | Well, yeah. He wasn't the only one, but he was the most likely target. |
| State: | And Dr. Marin [sic] also testified in his deposition that the Defendant's father would actually punch the Defendant out? |
| Dr. Fisher: | Yes. |
| State: | You also indicated that the father would knock him down and punch him in the face? |
| Dr. Fisher: | Yes. |
| State: | So Dr. Marin [sic] obviously had extensive knowledge of the background of the Defendant as far as physical abuse? |
| Dr. Fisher: | Well, it's unclear to me. It still is my recollection that all he did is talk to Richard, but I may be wrong. That was my recollection. |

. . .

| State: | Now, you also indicated that your other finding - - the second opinion - - was that you found the Defendant had a very dependent disorder? |
|---|---|
| Dr. Fisher: | Yes. |
| State: | And you also indicated that Dr. Marin [sic] spoke that [sic] very eloquently? |
| Dr. Fisher: | Well, he did differently than I did in a sense that my sources were everything from Richard through his family through those that knew him both in Ohio and Arizona, all of that.  And if you, rather than saying eloquently, I would say differently.  He apparently had spoken to Richard in more detail about the case per se or that time, and I didn't, so that he gave that additional perspective of how - - which I thought included a lot of dependent features. |
| State: | I believe you used the term eloquent when you referred to Dr. Marin [sic] having indicated in his deposition over his trial testimony what his findings were in agreement with yours? |
| Dr. Fisher: | I don't mean to say it's eloquent because he agreed with me.  I'm just saying that it was helpful to me to have a different perspective.  Mine was like everything else, but I hadn't talked to him in depth about the crime whereas Dr. Marin [sic] had talked to him in depth about the crime and that sort of punctuated - - in other words, the dependent person that I saw apparently was dependent at the time of the crime as well. |

(Dkt. 10, Ex. D8, pp. 1242, 1249-56).

In sum, Dr. Fisher's testimony does nothing to undermine the reliability of Dr. Merin's methodology or the competence of his evaluation.  Dr. Fisher's opinions are simply that of a second expert, differing in some respects from Dr. Merin's.  Petitioner acknowledges that Dr. Fisher's conclusions were "similar" to Dr. Merin's (Dkt. 18-2, p. 23 ("Dr. Fisher's conclusions, although similar to Dr. Merin's, are credible and persuasive because they are grounded in the substantial evidence of Mr. Cooper's abusive history."); (Dkt. 18-2, p. 24, n. 14 ("Dr. Fisher's opinion does not

differ substantially from Dr. Merin's, but is more convincing because he was provided with adequate information.")).

As the Florida Supreme Court observed in its order affirming the denial of this claim in Petitioner's Amended Rule 3.850 motion, a subsequent diagnosis more favorable to a petitioner does not render unreliable the conclusions of a competent mental health expert available at the time of trial. *Cooper v. State,* 856 So. 2d at 976, n. 5; *see e.g., Davis v. Singletary*, 853 F. Supp. 1492, 1538 (M.D. Fla. 1994) ("[S]ubsequent diagnoses more favorable to Petitioner's current legal status do not render unreliable those supplied at the time of trial.").

Here, Dr. Fisher does not even offer a more favorable diagnosis to Petitioner.  He offers no substantial criticism of Dr. Merin's findings. Dr. Fisher's conclusions about Petitioner's mental health are essentially the same as Dr. Merin's.  Both doctors agreed that Petitioner suffered from "horrendous" childhood physical abuse, drug abuse and had a dependent personality.  That Dr. Fisher's evaluation delved into those circumstances in more depth than Dr. Merin does not undermine the reliability or competency of Dr. Merin's findings or his evaluation of Petitioner. Indeed, Dr. Fisher confirmed that all of the additional information available to him corroborated the history Dr. Merin took from Petitioner's "self reporting."

To the extent Petitioner contends that Dr. Fisher's testimony supports his claim that counsel failed to provide Dr. Merin with sufficient materials to conduct a competent mental health evaluation, it does not.  The record confirms and Dr. Fisher acknowledges that Dr. Merin had extensive and accurate information concerning Petitioner's abusive childhood, drug and alcohol abuse and dependant personality.  Dr. Fisher does not say that the information considered by Dr. Merin prevented him from competently addressing any issues concerning Petitioner's mental health,

including his competency.  Further, Dr. Fisher acknowledges that the information he had access to in 1989 and during the state post conviction proceedings merely confirmed the history relied on by Dr. Merin.  According to Dr. Merin, none of that information would change any of his findings.  It is apparent that Dr. Merin believed that he had a sufficient and reliable history from Petitioner to enable him to make adequate findings.  Any alleged deficiency in counsels' conduct was not, therefore, prejudicial to Petitioner.

Petitioner's sanity was not "seriously in question" after Dr. Merin completed his evaluation of Petitioner.  Petitioner has not shown that the state courts' rejection of his *Ake*/ineffective assistance claim was an objectively unreasonable application of *Strickland*.  As the Supreme Court of Florida observed, the attorneys made a tactical decision not to call Dr. Merin to testify during the jury penalty phase, a factual finding not shown to have been unreasonable. *See Dorsey v. Chapman*, 262 F.3d 1181, 1186 n.4 (11th Cir. 2001) (citing 28 U.S.C. § 2254(e)(1); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991).

Absent a demonstration of deficient performance and prejudice, Petitioner cannot prevail on this claim of ineffective assistance of counsel.  As to Grounds A(c) and E, Petitioner fails to meet his burden of proving that the state court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts. *See* 28 U.S.C. § 2254(d).  Consequently, these claims warrant no federal habeas relief.

## GROUND A(d)

In this claim of ineffective assistance of counsel, Petitioner alleges that his attorneys failed to adequately investigate and present mitigating evidence during his penalty phase.  Specifically, he contends that counsel limited their investigation to interviews of Petitioner and his mother and failed

to contact his siblings, who could have provided compelling testimony of Petitioner's difficult childhood and background.[20]  The sole mitigation witness called by the attorneys was Petitioner's mother, Juanita Kokx.  Petitioner contends that as a result, the jury did not hear of Petitioner's "horrendous" abuse at the hands of his father and brother, Petitioner's tendency to follow dominating authority figures, Petitioner's suicidal tendencies, the impoverished conditions Petitioner lived in as a child, and Petitioner's extensive drug and alcohol abuse beginning at age eleven, none of which his mother testified about. Petitioner argues that although these witnesses were available, counsel failed to contact them.  Petitioner also contends that his attorneys failed to follow-up on leads "that any reasonable attorney would have investigated."  (Dkt. 53).

Petitioner's contentions have merit.  It is apparent, considering the evidence presented during the state court post-conviction hearing, that additional, mitigation evidence was available which was not pursued and developed by Petitioner's attorneys and that their failure was not strategic or reasonable.  Accordingly, the Florida Supreme Court's determination that Petitioner's counsels' penalty phase preparation and decisions were "entirely strategically reasonable" was an unreasonable application of *Strickland*.  Moreover, that determination was premised on clearly erroneous factual findings that (1) a "substantial part" of the evidence was presented, and (2) that it would have been in large part "repetitive" of the mother's testimony.

A.    Deficient performance

The first issue is whether Petitioner's attorneys were reasonably effective in investigating and locating mitigation witnesses for the penalty phase.  In preparing for the penalty phase, Petitioner's

---

[20]    Petitioner also contends that his attorney failed to hire a mitigation specialist.  Petitioner has not demonstrated that this failure fell below standards prevailing at the time of Petitioner's trial.

attorneys had a "duty to conduct a reasonable investigation, including an investigation of the [Petitioner's] background, for possible mitigating evidence." *Dobbs v. Turpin*, 142 F.3d 1383, 1387-88 (11th Cir. 1998). Under *Strickland,* it must be determined whether in light of all the circumstances, the alleged inadequate investigation was outside the wide range of professionally competent assistance.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington,* 466 U.S. at 690-91.

An attorney is not required to investigate every lead. *Id.* at 691 (citing *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir. 1989)). The extent to which an attorney investigates is a matter of informed judgment.[21] A strategic decision to limit the scope of a mitigation investigation can be reasonable, so long as "reasonable professional judgments support the limitations on investigations." *Strickland,* 466 U.S. at 691. What is already known to the attorney and whether what is known would lead a reasonable attorney to investigate further are considerations in determining whether the attorney

---

[21] The reasonableness of defense counsel's investigation is evaluated in light of a defendant's own statements or actions. *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008)("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant"); *Strickland v. Washington*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

Here, there is no suggestion in the record that Petitioner instructed his attorneys not to contact his family members. *See, e.g., Mitchell v. Kemp*, 762 F.2d 886, 889-90 (11th Cir. 1985) (attorney's investigation consisting of speaking with defendant and defendant's father reasonable, where defendant did not provide any information about troubled childhood and told counsel to "leave [his family] out of it.").

acted reasonably. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).   In assessing an attorney's effectiveness during a capital penalty phase, what the attorney did must first be examined, with a strong presumption that what was done was reasonable. *Chandler v. United States,* 218 F.3d at 1319-20.

During the state court post conviction hearing, Petitioner's attorneys were asked what they did to investigate mitigation witnesses and evidence.   According to the attorneys, they spoke extensively with Petitioner and his mother, stressing to Petitioner, according to Koch, "the importance of obtaining witnesses and leads for folks that would appear and testify."  (Dkt. 10, Ex. D7, p. 1036).   They solicited the names of potential mitigation witnesses from Petitioner and his mother.   The attorneys divided the responsibility of contacting these individuals.   They made telephone calls in an attempt to reach these potential witnesses but were largely unsuccessful.   Koch recalled making calls to Texas, Ohio and Arizona.   Crider recalled making calls to Texas.   Neither could recall the names provided.

Petitioner had a transient childhood.   Most of the potential witnesses were therefore "out of state," in Texas, Ohio and Arizona.   The attorneys had a difficult time contacting witnesses, which they discussed with Petitioner and his mother.   Those witnesses whom they were able to reach proved to be, in Koch's words, "dead ends."[22]   According to Crider, he wished they "had the opportunity to have had an investigator with some skill . . .We did what we thought we could and

---

[22]   The irony of this testimony is demonstrated by Crider's reference to "witnesses who would have to be brought in from out-of-town" as one reason supporting  his Motion to Postpone Phase Two.  (Dkt. 10, Ex. A1, p. 85).  Those witnesses were not identified and there was no indication where the witnesses were located.  The motion was denied "without prejudice to renew." (Dkt. 10, Ex. A1, p. 123).  Nothing in the record indicates that the motion was renewed.

gave it our best shot." (Dkt. 10, Ex D9, p. 1357.[23]  They explained to Petitioner the difficulty they were having in finding people, suggesting that he begin attending chapel so that the jail chaplain could be a potential witness. (Dkt. 10, Ex. D7, p. 1037).

Ultimately, other than Dr. Merin, and possibly Petitioner's stepfather, Petitioner and his mother were the only individuals the attorneys spoke with in person in preparing for the penalty phase.  According to Crider:

> The mitigating factors were investigated by us by primarily interviewing, as I recall, Richard and his mother.  And what we attempted to do was develop whatever mitigation that we could by interviewing them, getting names from them, people from them that we could contact to try and develop mitigation. by interviewing the individuals.  And that's primarily how that occurred.  As I recall, Mr. Koch probably had more to do with that than I did.  Although I do recall making telephone calls to try and locate witnesses the [sic] could help us in terms of mitigation at the sentencing phase.

Although Crider opined that in hindsight, "we probably could have done more," he testified that they had no strategic reasons for "not going further," "[j]ust the difficulty of locating these people." (Dkt. 10, Ex. D9, p. 1357).

Ultimately, Koch and Crider called only Petitioner's mother during the jury penalty phase. The possibility of calling the jail chaplain was thwarted because Petitioner had become disruptive and profane. (Dkt. 10, Ex. D7, p. 1054).  As for Dr. Merin, one of the reasons they engaged Dr. Merin was "certainly at a minimum to assist us in the penalty phase if we were to get there." (Dkt. 10, Ex. D7, p. 1061).  They decided not to call Dr. Merin to testify in front of the jury because, among other reasons, Petitioner had admitted to Dr. Merin that he fired four shots, which conflicted

---

[23] Likewise, the irony of this testimony is demonstrated by the Motion for Cost of Investigation filed by Crider, in which he referenced the need "for an investigator to travel to the defendant's hometown in the area of Inverness, Florida."  The motion was granted, authorizing up to $600 for that and "expert witness consultations." (Dkt. 10, Ex. A1, pp. 29, 33).

with what he told police in his confession. (Dkt. 10, Ex. A3, pp. 397-440; Ex. D7, pp. 1061-62; Ex.

D9, p. 1365-6).  According to Crider:

> My judgment was that Dr. Merin's testimony was so damaging that we would
> outweigh any possible benefit that we would receive by putting him on the stand in
> the guilt phase. . . .  We didn't want to put him on for the penalty phase either
> because again, in our view, Dr. Merin's testimony inculpated Richard far more than
> his statements to law enforcement did.  And at that point in my opinion the State
> really hadn't developed the issue of the gun being reloaded, or a plug being removed
> for a gun, or those kinds of things. . . . So I didn't want to open that issue up.

(Dkt. 10, Ex. D9, pp. 1366-67)

Crider explained that Dr. Merin "was our only vehicle" for testimony concerning Petitioner's

background, "with the exception of Richard's mother." (Dkt. 10, Ex. D9, p. 1381).  However, after

they decided not to call Dr. Merin, they did nothing further to develop background mitigation. *Id.*

The attorneys essentially were left with no evidentiary support for their primary mitigation theory,

having done nothing more to develop background mitigation.

According to Crider, "[w]hat we tried to do was paint a picture of a young man who I believe

acted on impulse, acted in the spur of the moment, acted in bad judgment, acted at the direction and

really under the domination of another individual, that being Mr. Walton." (Dkt. 10, Ex. D9, p. 1366.

Consistent with this mitigation strategy, Koch argued that Petitioner acted under the substantial

domination and control of J.D. Walton. *See* Fla. Stat. § 921.141(6)(e); *Id.* at pp. 1599-1600.[24]  Koch

attempted to link what he contended was Walton's domination to Petitioner's background and his

"horrible" family life, urging that what Mrs. Kokx told the jury was "absolutely critical to you from

[sic] this is about Richard Cooper's background, what, what he was like as a kid, what his family

---

[24] The sentencing judge expressly rejected extreme duress and substantial domination of another as a mitigating
factor. (Dkt. 10, Ex. A 2, p. 247).

life like, and it was horrible, it was tragic and its something that none of us have experienced I'm

sure." (Dkt. 10, Ex. A10, p. 1600).

In his argument to the jury, the prosecutor questioned why the defense called only one

mitigation witness. "When their big chance came to establish mitigating circumstances what did you

hear? You heard one witness." (Dkt. 10, Ex. A11, p. 1577). The prosecutor did not stop there:

> Was there any evidence that he was immature, any evidence, any evidence that he
> didn't know what he was doing? No. Of all the people that may have been associated
> with this man, because he is a man, he is an adult and he was an adult at the time of
> the crime, of his brothers and sisters, of all the people he has met in the three states
> he has lived in over the last five years one person came.
>
> . . .
>
> They can come in, they can come in and they can - - they can develop just about
> anything that you might want to hear. And what did you hear? Well, you heard that
> his mother was married to a violent man and that he abused her. What has that got
> to do with the defendant? The suggestion was made, well, gee, the defendant saw all
> this terrible stuff, and and that's unfortunate, but what was the defendant's response
> to it? His mother has made efforts, made efforts to have him live with her. He went
> and lived with his father. That was his choice. Was he so traumatized by anything
> that it would affect his character any way? I don't think so.

 (Dkt. 10, Ex. A11, pp. 1580-82).

In addition to Juanita Kokx' testimony, Petitioner's attorneys introduced a letter written by

Petitioner to his co-defendant McCoy, in which he discussed the crime and referenced his mother,

prayer, faith, and his relationship with McCoy. (Dkt. 10, Ex. A10, pp. 1481-86). The letter had been

mailed but was returned undelivered. Anticipating a defense argument that it demonstrated

Petitioner's remorse, the prosecutor again emphasized that the defense had not called any witnesses

to testify about Petitioner's character:

> Of all the people this guy has probably had contact with, with all the people that
> know him, what do you get? You get a letter that he wrote and it was never received.

Now, that's pretty pathetic. That's how desperate they are for evidence of this guy's character, this little piece of paper, no witnesses, a little piece of paper he wrote.

(Dkt. 10, Ex. A10, p. 1684).

Koch's argument would have been more credible if Petitioner's sister and brother had been called to support his arguments.   Moreover, the prosecutor's argument underscores counsels' deficient mitigation investigation.   The jury heard nothing about the abuse inflicted on Petitioner by his father and brother. Petitioner contends that the testimony of Petitioner's sister and brother would have supported the argument that Petitioner had essentially learned to follow orders given by those with more forceful personalities like his father and brother, because of the abuse he endured.[25]

In the state court post conviction hearing, Petitioner's brother and sister, Donnie Cooper and Peggy Jo Cooper-Chipman, his former girlfriend, Lisa Harville, and his elementary school principal, Ralph Palmeroy, testified.[26]   Petitioner's brother and sister described the beatings and abuse they suffered from Petitioner's father, Philip Cooper.   Both testified that they never experienced any period of calm during which the beatings stopped or subsided.   (Dkt. 10, Ex. D7, pp. 1132, 1170).

---

[25] This is essentially the theory Dr. Merin testified to at sentencing before the state judge. (Dkt. 10, Ex. A3, pp. 400; 402; 403; 405-06).

[26] Donnie Cooper testified that Philip "was a very hard man.  Very strict.  He beat on us a lot" (Dkt. 10, Ex. D7, p. 1116). Donnie testified that Philip "[beat] [Petitioner], punch[ed] him, [kick[ed] him. Putting him up against the wall off his feet like slamming him up against the wall" (Dkt. 10, Ex. D7, p. 1118).  Donnie stated that Philip "threatened to shoot us a couple of times" and that he and Petitioner would run away from home (Dkt. 10, Ex. D7, p. 1119-20). Donnie testified that he would get into fights with Petitioner and that he had punched and burned Petitioner (Dkt. 10, Ex. D7, p. 1123).  Donnie further testified that Petitioner had used drugs (Dkt. 10, Ex. D7, p. 1124) and described Petitioner as "always wanting to kill himself" (Dkt. 10, Ex. D7, p. 1127).
Cooper-Chipman testified that Philip was "very violent" (Dkt. 10, Ex. D7, p. 1161) and beat Petitioner (Dkt. 10, Ex. D7, p. 1163).  Lisa Harville, Petitioner's former girlfriend, testified that she witnessed Donnie beat Petitioner (Dkt. 10, Ex. D8, p. 1188).  Harville testified that she had witnessed Petitioner take drugs in the past (Dkt. 10, Ex. D8, p. 1192).  Harville described Petitioner as "quiet and non-violent" (Dkt. 10, Ex. D8, p. 1196).  Harville also testified that Petitioner called her on the night of the murders and said that he "shot someone" (Dkt. 10, Ex. D8, p. 1206-07).  Harville believed Petitioner was on drugs at the time of the murders (Dkt. 10, Ex. D8, p. 1208).  Ralph Palmeroy, the principal of Petitioner's elementary school, testified that he knew Petitioner was abused (Dkt. 10, Ex. D7, p. 1083) but did not report the abuse to state authorities for fear the abuse would escalate (Dkt. 10, Ex. D7, p. 14).

Both siblings and the former girlfriend, all of whom lived in Ohio at the time, were aware that Petitioner had been arrested and charged with murder. Each of them denied, however, having been contacted by anyone about testifying.[27] They testified that if they had been asked, they would have testified on Petitioner's behalf.

Petitioner's attorneys, by their own admission, relied exclusively on Petitioner and his mother to provide the names of possible mitigation witnesses. There is nothing in the record indicating that Petitioner's attorneys investigated his background independent of Petitioner and his mother. Crider was asked if they had obtained Petitioner's "background records, hospital, school or anything of that nature," to which Crider responded: "I don't know. I don't believe so, but I don't recall." (Dkt. 10, Ex. D9, p. 1355). Conspicuously absent from their testimony during the state court hearing is any explanation as to why they did not contact Petitioner's siblings, whether they attempted to contact them, or if they were contacted, what the results were.[28] Effective representation involves "the independent duty to investigate and prepare." *House v. Balkcom,* 725 F.2d 608, 618 (11th Cir. 1984); *Hardwick v. Crosby,* 320 F.3d 1127, 1162 (11th Cir. 2003).

---

[27] Respondent points out that according to Cooper-Chipman, she did not like Petitioner's mother, she had not stayed in contact with Petitioner and his mother after they moved to Florida, and they probably would not have known where she lived. (Dkt. 9-2; Dkt. 10, Ex. D7, pp. 1176-78). Notwithstanding, Cooper-Chipman was located by Petitioner's post conviction counsel and nothing in the record indicates that Koch and Crider even tried to locate her.

Cooper-Chipman, who lived in Ohio at the time, testified that Petitioner knew where she lived. The first time she was contacted about Petitioner's case, however, was after he had been sentenced. She had been aware that Petitioner had been charged with murder before his trial. According to Cooper-Chipman, she didn't come down for the trial because "[n]o one ever invited us or told us that we could. We were never included in anything." (Dkt. 10, Ex. D7, p. 1176-77).

According to Donnie Cooper, he was aware of his brother's arrest but "[n]obody bothered to involve us in it." He was aware, however, that his stepmother, Kokx, was "at the trial." (Dkt. 10, Ex. D7, pp. 1148-49).

Harville was first contacted in 1989, after Petitioner had been sentenced. According to her, "[n]obody was ever asked to come to testify on Richie's behalf, which the brothers and myself would be more than willing to have come if it would have benefitted Richie in any way, but nobody contacted us." (Dkt. 10, Ex. D8, p. 1197).

[28] Crider was asked if he recalled speaking with any family members other than Petitioner's mother, to which he responded: "Boy, I want to say that I do. But I don't have a specific recollection of that, no." The only people they spoke with to develop the circumstance of Petitioner's life were Petitioner and his mother. (Dkt. 10, Ex. D9, p. 1358).

Although the attorneys limited their penalty phase preparation to their interviews with Petitioner and his mother, they certainly knew from Dr. Merin's evaluation that Petitioner had an extensive history of "horrendous" parental abuse, familial turmoil and mental health issues. That information would have led a reasonable attorney to investigate further. *Williams v. Allen*, 542 F.3d 1326, 1339 (11th Cir. 2008). Other than the difficulties they experienced in reaching potential witnesses, the attorneys offered no explanation for not broadening their mitigation investigation beyond what they learned from Dr. Merin, Petitioner and his mother. Their penalty phase investigation and preparation cannot, therefore, be said to have been "entirely strategically reasonable," as the Florida Supreme Court found.

Based on Koch's penalty phase final argument, it is apparent that one defense mitigation strategy was to convince the jury that because of his violent and abusive father, Petitioner was, at the time of the murders, likely responding to the dominion and control of the older J.D. Walton. However, Petitioner's mother's testimony was the only evidence which ostensibly supported this mitigation strategy. Koch argued to the jury that Petitioner's mother's testimony was "absolutely critical to you from [sic] this is about Richard Cooper's background, what, what he was like as a kid, what his family life like, and it was horrible, it was tragic and its something that none of us have experienced I'm sure." (Dkt. 10, Ex. A10, p. 1600).

Because in Koch's own words Petitioner's background was "critical," it was unreasonable for the attorneys not to have independently developed leads and gathered evidence to support their mitigation theory. At the very least, they should have contacted Petitioner's siblings. Specifically, the brother and sister could have described the abuse inflicted on Petitioner by his father, and how it escalated during his mother's absence, something the mother could not and did not testify about.

Petitioner's sister could have described the physical abuse Petitioner suffered from his brother Donnie after Petitioner's father died, and the influence of the older, stronger Donnie on Petitioner.[29] Additionally, her testimony could have supported the defense theory that Petitioner had a tendency to follow dominating authority figures.  The mother's testimony did not address any of these aspects of Petitioner's background.

Considering the information about Petitioner's difficult life the attorneys gained from Dr. Merin, Petitioner and his mother, a reasonable investigation of those leads "should have included, at a minimum, interviewing other family members who could corroborate any evidence of abuse and speak to the resulting impact on [Petitioner]." *Williams v. Allen*, 542 F.3d at 1340.[30]  The attorneys' failure to conduct a reasonable mitigation investigation beyond what they learned from Petitioner, his mother and Dr. Merin, and their corresponding failure to present the additional mitigation evidence during the penalty phase, resulted in a representation below professional, competent standards.  Specifically, they failed to conduct an investigation which would enable them "to discover *all reasonably available* mitigating evidence." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C)(1989).[31]

---

[29] Cooper-Chipman described how after Philip died, Donnie continued the abusive treatment of Petitioner that his father had inflicted. According to Cooper-Chipman, Donnie beat Petitioner on a daily basis and exercised control over him. (Dkt. 10, Ex. D8, p. 1189, 1191; Ex. D7, p. 1124).  Harville and Cooper-Chipman described Donnie as a "control freak" and Petitioner as a "follower." (Dkt. 10, Ex. D7, pp. 1164, 1190-91).  Donnie admitted that he beat Petitioner, used torture to get Petitioner to do what he wanted him to, on one occasion even burning him with a magnifying glass (Dkt. 10, Ex. D7. pp. 1123, 1124, 1152).  The witnesses also described Petitioner's abuse of alcohol and drugs from age 11, which they characterized as his attempt to escape the abuse. (Dkt. 10, Ex. D7, p. 1146; Ex. D8, pp. 1192, 1202).

[30] In this Circuit, there is no *"per se* rule of ineffective assistance where counsel does not consult family members." *Holladay v. Haley*, 209 F.3d 1243, 1252 (11th Cir. 2000).

[31] The ABA guidelines have long been referred to as standards in assessing the competence of death penalty counsel's performance, including the adequacy of counsel's mitigation investigation.  *See Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003).

(continued...)

**Was the state court's application of *Strickland* unreasonable?**

The state *trial* court, in rejecting this claim of ineffective assistance, did not expressly determine that the mitigation investigation by Petitioner's attorneys was deficient.  Rather, that court assumed that the additional mitigating evidence should have been presented but found that it would have been cumulative and that Petitioner therefore suffered no prejudice:

> Moreover, as explained below, assuming additional evidence should have been offered in mitigation, the Court finds the result would only have been cumulative.
> . . . .
> The Court is not convinced that, assuming without deciding that counsel was deficient in failing to present the nonstatutory mitigating evidence that was proffered, Defendant would have "probably received a life sentence but for counsel's errors."
> . . . .
> In sum, the testimony adduced at the evidentiary hearing from defense witnesses revealed that Defendant suffered physical abuse by his father, lived through an impoverished childhood, had a history of substance abuse, and may have suffered some mental illness.  Much of this testimony, however, is cumulative - certainly, the testimony concerning physical abuse and the impoverished childhood is duplicative of Juanita Kokx's [mother's] testimony. . . .

(Dkt. 10, Ex. D15, pp. 2263-73).

The Florida Supreme Court, applying *Strickland,* affirmed.  It found that counsel's penalty phase preparation and decisions were "entirely strategically reasonable" and that "the introduction of Cooper's additional proffered evidence regarding his unfortunate and abused background does not constitute a 'clear, substantial deficiency [which] so affected the fairness and reliability of the

---

[31](...continued)

Petitioner's trial was held in 1984.  The American Bar Association Standards for Criminal Justice in circulation at the time of Petitioner's trial describes counsel's obligation to conduct an appropriate mitigation investigation:  "The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . Investigation is essential to fulfillment of these functions."  1 ABA Standards for Criminal Justice 4-4.1, commentary, pp. 4-55 (2d ed. 1982).  The codification of the 1989 ABA guidelines reflect those professional standards referred to in *Strickland* as "prevailing professional norms" as "guided" by "American Bar Association standards and the like."  *Hamblin v. Mitchell,* 354 F.3d 482, 487 (6th Cir. 2003), *cert. denied*, 543 U.S. 1009 (2004).

proceeding that confidence in the outcome is undermined.'" *Cooper v. State*, 856 So. 2d at 975-76. That court also found that the additional mitigation evidence "in large part . . . would have been repetitive." *Id*. at 976.

Petitioner argues that the Florida Supreme Court's denial of this claim was both contrary to and an unreasonable application of clearly established federal law.  Because the Florida Supreme Court applied the correct standard under *Strickland*, the issue is whether the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts presented in the state court proceedings. 28 U.S.C. § 2254(d); *See Williams v. Allen*, 542 F.3d 1336.  Where, as here, the state court identifies the correct legal principle from *Strickland*, relief is appropriate if that principle is unreasonably applied to the facts. *Id*.  The "focus is on whether the state court's application of clearly established federal law is objectively unreasonable." *Id*. (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

The Florida Supreme Court's finding that counsel's mitigation investigation was "entirely strategic" was based on an unreasonable determination of the facts and therefore clearly erroneous. To the extent that finding supports that court's ultimate determination that counsel's mitigation investigation was not deficient, that was an objectively unreasonable application of *Strickland*.

Two statements, one in the state trial court's order, and the other in the Florida Supreme Court's opinion, demonstrate that the court's factual finding was erroneous.  First, the state trial court found: "In sum, trial counsel and co-counsel testified that they *thoroughly* investigated and interviewed witnesses, that they spoke on several occasions with Defendant and his mother, and that they obtained names and leads and pursued those leads." (emphasis added).  That finding is

inconsistent with the mitigation investigation described by Koch and Crider themselves and therefore was an unreasonable determination of the facts.[32]  Crider testified:

> The mitigating factors were investigated by us by primarily interviewing, as I recall, Richard and his mother.  And what we attempted to do was to develop whatever mitigation that we could by interviewing them, getting names from them, people from them that we could contact to try and develop mitigation.  And that's primarily how that occurred.  As I recall, Mr. Koch probably had more to do with that than I did.  Although I do recall making telephone calls to try and locate witnesses the [sic] could help us in terms of mitigation at the sentencing phase.
> . . . .
>
> At this point, I can't remember.  I think that I made an attempt to contact a couple of witnesses. . . .I've looked through the notes that I had in our records and really haven't been able to locate anything that refreshed my recollection.  But it seems to me like the - I did make on [sic] or two calls, or try to locate one or two individuals and was unable to do so. . . .
>
> We did what we thought we could and gave it our best shot.

Based on Crider's testimony, Koch and Crider's mitigation investigative was limited to interviewing Petitioner and his mother and attempting to locate witnesses that Petitioner and his mother identified.  Other than the few telephone calls they made trying to reach those individuals, they made no other attempts to independently pursue leads or develop mitigation evidence.  Although the passage of time may have rendered their memories faint, their explanations were nevertheless remarkably weak, raising a strong inference that much more could and should have been done on Petitioner's behalf.[33]  As Crider put it: "I think in hindsight, yeah, we probably could have

---

[32] This finding, to the extent it was implicitly adopted by the Florida Supreme Court as a correct factual finding as opposed to a characterization of counsel's efforts, is presumed to be correct, unless overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Here, the presumption has been overcome.

[33] The attorneys testified during the state court evidentiary hearing in 1999, more than fifteen years after Petitioner's trial in 1984.  When asked what individuals they tried to contact, Crider answered: "At this point I can't remember.  I think that I made an attempt to contact a couple of witnesses.  And I want to say it was in Texas.  And I've looked through the notes that I had in our records and really haven't been able to locate anything that refreshed my recollection." (Dkt. 10, Ex. D9, p. 1356).

done more." (Dkt. 10, Ex. D9, p. 1357).[34]  In sum, the attorneys' description of their investigative efforts does not support the state court's finding that they "thoroughly investigated and interviewed witnesses."

Second, the Florida Supreme Court's finding that Koch's and Crider's preparation for the penalty phase was "entirely strategically reasonable" is not supported by the record evidence.[35]  With respect  to the attorneys' mitigation investigation, that finding was an unreasonable determination of the facts.  As demonstrated by Crider's post conviction hearing testimony, there was nothing strategic about their failure to develop mitigation beyond trying to contact the individuals Petitioner and his mother identified:

> CCRC:      Was there any particular strategic reason for going as
>            far as  you did and not going further?
>
> Crider:    No. No strategic basis for that.  Just the difficulty of locating
>            these people.  As I recall, it's been a long time now. But as
>            I recall, Richard had lived in Ohio, had lived in Texas, then
>            had lived here, and then maybe had moved back to Ohio.  So
>            there was really a great deal of difficulty in developing those
>            types of witnesses or witnesses that could assist us in
>            offering mitigation.

(Dkt. 10, Ex. D9, p. 1357).

---

[34]  This acknowledgment is not dispositive of the claim of ineffective assistance.  *See Harris v. Dugger*, 874 F.2d 756, 761 n.4 (11th Cir. 1989) ("[B]ecause ineffectiveness is a question which we must decide, admissions of deficient performance by attorneys are not decisive.").

[35]  That court found:
"Because we conclude that the preparation of Cooper's attorneys for the penalty phase and their decisions regarding what evidence to present at trial were entirely strategically reasonable, we decline to grant Cooper relief." 856 So. 2d at 975.

Koch confirmed that there was no trial strategy or reason for not investigating beyond trying to contact the individuals identified as potential mitigation witnesses by Petitioner and his mother. (Dkt. 10, Ex. D7, p. 1037).

If, after conducting a sufficient investigation, Koch and Crider had determined to limit their presentation of mitigation evidence, that may have constituted a presumptively reasonable strategy. *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir. 1985), *cert. denied,* 483 U.S. 1026 (1987). However, Koch and Crider did not conduct an adequate mitigation investigation and therefore could not have made an informed strategic decision to limit their mitigation presentation. They simply made a few telephone calls which proved to be unproductive and failed to pursue the logical and reasonable course of investigating Petitioner's life through other available sources, including his siblings. Moreover, as Petitioner notes, they made no effort to obtain hospital, school, or any other background records. (Dkt. 18-2; Dkt. 10, Ex. D7, pp. 1069-70; D9, p. 1355). Their penalty phase preparation, to the extent that their investigation was restricted to what they learned from Petitioner, his mother and Dr. Merin, cannot be considered to have been "entirely strategically reasonable," as the Florida Supreme Court found.

Petitioner relies on *Williams v. Taylor*, 529 U.S. 362 (2000), and *Wiggins v. Smith*, *supra*.[36] In *Williams*, the Supreme Court held that counsel for a defendant in a capital murder case rendered

---

[36] The relevant state court decision is the Florida Supreme Court's opinion rejecting Petitioner's claim of ineffective assistance on June 26, 2003. *Cooper v. State*, *supra*. For purposes of analyzing Petitioner's claims of ineffective assistance, *Wiggins v. Smith*, *supra*, *Williams v. Taylor*, *supra*, and *Rompilla v. Beard*, *supra*, all constitute clearly established federal law under § 2254(d). *Newland v. Hall,* 527 F.3d 1162, 1201 (11th Cir. 2008)("To reiterate briefly, by applying the above principles to *Williams, Wiggins,* and *Rompilla*, we conclude that all three cases constitute clearly established federal law: *Williams,* because it was decided before the relevant state court decision; *Rompilla* and *Wiggins,* because they are 'old rules' under *Teague*.").

ineffective assistance by failing to investigate and present substantial mitigating evidence from extensive state records describing Williams's "nightmarish childhood" and by failing to present evidence that Williams was "borderline mentally retarded." 529 U.S. at 395-96. In *Wiggins*, defense counsel in a capital case minimally investigated his client's background, reviewing only psychiatric test results, a presentence investigation report and state social services records. *Wiggins v. Smith*, 539 U.S. at 523. The Supreme Court found that "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources," and that "[c]ounsel's decision not to expand their investigation beyond the [presentence investigation report and social services records] fell short of [prevailing] professional standards." *Wiggins v. Smith*, 539 U.S. at 524.

Recently, the Eleventh Circuit, citing *Wiggins*, found an attorney's mitigation investigation in a capital case deficient because he failed to broaden the scope of his mitigation investigation beyond interviews of his client, his client's mother and a defense psychologist. *Williams v. Allen,* 542 F. 3d at 1340. Criticizing the attorney's sole reliance on those three informational sources, and noting that there were several members of the defendant's family who were available but who were not contacted, the court found that "[a] reasonable investigation into the leads in this case should have included, at a minimum, interviewing other family members who could corroborate the evidence of abuse and speak to the resulting impact on Williams." *Id.*

Koch and Crider's mitigation investigation was remarkably similar to the investigations found to be deficient in *Wiggins v. Smith* and *Williams v. Allen*. The information relied on by Koch and Crider was, as in *Williams,* essentially limited to three sources, Dr. Merin, Petitioner, and his mother. From these interviews, they obtained leads which they did not pursue. For example, Dr.

Merin's evaluation of Petitioner revealed relevant aspects of Petitioner's childhood.  Specifically, in his testimony before the sentencing judge, Dr. Merin described Petitioner's "horrendous background," Petitioner's "extremely abusive father" and the effect of Petitioner's father's physical and verbal abuse on Petitioner's actions on the night of the murders. ( Dkt. 10, Ex. A3, pp. 402; 403; 405-06). [37]  Dr. Merin described Petitioner's history of alcohol and substance abuse which began at age eleven and his treatment with a psychiatrist at about that same age.  (*Id.* at p. 401).  The information provided by Dr. Merin would have led a reasonable attorney to investigate further.  *See Wiggins v. Smith*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Williams v. Allen*, *supra*.

Accordingly, in light of the information available to them about Petitioner's background and their failure to pursue leads from that information by contacting Petitioner's siblings, their minimal investigation  was inadequate under prevailing professional norms.  Their failure to "expand their investigation 'resulted from inattention, not reasoned strategic judgment.'" *See Wiggins v. Smith*, 539

---

[37]  Dr. Merin testified:

He is capable of reacting to the domination, that is mindlessly reacting to the domination and to the direct emotional commands of a more powerful figure. He then follows in a panic. He is easily suggestible by a fearsome authoritative figure who in his mind is reminiscent of the blind but terror filled years that he had with his abusive father. . . . The incident itself I viewed as a panicked reaction to J.D. Walton's emotional and even hysterical command. . . . It's as though his thinking had already been preprogrammed by his early life conditions and the manner in which he generally grew up. . . .  I considered his behavior at that time was an automatic reaction as though he were instantaneously responding to the angry, to the intimidating and fearsome command earlier in life of his father. (Dkt. 10, Ex. A3, pp. 402; 403; 405-06).

U.S. at 526; *Williams v. Allen*, 542 F.3d at 1340.   Petitioner has satisfied *Strickland's* deficient performance prong.[38]

B.      Prejudice

To obtain relief on Petitioner's claim of ineffective assistance at the penalty phase, he must show in addition to deficient performance that the performance "prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different." *Bolender v. Singletary*, 16 F.3d 1547, 1556-57 (11th Cir. 1994)(citing *Strickland v. Washington*, 466 U.S. at 687); *Williams v. Allen*, 542 F.3d at 1342. Petitioner must show that there is a reasonable probability that the mitigating evidence not presented would have changed the weighing process so that death was not warranted. *Hardwick v. Crosby*, *supra*; *Williams v. Allen*, 542 F.3d at 1342 ("In a case challenging a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'") (quoting *Strickland*, 466 U.S. at 695).

---

[38] Lastly, Petitioner contends that his attorneys erred in not discovering and presenting to the jury that Petitioner "struggled badly in school, or that his IQ was 75, indicating borderline mental retardation "and that the physical abuse Cooper suffered, and his extensive drug use, likely caused neurological difficulties." (Dkt. 53, p. 9). In support, Petitioner relies on the post conviction testimony of Dr. Fisher, who evaluated Petitioner incident to the post conviction proceedings.

The Florida Supreme Court, in rejecting this argument, acknowledged these aspects of Dr. Fisher's testimony but found that his conclusions were nothing more than a more favorable opinion than what Dr. Merin rendered. *Cooper v. State,* 856 So. 2d at 976. Noting that Dr. Merin had concluded that Petitioner "suffered from an antisocial personality disorder, a borderline personality disorder, a substance abuse disorder, and an isolated explosive disorder- none of which would have  affected his ability to differentiate between right and wrong at the time of his crimes," that court found that counsels' decision not to call Dr. Merin to testify before the jury "because his conclusions regarding Cooper's culpability were potentially damaging" was "precisely the type of strategic decision which *Strickland* protects from subsequent appellate scrutiny." *Id.*   This determination was not an unreasonable application of *Strickland* or an unreasonable determination of the facts.

**The Florida Supreme Court applied the correct standard on prejudice.**

Petitioner contends that the Florida Supreme Court imposed  a more demanding prejudice test than *Strickland's*, resulting in a decision "contrary to" clearly established federal law.  This Court disagrees.  Throughout its opinion, and immediately after determining that Petitioner had not established prejudice, the Florida Supreme Court cited *Strickland*.  The court concluded, with respect to the "additional proffered evidence regarding his unfortunate and abused background," that there was no "clear, substantial deficiency [which] so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." *Cooper v. State*, 856 So. 2d at 976 (quoting *Maxwell v. Wainwright,* 490 So. 2d 927, 932 (Fla. 1986)).  This reference to undermining confidence in the outcome is the *Strickland* standard. *See Woodford v. Visciotti,* 537 U.S. 19, 23 (2002) ("'Undermin[ing] confidence in the outcome' is exactly Strickland's description of what is meant by the 'reasonable probability' standard.").

In support of his argument, Petitioner points to that portion of the Florida Supreme Court's opinion which states:

> Although the introduction of the mitigating evidence identified by Cooper might have provided his penalty phase jury with a more extensive picture of his upbringing, Cooper has not shown that this evidence would have *caused* the jury to conclude that "the balance of aggravating and mitigating circumstances did not warrant death." (emphasis added)

*Cooper v. State*, 856 So. 2d at 976.

Notwithstanding the court's reference to causation,  there is nothing in its opinion suggesting that the Florida Supreme Court misinterpreted the *Strickland* standard. *Woodford v. Visciotti*, *supra.* Although, if taken literally, its reference to causation may have been imprecise, it certainly does not evidence a departure from or repudiation of *Strickland's* prejudice standard.  *See Parker v. Sec'y for*

*Dep't of Corrs.,* 331 F.3d 764, 786 (11th Cir. 2003), *cert. denied,* 540 U.S. 1222 (2004) (holding that although the Florida Supreme Court used imprecise language to describe the prejudice prong, it applied the correct prejudice standard where it cited *Strickland,* relied upon the circuit court's reasoning, which included a proper enunciation of the "reasonable probability" standard, and cited the circuit court's conclusion that it "cannot conclude that the jury likely would have been persuaded by such testimony to recommend a sentence other than death").[39]

Finally, Petitioner's contention that the Florida Supreme Court imposed a more demanding prejudice standard on him is inconsistent with the presumption that state courts know and follow the law and the Supreme Court's instruction that "state-court decisions be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. at 24; *Parker v. Sec'y for Dep't of Corrs.,* 331 F.3d at 786 ("[w]e will not presume that a state court misapplied federal law, and absent indication to the contrary will assume that state courts do understand 'clearly established Federal law . . . as determined by the Supreme Court of the United States.'") (quoting *Wright v. Moore,* 278 F.3d 1245, 1256 n.3 (11th

_____

[39] Similarly, the circuit court in Petitioner's case correctly recited *Strickland's* prejudice standard:

The Court is not convinced that, assuming without deciding that counsel was deficient in failing to present the nonstatutory mitigating evidence that was proffered, Defendant would have "probably received a life sentence but for counsel's errors." See Johnson, 769 So. 2d at 1003.

Again, the question presented here is whether, in light of the additional mitigation, it is "reasonably probable, given the nature of the mitigation offered, that this altered picture would have led to the imposition of a life sentence, outweighing the multiple substantial aggravators at issue in this case." (Citation omitted). Based on Defendant's voluntary confessions, which were detailed and very specific, based on the multiple substantial aggravating factors that were found to be present in this case, and based on the mitigating evidence that was presented/argued (young age, remorse, willingness to confess/cooperate), it cannot be said that the presentation of additional nonstatutory mitigating evidence of Defendant's childhood abuse, drug use, impoverished means, or concerning possible mental illness would have outweighed the numerous and serious aggravating factors found to be present in this case.

(Dkt. 10, Ex. D15, pp. 2263-73)

Cir. 2002).  The Florida Supreme Court did not, as Petitioner argues, hold him to a more demanding, outcome determinative test than that announced in *Strickland*.

**The Florida Supreme Court made an unreasonable determination of the facts.**

Petitioner contends that his attorneys' failure to present the testimony of his siblings during the jury penalty phase prejudiced him by precluding the jury from fully considering "a substantial history of abuse . . . and Mr. Cooper's life-long tendency to submit to the domination of others." (Dkt. 18-2, p. 13).  Petitioner contends that but for the unreasonable performance of counsel, the jury would have heard evidence that would have "provided mitigating factors to outweigh the State's aggravating factors, including a history of repeated physical abuse and evidence of substantial domination by another." (Id. at p. 12).

"[W]hen a petitioner contends that the presentation of additional mitigating evidence would have changed the weighing process so that death is not warranted, 'we look at the mitigating circumstance evidence that was not presented, along with that which was, and consider the totality of it against the aggravating circumstances that were found.'" *Hardwick v. Crosby*, 320 F.3d 1127, 1133 (11th Cir. 2003).  In evaluating the prejudice component, the totality of the evidence must be considered.  *Williams v. Allen*, 542 F.3d at 1342 (citing *Strickland v. Washington*, 466 U.S. at 696).

The Florida Supreme Court acknowledged that "[a]lthough the introduction of the mitigating evidence identified by Cooper might have provided his penalty phase jury with a more extensive picture of [Petitioner's] upbringing," it concluded, after noting that "the State persuasively established five aggravating factors at trial," that the evidence would not have changed the jury's weighing process.  That court  summarized the mitigating evidence Petitioner contends his attorneys should have presented and concluded that it would not have changed the weighing process:

Cooper argues that his attorneys should have presented more evidence regarding the unfortunate circumstances in which he was raised. In support of this claim, Cooper presented the testimony of his elementary school principal, two siblings, and a childhood friend during the trial court proceedings. In sum, these witnesses detailed the repetitive physical abuse to which Cooper was subject during his formative years. Specifically, they described a home in which the family was under constant threat of physical violence from Cooper's father, a man who often acted upon his threats in a frightful fashion. Additionally, these witnesses opined that Cooper's negative home life drove him to abuse  alcohol and drugs at a fairly young age.

We conclude that the introduction of Cooper's additional proffered evidence regarding his unfortunate and abused background does not constitute a "clear, substantial deficiency [which] so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." (citation omitted). First, a substantial part of the information regarding Cooper's disadvantaged childhood was presented at Cooper's trial. During Cooper's penalty phase, Cooper's mother testified that Cooper's father was both violent and emotionally abusive to Cooper during his formative years. Thus, in large part, introduction of the evidence proffered below would have been repetitive. Also, the State persuasively established five significant aggravating factors at trial: (1) heinous, atrocious, or cruel; (2) cold, calculated, and premeditated; (3) murder committed to avoid arrest; (4) murder committed for pecuniary gain; and (5) commission of prior violent felonies. See *Cooper*, 492 So.2d 1059. Although the introduction of the mitigating evidence identified by Cooper might have provided his penalty phase jury with a more extensive picture of his upbringing, Cooper has not shown that this evidence would have caused the jury to conclude that "the balance of aggravating and mitigating circumstances did not warrant death." (*Cherry v. State,* 781 So.2d 1040, 1048 (Fla.2000) (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052). Thus, Cooper's claim of ineffective assistance of counsel fails.

*Cooper v. State,* 856 So. 2d at 975-76.

Petitioner contends that the state court's determination was an unreasonable application of *Strickland*. (Dkt. 18-2, p. 12; (Dkt. 53, p. 6).[40]  Specifically, Petitioner challenges the Florida Supreme Court's finding that the mitigating evidence presented during the post conviction hearing was "largely cumulative." (Dkt. 53, p. 6).  In support, Petitioner argues:

> The jury did not hear any evidence that Cooper was physically abused. Instead, Kokx testified at the penalty phase that Cooper's father, Philip Cooper, used corporal punishment, and that while Philip was episodically violent towards her, most of Cooper's childhood was peaceful."

(Dkt. 53, p. 6).

Petitioner also contends that Kokx' "brief trial testimony that Cooper had low self esteem and was not assertive . . . did not begin to give the jury an adequate picture of the enduring effects of Cooper's horrific childhood." (Dkt. 53, p. 8, citing Ex A11, pp. 1477-78).

Petitioner's argument necessarily challenges the reasonableness of the Florida Supreme Court's factual findings that "a substantial part of the information regarding Cooper's disadvantaged childhood was presented at Cooper's trial, . . . and in large part, introduction of the evidence proffered below would have been repetitive." *Cooper v. State*, 856 So. 2d at 976.  Those findings are presumptively correct unless shown to be factually wrong by clear and convincing evidence, an arduous burden for Petitioner to sustain. *See Gore v. Sec'y for Dep't of Corrs.*, 492 F.3d 1273, 1294 (11th Cir. 2007); *Jones v. Walker*, 540 F.3d 1277, 1288 (11th Cir. 2008).  Moreover, to satisfy the prejudice prong under *Strickland,* it is not sufficient for Petitioner to identify evidence that could

---

[40] The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be "objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 75-76 (2003).

have been presented when that evidence is "merely cumulative." *Van Poyck v. Fla. Dep't of Corrs.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).

The Florida Supreme Court's findings that the additional mitigation evidence was "repetitive" and that a "substantial part" of the information regarding Cooper's disadvantaged childhood had been presented through his mother are necessarily predicated on the testimony of Juanita Kokx, as she was the only mitigation witness to testify.  Petitioner has demonstrated, by clear and convincing evidence, that these factual determinations are unreasonable.

First, in her testimony, Kokx described the physical abuse *she* suffered at the hands of Philip, that Petitioner witnessed this abuse, and that Petitioner had low self-esteem.[41]  However, with respect to Philip's abuse of Petitioner, Kokx testified only that Philip: "was very hard on the children and when he did discipline he used a belt [that] left marks on the children," that he was "very much" authoritarian with the children, and that he used profanity towards the children. (Dkt. 10, Ex. A11, pp. 1469, 1471).  Second, Kokx did not testify at all as to Donnie's abuse of Petitioner.  Finally,

---

[41]  During the jury penalty phase, Petitioner's mother  described her husband's violence to which the children were exposed and Petitioner's fear of his father. Kokx separated from Philip three times because of the continued violence, the first time when Petitioner was six years old. She and some of her children, including Petitioner, moved several times.  Petitioner eventually went to live with Philip in Arizona. She described one occasion, after she had reunited with her husband: ". . . then he started becoming violent again and at one time he was, he had seen Richard in town and Richard had ran from him and he became very very angry and he grabbed me and was beating my head on the door and choking me and Richard banged on the door until he finally opened it and I got away from him." (Dkt. 10, Ex. A10, pp. 1471, 1478). When the police tried to arrest Philip, there was a struggle ". . . and Richard was watching all of this and he felt that it was his fault because the father was angry because he had ran from him. He felt like he caused it." *Id*. at p. 1473.  "I feel that he was - - had times when he was afraid of his father, but he loved his father." *Id*. at p. 1473. She described another incident when Philip hit her so hard that she required surgery  and that Petitioner, then thirteen, sat with her while she recovered from the facial surgery. *Id*. at p. 1469.  The children saw Philip kick out a windshield and ridicule their mother.

In 1980, while Petitioner was living with Philip, Philip developed lung cancer and died.  Petitioner was sixteen years old at the time (Dkt. 10, Ex. A11, p. 1474).  Thereafter, Petitioner moved to Florida to live with his mother. She described him as feeling "worthless" and that he "didn't believe in himself" (Dkt. 10, Ex. A11, p. 1474).  When asked how he reacted to "stressful situations or emotional situations," she described him as someone who "seems to hold everything in.  He doesn't come out with his feelings."  She did not believe him to be an "assertive, take charge kind of person." According to his mother, Petitioner never gave her an indication that he was violent or mean. "He was, he was nice to me. He was good to me."  (Dkt. 10, Ex. A10, pp. 1463-1489).

Kokx did not and could not have testified to much of the abuse, as Kokx separated from Philip three times during Petitioner's younger years and did not witness the abuse that occurred during her absences. Petitioner's siblings testified that Philip did not abuse Petitioner as badly when his mother was present. (Dkt. 10, Ex. D31, pp. 2444-45).

In contrast to Kokx' testimony, Cooper-Chipman, Donnie Cooper, and Harville testified as to both Philip's and Donnie's physical abuse of Petitioner. Petitioner's Supplemental Brief describes what was not but could have been presented to the jury:

> (1) Philip, who was a golden glove boxer, punched Cooper and his siblings in the head "all the time," using a hard knot on his right hand where his finger had been cut off, D7/1134-35, 1163; (2) Philip would pick Cooper up and throw him against the family's mobile home, D7/1163; (3) Philip assaulted Cooper and his siblings with boards, switches, and horse whips, D7/1119; (4) Philip banged Cooper's and his siblings heads together, D7/1161, 1163; (5) Philip threw rocks at Cooper and his siblings, and he slammed Cooper against walls and against the outside of the trailer, D7/1118, 1149; (6) Philip forced Cooper and his siblings to bend over, and Philip kicked them on their backsides with the point of his cowboy boots, D7/1161. Cooper and his brothers would scream and beg Philip to stop during these vicious attacks, which caused significant injuries, but Philip did not show any restraint. D7/1119-20, 1123, 1136, 1149-50, 1171; *see also* D8/1236. Philip also threatened even worse atrocities: he told Cooper and Donnie on more than one occasion that he would shoot them. D7/1120.

> Cooper repeatedly ran away to escape his father's horrific abuse. D7/1120-21; *see also* D7/1104. However, Philip kept Cooper and his siblings isolated from friends, neighbors and social networks, so they had no one to turn to. D7/1162-63. Once, Philip scared the Sheriff away when he responded to a call from the children for help. D7/1162.

> Readily available evidence, not presented to the jury, showed that Cooper was also abused by his grandmother and his brother Donnie. D7/1123-24, 1128-29. Donnie picked up where Philip left off after his death, beating Cooper on a daily basis, and even locking Cooper in a closet. D7/1124; D8/1189, 1191, 1233. Donnie also burned Cooper and tortured Cooper to force him to do what Donnie wanted. D7/1123-24, 1151; D3/374-75. Finally, Cooper felt abandoned by Kokx when she did not want to take him with her after she divorced Philip. D7/1171, 1154; D3/391.

> The jury heard none of the available evidence of poverty and deprivation, including the fact that Cooper and his brothers were sometimes so hungry that they ate dog food and drank horses' milk. D7/1090, 1099, 1108, 1135, 1165; D8/1196; D3/391.

(Dkt. 53).

In addition, in her testimony at the state post conviction hearing, Cooper-Chipman described Petitioner and his brother Donnie as "pretty close":

> They got along pretty good. If you didn't do what Donnie would tell you, he'd beat you up. And Donnie's real strong. And he used to beat on all of us. . . .And a lot of times Richie, he mostly drug Richie around and told Richie, you do this or I'll beat you up. And he would. And then we'd tell dad and then dad would beat Donnie. And then Donnie would beat Richie.

According to Donnie, "I beat him and would make him do things I wanted him to do . . . I exercised control over Richie and all my other brothers and sister." (Dkt. 10, Ex D 7, p. 1124).

Kokx's testimony did not include the evidence regarding Philip and Donnie's physical abuse of Petitioner.  As a result, the Florida Supreme Court's finding that "Cooper's mother testified that Cooper's father was both violent and emotionally abusive to Cooper during his formative years" was an inaccurate characterization of Kokx' testimony.  Kokx did not, contrary to what that court found, testify that Petitioner's father was "*both* violent and emotionally abusive to Cooper."  While she described Philip's violence toward her and testified that Petitioner witnessed some of this violence, she did not describe any violence directed toward Petitioner by his father, other than the father's use of a belt to punish the children.[42]

---

[42]  The Florida Supreme Court's finding that "Cooper's mother testified that Cooper's father was both violent and emotionally abusive to Cooper during his formative years" is susceptible to another, equally plausible interpretation. The court could have meant that Kokx testified that Philip was a generally "violent" person who was also "emotionally abusive" to Petitioner. It remains, however, that the testimony of Petitioner's sister and brother could not logically have been "repetitive," as Kokx never testified about any of the physical abuse Petitioner suffered, except with respect to Philip's use of the belt to discipline the children.

Petitioner has shown by clear and convincing evidence that the Florida Supreme Court's finding that a "substantial part" of the mitigation evidence was presented and would have been "repetitive" to Kokx' testimony was factually wrong.  Accordingly, the Florida Supreme Court made an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see Wiggins v. Taylor,* 539 U.S. at 528 (state court's "partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision."); *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (finding unreasonable determination of facts where Georgia Supreme Court erroneously stated that a witness testified to something which she had not).  It follows that the state court's decision on this claim is not entitled to the ordinary AEDPA deference.  *Jones v. Walker*, 540 F.3d at 1288.  This Court must instead conduct a *de novo* review of Petitioner's claim of prejudice. *Wiggins v. Taylor,* 539 U.S. at 531; *Jones v. Walker*, 540 F.3d at 1288 (reviewing waiver of counsel claim *de novo* but finding that state court did not err in denying habeas petition).

### *De novo* consideration of whether counsels' deficient performance prejudiced Petitioner

In determining whether there is a reasonable probability that the additional mitigating evidence "would have changed the weighing process so that death is not warranted," this Court considers the totality of the evidence by weighing the mitigating evidence that was presented, and that which was not presented, "against the aggravating circumstances that were found." *Hardwick v. Crosby*, 320 F.3d at 1133; *Williams v. Allen*, 542 F.3d at 1342.

### 1.    Mitigating evidence

The testimony of the post conviction witnesses regarding Petitioner's life history and abusive background, which will not be repeated here, is relevant to an assessment of Petitioner's moral

culpability, particularly considering his age.  *See Williams v. Allen,* 542 F.3d at 1342.  It is fair to say that the post conviction testimony of Petitioner's witnesses paints a more extensive picture of Petitioner's background than that conveyed by Petitioner's mother.  *See Williams v. Allen*, 542 F.3d at 1342.[43]  The punishment and abuse described by them "far exceeded–in both frequency and severity–the punishments described" by Petitioner's mother.  *Id.*

At the time of the murders, Petitioner was eighteen. Fla. Stat. § 921.141(6)(g).[44]  On the night of the murders, Petitioner called both Lisa Harville and Donnie, crying, remorseful, disoriented, and high on drugs, out of touch with reality (Dkt. 10, Ex. D7, pp. 1124-25, 1146; D8, pp. 1192, 1202-03; Ex. D8, pp. 1193-95, 1205; Ex. D3, p. 377).  At age eleven, Petitioner had begun using drugs.  This evidence arguably supports the statutory mitigating factor of substantial impairment. *See* Fla. Stat. § 921.141(6)(f).  Notwithstanding, Petitioner's confessions to the detectives and the details of the murders he related to them undermines any serious contention that he was substantially impaired at the time of the murders.

When the murders were committed, Petitioner had lived with his mother and step-father in Florida only a short time.  According to his mother, the few friends he had made included his co-defendant, the older J.D. Walton.  During trial, Walton was described as having directed the others to shoot the victims after one of them recognized him.  At sentencing, Dr. Merin testified about

---

[43]  Accordingly, this case is distinguishable from *Marquard v. Sec'y for Dep't of Corrs.,* 429 F.3d 1278, 1307 (11th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006) ("Dr. Krop testified relative to Marquard's history of drug use and childhood abuse and informed the jury as to the effects of this history on Marquard's present state of mind.  The jury thus knew of Marquard's drug addiction, that it began at an early age, and that he had a deprived childhood.  Although other witnesses could have provided more details relative to Marquard's early life, counsel is not required to present cumulative evidence.").

[44]  The sentencing judge expressly rejected Petitioner's age as a mitigating factor. (Dkt. 10, Ex. A2, p. 243).  Unlike the state judge, this Court finds that Petitioner's age, considered with the evidence of his difficult background, is a mitigating circumstance.

Petitioner's "horrendous background," his abusive father, and opined that Petitioner's conduct was "an automatic reaction as though he were instantaneously responding to the angry, to the intimidating and fearsome command earlier in life of his father." (Dkt. 10, Ex. A3, pp. 400; 405-06).[45]

Based on the totality of the mitigation evidence, Petitioner can be fairly characterized at the time of the murders as a young man with low self esteem who was raised in a home environment marked by repeated domestic violence. During his formative years, he endured physical and psychological abuse from his father and brother. An inference that Petitioner was susceptible to being influenced by older, dominant males can reasonably be drawn from this evidence.

## 2.    Aggravating factors

The state sentencing judge followed the jury's recommendation on all three counts, finding five aggravating factors: heinous, atrocious or cruel; cold, calculated and premeditated; murder committed to avoid arrest; murder committed for pecuniary gain; and prior violent felony convictions. Each of these aggravating factors is convincingly supported by the evidence. This was nothing short of a horrific crime, and the evidence of Petitioner's guilt and the cold, calculated and premeditated nature of the murders was overwhelming.

Petitioner and his co-defendants carefully planned the robbery. They traveled from another county at night armed with firearms, intending to rob the victims of money and drugs. All of the perpetrators were masked. The three victims were awakened and forced to lie face down on the floor

---

[45] The state judge found no mitigating circumstances, expressly rejecting Dr. Merin's testimony "as being not reliable and is not believed." (Dkt. 10, Ex. A2, p. 247). "Dr. Merin's testimony nor any other testimony revealed any aspect of the Defendant's character or circumstances of the offense which would offer any mitigation, but merely buttressed the state's contention that an aspect of the Defendant's character was that he was really without remorse." *Id.* at 248.

The state judge understandably rejected Dr. Merin's testimony, as he did not have the benefit of an independent evidentiary foundation for the doctor's opinion. The testimony of Petitioner's brother and sister would have provided that.

with their hands bound behind them with duct tape.  Petitioner locked the eight year old son of one of the victims in a bathroom, his mouth taped and hands tied behind him.  When one of the victims recognized Walton, Walton and Petitioner, drinking beer in the kitchen, agreed that the three men would be killed.  They were executed with shotguns.  Six shots were fired.  There was evidence that each victim was shot with the Savage shotgun Petitioner confessed to having carried and used that night.  Petitioner fired at least four times, shooting all three victims.  He inflicted fatal wounds on Steven Fridella and one of the other two victims.  There was evidence of multiple wounds to two of the victims. (Dkt. 10, Ex. A11. pp. 1556-58; 1587; Ex. A2, p. 244, 246).

Petitioner bragged about the murders to Skalnik and told him that a jury would never impose a death sentence because of his age.  He told Skalnik that when Walton made the decision to kill the victims, his response was "Good."  According to Skalnik, "[t]o him, . . . it was no big deal.  He didn't care one way or the other." (Dkt. 10, Ex. A10, p. 1448-49).

In his confession to Detective Halliday, Petitioner admitting that after he left the house, he returned and shot one of the victims.  According to Halliday, Petitioner described that victim as the "furthest victim from the doorway, the one with the dark hair and facial hair meaning a beard." (Dkt. 10, Ex. A7, p. 925).  This was undoubtedly a reference to Steven Fridella, whose son had been bound and locked in the bathroom by Petitioner, and who had begged for his life before being shot.  During the penalty phase, the jury heard that after the initial shootings, Cooper ran to his car but returned to the house after being told the man he shot was getting up.  Cooper reloaded his shotgun and shot the man again, who was on his knees.  According to Skalnik: "When Cooper was over the man with the boy he said that the man was begging for his life because of his son and he stated that as he shot the -- at the man with his shotgun the man had moved . . . ." (Dkt. 10, Ex. A10, p. 1444).  "He was

getting up and Cooper said he ran back in and put the shotgun up near the base or back of his head

and blew his head off so that he couldn't get up." (*Id*. at p 1446).

3.    *De novo* **weighing of the evidence**

Evidence of Petitioner's difficult childhood, including the constant beatings and abuse

inflicted on Petitioner by his father and brother, certainly would have been relevant to the jury's

assessment of his moral culpability, particularly in light of his age.  *Wiggins*, 539 U.S. at 535

(evidence of defendant's background and character is relevant "because of the belief, long held by

society, that defendants who commit criminal acts that are attributable to a disadvantaged

background . . . may be less culpable than defendants who have no such excuse"); *Williams v. Allen*,

542 F.3d at 1342.  The additional mitigating evidence does not, however, demonstrate a reasonable

probability that the result would have been different.

In cases involving compelling aggravating circumstances, as here, the Eleventh Circuit has

consistently found "that the aggravating circumstances of the crime outweigh any prejudice caused

when a lawyer fails to present mitigating evidence." *Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir.

1998) ("We note that [m]any death penalty cases involve murders that are carefully planned, or

accompanied by torture, rape or kidnapping.") (internal quotations omitted); *see Grayson v.

Thompson*, 257 F.3d 1194, 1228-29 (11th Cir. 2001) ("In light of the horrendous nature of this crime,

we find no reasonable probability that the sentence would have been different if the judge and jury

had possessed detailed information regarding Grayson's history"), *cert. denied,* 536 U.S. 964 (2002);

*Francis v. Dugger*, 908 F.2d 696, 703-04 (11th Cir. 1990) (finding that the failure to present

mitigating evidence of a deprived and abusive childhood did not prejudice capital defendant at trial

for torture-murder of government informant); *Thompson v. Wainwright*, 787 F.2d 1447, 1453 (11th

Cir. 1986) (despite existence of mitigating evidence that was unreasonably ignored by counsel, there was no prejudice because jury's determination was strongly supported by the aggravating circumstances in brutal torture murder); *see also Clisby v. Alabama,* 26 F.3d 1054, 1057 (11th Cir. 1994)("sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder-or, even, a less brutal murder for which there is strong evidence of guilt in fact") (emphasis in original); *Crawford v. Head,* 311 F.3d 1288, 1321 (11th Cir. 2002) (evidence of combat experience, PTSD, alcohol abuse, and disadvantaged childhood would not have outweighed aggravating factors in rape and strangulation of defendant's 29-month-old niece).

Notwithstanding the unsettling nature of the additional mitigation evidence and Petitioner's age at the time of the murders, the totality of the mitigation evidence in this case does not begin to outweigh the compelling aggravating circumstances of the murders.  While the additional mitigating evidence could have had some "conceivable effect" on the jury's weighing of the aggravating and mitigating factors, this is not enough.  *Strickland,* 466 U.S. at 693.  As the state sentencing judge correctly found, "It is clear the Defendant thought about shooting, intended to shoot, shot at least four times and intended to kill before he shot." *Id*. at p. 247.  The evidence supporting this finding outweighs any mitigating aspects of Petitioner's difficult life, his age, and any contention that Petitioner acted under the substantial domination of Jason Walton when he took the life of Steven Fridella.

Considering the overwhelming evidence of Petitioner's guilt and the horrendous facts of the triple murders, there is not a reasonable probability that the result would have been different if the mitigation evidence counsel failed to develop and present had been presented.  Counsels' failure to present the additional evidence of Petitioner's difficult and abusive childhood did not, therefore,

prejudice Petitioner.[46]   Simply put, confidence in the outcome of Petitioner's penalty phase is not undermined. *Strickland*, 466 U.S. at 694.

While Petitioner has satisfied *Strickland's* performance prong, he has not demonstrated prejudice from counsels' deficient performance.   Accordingly, Petitioner is not entitled to relief on his claim of ineffective assistance of counsel presented in Ground A(d).   *Strickland v. Washington*, 466 U.S. at 687 (Unless a defendant makes [a showing of both deficient performance and prejudice], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.").

## Overall performance of counsel

Finally, as to the *guilt* phase, Petitioner has not demonstrated that his attorneys' overall performance was so deficient and prejudicial that confidence in the outcome of Petitioner's trial is undermined.   *See Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) ("It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance.   Since there are countless ways to provide effective assistance in any given case,  unless consideration is given to counsel's overall performance, before and at trial, it will be all too easy for a court, examining counsel's defense after it has proved

---

[46] Although the jury was split in two of its recommendations of death, voting 7-5 in each, its 9-3 vote recommending the death penalty was decisive. *Williams v. Allen,* 542 F.3d at 1343 (finding  that the jury, which voted 9-3 vote in favor of life, "decisively voted against the death penalty . . , [which] weighs heavily in favor of a finding of prejudice.")   Further, this is not a case where the jury heard nothing about Petitioner's difficult background but nonetheless voted for death by such a slim margin that it was probable that the vote would have been different  if the additional mitigation evidence had been presented. *Cf Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991), *cert. denied,* 504 U.S. 943 (1992); *Cave v. Singletary,* 971 F.2d 1513 (11th Cir. 1992); *Wiggins v. Smith, supra* ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.").

unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.") (internal quotations and citations omitted)).

"The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992), *cert. denied,* 514 U.S. 1131 (1995)("We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.").  It is not the quality of Petitioner's lawyers' judgment which is reviewed but rather the reasonableness of their conduct. *Chandler v. United States,* 218 F.3d at 1326 n.41. Moreover, the performance of Petitioner's attorneys is presumptively reasonable, a "heavy burden" to overcome. *Grayson v. Thompson,* 257 F.3d at 1216.  Petitioner must show that his attorneys' errors had more than "some conceivable effect on the outcome of the proceeding." *Id*. at 1225 (citing *Williams v. Taylor*, 529 U.S. at 394).

With respect to the guilt phase of Petitioner's trial, Petitioner challenges a number of things his attorneys did or did not do in representing him, as well as the manner in which they performed. Essentially everything from their cross examination during the pre-trial suppression hearing to their final argument at trial has been scrutinized and criticized.[47]  Other than the mitigation investigation, those challenges largely consist of hindsight criticism of the manner in which Petitioner's attorneys

---

[47] Counsel's closing argument did not render the proceeding fundamentally unfair.  Petitioner had been convicted of a triple murder motivated by robbery, in which the three victims were bound and executed.  He had confessed and was heard bragging about the murders.  Given these facts, counsel was in an untenable position of trying to convince the jury to recommend life rather than death and convincing a seasoned trial judge to override the jury's recommendation of death.  Under these circumstances, counsel could hardly make a credible argument seeking mercy without acknowledging the harsh realities of the crime, the culpability of his client, and the necessity of punishing Petitioner.  Stressing that his client should be punished but reminding the jury of what his client would never get to experience if sentenced to life in prison was not an unreasonable approach under the circumstances.  Regardless, it not appropriate to "grade counsel's performance," an "admonition [which] seems particularly compelling in the case of closing argument, an inherently subjective task." *Thompson v. Wainwright,* 787 F.2d 1447, 1455 (11th Cir. 1986).

performed, rather than demonstrating that their performance was unreasonable.  Such an approach

is unavailing.  Perfection is not constitutionally required.  While in retrospect, shortcomings in an

attorney's performance may always be identified, "showing what 'might have been' proves that

nothing is clearer than hindsight-except perhaps the rule that we will not judge trial counsel's

performance through hindsight." *Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir. 1995), *cert.*

*denied,* 516 U.S. 856 (1995).

"[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose

result is being challenged." *Strickland,* 466 U.S. at 696.  The guilt phase of Petitioner's trial has not

been shown to have been fundamentally unfair as a result of counsel's performance.[48]  There was no

breakdown in the adversarial process.  The guilty verdicts are just and reliable.  Confidence in the

outcome is not undermined as a result of counsel's overall performance.

### GROUND A(e)

In this ineffective assistance of counsel claim, Petitioner contends that both of his attorneys

had conflicts of interest which they failed to disclose to the trial court.  Petitioner first points out that

Crider was a prosecutor with the State Attorney's office at the time of the murders.  Second,

Petitioner points to Koch's prior representation of Skalnik, who was the State's only penalty phase

witness.  The state trial court rejected these claims when it denied Petitioner's Amended Rule 3.850

motion.

The defendant claims he was denied effective assistance of counsel for the following
reasons:

---

[48] To the extent Petitioner implicitly argues that the cumulative effect of counsels' alleged errors should be considered in determining *Strickland's* prejudice prong, that suggestion is unpersuasive.  First, it does not appear that Petitioner made this argument to the state courts.  Second, Petitioner cites no authority holding that a showing of prejudice may be made based on a series of errors, none of which individually would meet *Strickland's* prejudice prong.  Indeed, there is authority to the contrary.  *See Middleton v. Roper,* 455 F.3d 838, 851 (8th Cir. 2006).

That the trial court failed to inquire into the possibility that one of his trial counsel had a conflict of interest, and because of the undetected conflict the trial counsel was ineffective.  The alleged conflict is that one of the defendant's trial counsel was a member of the State Attorney's office at the time of the crime and its subsequent investigation.  The record refutes the defendant's claim that the court did not inquire into the potential conflict.  At a pre-trial hearing on May 27, 1983, the alleged conflict of interest issue was raised before the court.  An inquiry was made into the trial counsel's possible involvement with the case while a member of the State Attorney's office.   On page 317-8 of the record, as cited by the defendant, trial counsel responded as follows:

> I have already looked into that prior to being appointed to this case.
> I'll just state for the record that I had no knowledge of the facts of this
> case and had no knowledge of the investigation.  I was not involved
> in the investigation and had no part in the facts surrounding that.
> Also prior to taking the appointment in this case, I called the State
> Attorney's Office, spoke with Mr. Hart, who was handling the
> investigation at that time and reaffirmed with him that there would be
> no problem with representing this defendant.

Because there was no conflict of interest, there was none to waive, and there was no need for the court to consult with the defendant about a conflict which did not exist.  The court finds this claim is denied because it is conclusively refuted by the record.

(Dkt. 10, Ex. D5, pp. 813-14).

The Florida Supreme Court affirmed:

In his third claim, Cooper asserts that his trial attorneys were unable to adequately represent him, due to significant conflicts of interest.  To establish an ineffectiveness claim premised on an alleged conflict of interest, Cooper must establish that an actual conflict of interest adversely affected his lawyer's performance.  A lawyer suffers from an actual conflict of interest when he or she actively represents conflicting interests.  To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised.  A possible, speculative, or merely hypothetical conflict is insufficient to impugn a criminal conviction.  *Hunter v. State*, 817 So. 2d 786, 791-92 (Fla. 2002) (citations and quotation marks omitted).  A review of the facts contained in the record before this Court reveals no actual conflict, and we conclude that Cooper's assertions amount to no more than the speculation deemed insufficient in *Hunter.*

The first of Cooper's trial attorneys, Ronnie Crider, had, prior to his representation of Cooper, been employed as a deputy sheriff and as a prosecutor with the Sixth Circuit State Attorney's Office.  Although Crider had some interaction with law

enforcement officers who eventually participated in the investigation of Cooper's crimes while a sheriff's deputy, and was an employee of the State Attorney's Office during the investigation of the instant case, Crider never had any actual or substantive connection with the investigation or prosecution of Cooper. Nothing before this Court suggests that Crider's interests were compromised at trial, and Cooper's claim that Crider suffered from a conflict of interest is entirely hypothetical.

With regard to Cooper's second trial counsel, Ky Koch, Cooper contends that Koch's prior representation of Skalnik during a sentence reconsideration hearing constitutes a specific, prejudicial conflict of interest because Koch was dedicated to protecting Skalnik, and thus could not zealously represent Cooper at trial. The record reflects that Koch's brief representation of Skalnik did not prejudice Cooper's case. Koch aggressively cross-examined Skalnik, eliciting testimony which severely damaged the witness's credibility. [FN4] Additionally, Koch's testimony during the proceeding below reveals that Cooper was informed of his attorney's prior representation of Skalnik, and decided to proceed with Koch as his attorney without objection. Both of Cooper's claims asserting that his trial attorneys were laboring under actionable conflicts of interest are without merit.

> FN4. As our review of the record on appeal causes us to conclude that Koch's pretrial investigation and cross-examination of Skalnik at trial were both adequate and effective, Cooper's allegations of ineffective assistance of counsel impugning his attorney's method of addressing Skalnik's testimony must fail. *See Valle v. State,* 778 So. 2d 960, 965 (Fla. 2001) (noting that to prevail on an ineffectiveness claim, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment").

*Cooper v. State*, 856 So. 2d at 974-75.

Petitioner contends that the standard in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), governs resolution of this ineffective assistance claim. In *Sullivan*, the United States Supreme Court held that prejudice is presumed for purposes of an ineffective assistance claim based on a conflict of interest if a defendant demonstrates "that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland v. Washington*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan,* 446 U.S. at 350). The United States Supreme Court has noted that the "Courts of Appeals . . . have applied *Sullivan* 'unblinkingly' to 'all kinds of alleged

attorney ethical conflicts,'" including conflicts based on counsel's obligation to a former client. *Mickens v. Taylor*, 535 U.S. 162, 174 (2002) (quoting *Beets v. Scott*, 65 F.3d 1258, 1266 (5th Cir. 1995)). However, *Mickens* noted that *Sullivan* applies in cases of multiple concurrent representation.

Koch's prior representation of Skalnik, unlike *Sullivan*, is a case of successive rather than concurrent representation.[49] Whether the rationale of *Sullivan* applies to successive representation remains unanswered. *Mickens v. Taylor*, 535 U.S. at 176 ("Whether *Sullivan* should be extended to [cases of successive representation] remains, as far as the jurisprudence of this Court is concerned, an open question."); *see also Gillard v. Mitchell*, 445 F.3d 883, 891 (6th Cir. 2006) ("Because the Supreme Court has not held that successive representation gives rise to a presumption of prejudice, the *Sullivan* presumption does not control this habeas case"). As this question remains open, Petitioner's conflict of interest claim will be addressed under *Sullivan* as well as *Strickland*. *See e.g., Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006) (reviewing denial of federal habeas relief on conflict of interest claim under both *Sullivan* and *Strickland*); *Quince v. Crosby*, 360 F.3d 1259 (11th Cir. 2004) (holding federal habeas petitioner failed to establish that he received ineffective assistance of counsel under either *Sullivan* or *Strickland*).

A.      *Sullivan* standard

A criminal defendant is entitled to conflict-free representation. *Cuyler v. Sullivan*, 446 U.S. at 346. "A criminal defendant's right to effective assistance of counsel is violated where the defendant's attorney has an actual conflict of interest that affects the defendant adversely." *United States v. Rodriguez*, 982 F.2d 474, 477 (11th Cir. 1993). "An 'actual conflict' of interest occurs

---

[49] "Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness." *Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003).

when a lawyer has 'inconsistent interests.'" *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir.

1999) (quoting *Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987)).  "To prove that an actual

conflict hindered counsel's performance, petitioner 'must make a factual showing of inconsistent

interests' or point to 'specific instances in the record' to suggest an actual impairment of his

interests." *Id.*  "Prejudice is presumed only if [Petitioner demonstrates that counsel 'actively

represented conflicting interests' and that 'an actual conflict of interest adversely affected his

lawyer's performance.'" *Strickland v. Washington,* 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446

U.S. at 350).

With respect to Attorney Crider, the record shows that Crider alerted the trial court to his

prior employment with the State Attorney's office during a pretrial hearing:

| | |
|---|---|
| Court: | Yes, Mr. Crider, approach the bench please. |
| | (Whereupon, the following side bar conference was held). |
| Court: | You were with the State Attorney's Office when this matter went down, and do you have any problems with conflict of interest? |
| Crider: | No, Your Honor.  I have already looked into that prior to being appointed to this case.  I'll just state for the record that I had no knowledge of the facts of this case and had no knowledge of the investigation.  I was not involved in the investigation and had no part in the facts surrounding that.  Also prior to taking the appointment in this case, I called the State Attorney's Office, spoke with Mr. Hart, who was handling the investigation at that time and reaffirmed with him that there would be no problem with representing this defendant. |
| Crow: | As far as to the extent that the State Attorney's Office would be informed of Mr. Crider's prior legal services, I personally would object to any conflict; we don't feel there is any conflict.  I'm glad you brought it up and made it part of the record. |

(Dkt. 10, Ex. A3, pp. 317-18).[50]

---

[50]  The trial court did not address this matter further (Dkt. 10, Ex. A3, pp. 318-19).

The record refutes Petitioner's contention that Crider failed to alert the trial court of a potential conflict and that Crider had an actual conflict of interest.  Further, there is no showing that Crider's representation of Petitioner and his previous employment with the State Attorney's Office constituted "inconsistent interests."  Crider's affidavit, submitted as part of the Amended Rule 3.850 post-conviction proceedings, demonstrates that he was "not assigned to the High Point murders" and although he was present during a conversation between investigators and the Assistant State Attorney assigned to the case, he did not, when appointed to represent Petitioner, "recall any substance of that conversation."  Moreover, Crider disclosed to Petitioner that he had been employed by the States Attorney's Office.  (Dkt. 10, Ex. D4, p. 707).

Petitioner makes no showing that the Florida Supreme Court misapplied the principles discussed in *Sullivan* in resolving this claim.  Its decision was therefore not "contrary to" established Supreme Court precedent, an unreasonable application of federal law or an unreasonable determination of the facts.

Petitioner's claim with respect to Attorney Koch likewise lacks merit.  It does give pause, however, considering the importance of Skalnik's testimony against Petitioner and Koch's prior, albeit brief, representation of Skalnik.  The Florida Supreme Court found that "Koch's brief representation of Skalnik did not prejudice Cooper's case," pointing to Koch's aggressive cross examination of Skalnik "which severely damaged the witness's credibility." *Cooper v. State*, 856 So. 2d at 975.  Petitioner has not demonstrated that this determination was contrary to established Supreme Court precedent, an unreasonable application of federal law or an unreasonable determination of the facts.

Although there is no indication in the record that Koch's prior representation of Skalnik was brought to the attention of the trial court, the Florida Supreme Court found that "Cooper was informed of his attorney's prior representation of Skalnik, and decided to proceed with Koch as his attorney without objection."[51]  *Cooper v. State*, 856 So. 2d at 975.  Koch's testimony at the post conviction hearing supports that finding:

> CCRC:  All right.  Did you ever discuss the facts of your prior representation of Scallonik [sic] and any of the issues surrounding that with Mr. Cooper?
>
> Koch:  I'm sorry.  Ask the question again.
>
> CCRC:  I let my voice sink.  I'm sorry.  Did you ever discuss your prior representation of Mr. Scallonik [sic] and any of the issues surrounding that fact with Mr. Cooper?
>
> Koch:  Absolutely.
>
> CCRC:  Do you know when and where?
>
> Koch:  As soon as I found out about it.
>
> CCRC:  Do you know what you told him?
>
> Koch:  What I told Richard?
>
> CCRC:  Yes.
>
> Koch:  Everything.
>
> CCRC:  Okay.  What was your understanding of his response?
>
> Koch:  Richard was accepting of it.  Appeared to understand it.  Never objected to my continued representation of him because of it.
>
> CCRC:  Did you ever tell Richard at any point that either your investigation or examination in court of Mr. Scallonik [sic] would be or might be limited because of the prior representation of Mr. Scallonik [sic]?
>
> Koch:  No, sir.

(Dkt. 10, Ex. D7, pp. 1034-35).

---

[51] Petitioner did not testify at the post conviction hearing.  Koch's testimony in this regard is therefore unrebutted.

Petitioner fails to demonstrate that an actual conflict of interest existed or that Koch's prior representation of Skalnik adversely affected his performance. "If a defendant is unable to show an 'actual conflict,' then he is not entitled to relief from his conviction because a 'speculative or merely hypothetical conflict of interest does not yield a Sixth Amendment violation.'" *United States v. Novaton*, 271 F.3d 968, 1011 (11th Cir. 2001) (quoting *Burden v. Zant*, 24 F.3d 1298, 1305 (11th Cir. 1994)). To prove an "actual conflict" in the successive representation context, Petitioner, must show, at a minimum, that Koch's earlier representation of Skalnik was substantially and particularly related to Koch's later representation of Petitioner, or that Koch learned particular confidential information during the prior representation of Skalnik that was relevant to Petitioner's case. *Freund v. Butterworth*, 165 F.3d at 859 (emphasis in original). The actual conflict inquiry is fact-specific, consistent with a petitioner's ultimate burden to prove that his conviction was unconstitutional. *Id.* (internal quotations omitted).

In October 1982, before he was appointed to represent Petitioner, and over two years before Petitioner's trial in 1984, Koch filed a motion for sentence reconsideration on behalf of Skalnik incident to Skalnik's desire to obtain a private investigator's license (Dkt. 10, Ex. D7, p. 1044). This was entirely unrelated to Petitioner's murder charges (Dkt. 10, Ex. D4, p. 712). Moreover, as the state court noted, before the motion was ruled on, Skalnik was charged with violating probation and another attorney took over representation of Skalnik. (Dkt. 10, Ex. D15, pp. 2257-59; Ex. D7, p. 1044).

Petitioner contends that he was prejudiced as a result of Koch's prior representation of Skalnik because Koch limited the scope of his cross examination of Skalnik during the pre-trial suppression hearing to the time period after November 1982, after his representation of Skalnik.

During the post conviction hearing, Koch acknowledged that he restricted his cross-examination of Skalnik, although he could not remember the reason why he did so:

> CCRC: Mr. Scallonik [sic] testified at the penalty phase as we've indicated and you cross-examined him; isn't that correct?
>
> Koch: Yes, sir.
>
> CCRC: Looking back on it, was your cross-examination limited in any way?
>
> Koch: Yes, sir.
>
> CCRC: How so?
>
> Koch: I read through this transcript when you all first contacted me back in 1989 a [sic] couple of times since then. And the questions that I asked to Mr. Scallonik [sic] were predicated upon since [sic] your incarceration in some month in 1982, what have you done to assist the State. And I - - to this date do not recall why I had placed that limiting time frame to the question.
>
> CCRC: The fact that it sticks in your mind after all this time indicates that there was some reason for doing so. It's just as of today you don't remember what it was.
>
> Koch: I can't tell you that there was.
>
> CCRC: Okay. I have a date. Go ahead and request judicial notice. The earliest one I have is State versus Scallonik [sic] of 81-44234CF indicating that at least one of the felony cases against him dates back to 1981. So he was already in the system by that time. When you say there was that limitation with regard to time, you were aware that he had been in the system before then; is that true?
>
> Koch: I assume that to be true. I don't right now recall the date on which I had that limiting phrase in my questions. My recollection is November 1982, but I don't know that to be a fact.

(Dkt. 10, Ex. D7, pp. 1026-30).[52]

---

[52] During the post conviction hearing, Petitioner's counsel erroneously referenced the penalty phase, rather than the suppression hearing, when asking Koch about the limitation on his cross examination of Skalnik. In his questioning of Koch, Respondent's counsel corrected this error (Dkt. 10, Ex. D7, p. 1047). Koch's cross examination of Skalnik during the penalty phase was not limited to a specific time period. (Dkt. 10, Ex. A10, pp. 1456-57).

Petitioner contends that Koch's decision to limit his cross-examination "to the period after [Koch's] representation of Mr. Skalnik ended was based only on his continuing duty of loyalty to his former client and not on any reasonable strategy" (Dkt. 18, Attach. 3, p. 1).[53]  This contention is

---

[53]  Skalnik waived the attorney-client privilege between himself and Koch at his November 18, 1983, deposition:

| | |
|---|---|
| Crider: | How about Mr. Koch.  What relationship have you had with Mr. Koch? |
| Skalnik: | Mr. Koch was my lawyer at one time for a reconsideration hearing and also a client of our investigative firm.  We served subpoenas and did investigation for him. |
| Crider: | Has he ever represented to you [sic] anything other than the reconsideration sentence? |
| Skalnik: | No, sir. |
| Crider: | Okay.  Has the [Assistant State Attorney] explained to you that an attorney-client relationship or privilege exists between you and Mr. Koch concerning any communications that you may have had with him in regard to his representation of you? |
| Skalnik: | Yes, sir.  He explained that to me. |
| Crider: | Do you understand that that privilege is absolute and can only be waived by you? |
| Skalnik: | I understand that. |
| Crider: | Do you have any problem with Mr. Koch representing Mr. Cooper and possibly being in a position to cross-examine you and possibly being in a position adversary to your position in this particular action? |
| Skalnik: | I don't foresee a problem, Mr. Crider. |
| Crider: | Do you understand what I am saying? |
| Skalnik: | Yes, I do. |
| Crider: | Are you willing to waive any confidentiality or any privilege that may exist between you and Mr. Koch? |
| Skalnik: | Yes, sir.  I will. |

(Dkt. 10, Ex. D18, pp. 3-4).

pure speculation.  Koch simply did not recall why he limited his cross examination of Skalnik to a particular time period.  From this record, however, one could infer that Koch did not question Skalnik about his informant activities prior to November 1982 because Koch had represented Skalnik on the motion for reconsideration. *See e.g., Wright v. New York*, No. 9:03-cv-806, 2007 WL 2412248, at *10 (N.D.N.Y. Aug. 21, 2007) (absent evidence to the contrary, it is possible to infer that counsel did not probe his former client about the extent of the client's criminal history because counsel previously represented the client on parole violations).  However, it is just as plausible, considering that the hearing involved an alleged *Henry* violation, that the limitation on cross examination merely reflects Koch's intent to focus on Skalnik's most recent cooperation, logically premised on Petitioner having been placed in a cell adjacent to Skalnik.  Notably, Koch did not limit his cross examination of Skalnik during the jury penalty phase.  Regardless, Petitioner has not shown that he was prejudiced by the limitation.

Koch had investigated Skalnik, had taken Skalnik's pre-trial deposition, and was very much aware of Skalnik's cooperation and informant activities. (Dkt. 10, Ex. D7, pp. 1020, 1024-25).  According to Koch, "Mr. Scallonik [sic] was a snitch." *Id*. at p. 1020.  As demonstrated by the excerpts from the evidentiary hearing cited by the state court in its denial of Petitioner's Amended Rule 3.850 motion, during the suppression hearing, Koch throughly questioned Skalnik on those matters affecting his credibility and his relationship with law enforcement during the time when Skalnik spoke with Petitioner.  Koch's cross examination elicited from Skalnik his prior convictions, the number of cases in which he had provided information to law enforcement since his most recent incarceration, and the circumstances surrounding Petitioner's statements to Skalnik about the murders (Dkt. 10, Ex. A5, pp. 480-96).  The focus of the alleged *Henry* violation was essentially

whether Skalnik had been deliberately placed in Petitioner's cell and directed to elicit incriminating statements. *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). Skalnik's history as an informant may be a relevant consideration, but that certainly would not be determinative of the alleged *Henry* violation. In any event, Koch brought out sufficient facts bearing on Skalnik's informant activities for consideration by the trial judge. Petitioner fails to show that Koch's temporal limitation on his cross examination of Skalnik during the suppression hearing prevented Koch from establishing the necessary evidentiary predicate for his *Henry* contention or that he was otherwise prejudiced.

Petitioner has not established that Koch's brief representation of Skalnik incident to the reconsideration motion substantially and particularly related to Koch's later representation of Petitioner or that Koch actually learned particular confidential information during his representation of Skalnik relevant to Petitioner's murder case. *See Freund v. Butterworth*, 165 F.3d at 859. Absent an actual conflict, the claim warrants no relief. *United States v. Novaton*, 271 F.3d at 1011. The state court's resolution of this claim was neither an unreasonable application of controlling Supreme Court precedent nor an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1).

Even assuming that an actual conflict existed because of Koch's prior representation of Skalnik, Petitioner has not shown that the conflict "adversely affected" Koch's performance. *Freund v. Butterworth,* 165 F.3d at 860 (requiring petitioner to identify plausible alternative strategy, that it was reasonable under the facts, and a link between the actual conflict and the decision to forego the alternative strategy). Petitioner has not persuasively pointed to a plausible alternative strategy or tactic which Koch may have pursued, but for his prior representation of Skalnik.

In its opinion affirming the denial of Petitioner's Rule 3.850 motion, and in particular the denial of Petitioner's contention that his attorneys labored under an actual conflict of interest, the

Florida Supreme Court cited to its earlier decision in *Hunter v. State,* 817 So. 2d 786, 791-92 (Fla. 2002). In *Hunter*, the Florida Supreme Court cited *Sullivan*. Accordingly, that court's decision was not "contrary to" Supreme Court precedent. Neither has Petitioner demonstrated that the court's decision involved an unreasonable application of clearly established law as determined by the Supreme Court of the United States or that the Florida Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, Petitioner fails to meet his burden with respect to this claim.

      B.    <u>*Strickland* standard</u>

Similarly, Petitioner's claim fails under *Strickland*. Even assuming, *arguendo*, that both Crider and Koch performed deficiently, Petitioner fails to establish that a reasonable probability exists that the outcome of either the suppression hearing or the penalty phase of his trial would have been different absent the alleged conflicts. Petitioner has not shown that the Florida Supreme Court's resolution of this claim was "contrary to" or an unreasonable application of *Strickland*, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d). Because Petitioner's claim fails under both *Sullivan* and *Strickland*, the claim warrants no federal habeas relief.

**GROUND A(f) (in part)**

In the remaining allegation of Ground A(f), Petitioner contends that trial counsel rendered ineffective assistance by failing to object to the prosecutor's minimization of the jury's responsibility at sentencing.[54] Petitioner argues that "the jury did not appreciate that its recommendation on

---

[54] Petitioner presents three claims for relief in Ground A(f) of his federal habeas petition. He concedes that the other two claims are procedurally barred. *See supra*, discussion of Ground A(f).

sentenc[ing], while not binding, must be afforded great weight" (Dkt. 1, p. 35).  Petitioner does not

provide any facts, record citations or legal authority to support this argument in either his petition

or reply.  To the extent that this claim asserts a constitutional violation under *Caldwell v. Mississippi*,

472 U.S. 320 (1985), the claim warrants no relief.

 In his Amended Rule 3.850 motion,[55] Petitioner alleged that the prosecutor[56] "misled the jury

on their role in the sentencing process in violation of Florida and constitutional law" (Dkt. 10, Ex.

D2, p. 177).  Petitioner argued that "counsel never objected to the comments of the prosecutor on

*voir dire* and during closing, or to the Court's instructions which essentially and fundamentally

misstated the *Tedder v. State*, 322 So. 2d 908, 910 (Fla. 1975) rule.  The result was to minimize the

jury's role" (Dkt. 10, Ex. D2, p. 177).

 In his Amended Rule 3.850 motion, Petitioner relied upon the following statements by the

prosecutor during *voir dire* to support his arguments:

> In that separate phase you would hear perhaps additional or different evidence and
> reach a recommendation to make to Judge Walker as to whether the death penalty
> should be applied or whether life imprisonment should be applied.
> . . .
>
> The Judge will tell you in Florida there are certain circumstances that you have to
> consider in making that decision, the aggravating circumstances the State can present
> evidence about, mitigating circumstances that the defense can present evidence
> about, and you weigh those two to make a determination which is merely a
> recommendation.  The final decision is made by Judge Walker.  Your verdict is an

---

[55]  Petitioner presented his *Caldwell* ineffective assistance argument in claim V of his Amended Rule 3.850 motion (Dkt. 10, Ex. D2, pp. 177-80).  Petitioner also presented additional allegations about statements made by the prosecutor in a separate argument of trial court error under *Caldwell* in claim XV of his Amended Rule 3.850 motion (Dkt. 10, Ex. D2, p. 309).  Petitioner's claim in his federal habeas petition appears to consist of a combination of claims V and XV of his Amended  Rule 3.850 motion, and the relevant portions of each of those claims are discussed here.

[56]  In his Amended Rule 3.850 motion, Petitioner argued that both the prosecutor and the trial court committed error under *Caldwell*.  Petitioner presents this claim only as to the prosecutor in his federal habeas petition.

advisory recommendation to him.  So, you - - do you think you would have any difficulty making that kind of decision?

. . .

Well, what the Judge will instruct you, at least what I believe he will instruct you, and as far as the defendant is that you are to just look at the aggravating circumstances that he tells you might apply, the mitigating circumstances and you are to weigh the aggravating against the mitigating and make a recommendation for whether the death penalty is appropriate or a life sentence is appropriate.

. . .

[I]f there is a guilty verdict of First Degree Murder we go to [the] second phase with possibly additional or different evidence than you heard in the initial phase, possibly not, but then you will be instructed on the laws that apply to the death penalty and the circumstances to consider when recommending to the judge whether the death penalty should be imposed or whether life imprisonment should be imposed, and after the close of that portion of the case and after you're instructed on it, you would go back and deliberate with the other members of the jury panel and by majority vote, make a recommendation.

. . .

Do you have any problem with the fact that you would have to look to at the facts and you would have to, after discussing it with the other people on the jury, make a recommendation to Judge Walker as to what penalty was appropriate?

. . .

You hear all that about the first phase, guilt or innocence, and second penalty phase to determine the punishment.  Do you understand that you may be called upon to make a recommendation to Judge Walker as to what penalty you feel and the jury feels is appropriate in this case?  Would you have any difficulty if the facts and all warranted in [sic] recommending the death penalty in this case?

. . .

And you understand there are specific criteria about the crime, about other factors that you would be asked to consider by Judge Walker and can you rely on the criteria Judge Walker tells you to consider in making your recommendation?

(Dkt. 10, Ex. D2, pp. 311-13).

Petitioner also relied upon the following statements by the prosecutor in the State's closing

argument:

And we ask you simply to find the facts of what he did and apply the law and in doing that make a recommendation. Don't let someone try to intimidate you or place the blame on you for making this decision.
. . .

What we feel the law requires, because of his actions, he should forfeit his life. If the death penalty is to have any meaning, if it's applied to any case, this is the appropriate case, and I ask you not to fall into the trap that he was so confident when he talked to Paul Skalnik of what was going to happen, no jury is going to send him to - - no jury is going to recommend to Judge Walker that he do that and again all you do is recommend. If Judge Walker doesn't think it is the appropriate penalty, he wouldn't impose it.

(Dkt. 10, Ex. D2, p. 314).

Finally, Petitioner pointed to following exchange during his closing argument to further

support this claim:

> [Defense counsel:   Should you make the recommend [sic] that Richard Cooper be executed, it's a virtual certainty that that will occur.]
>
> State:   Your Honor, I'm going to object and ask the jury be instructed to disregard that. It's Your Honor's decision as to whether to impose it and not the jury's.
>
> The Court:   The jury will be so instructed. Their recommendation, their verdict in this instance is a recommendation only and the instructions carefully carry that and you are so advised.

(Dkt. 10, Ex. D2, p. 315; Ex. A10, pp. 1592-93).

Petitioner urges that each of these statements misled the jury as to the critical nature of its

role, in violation of *Caldwell*. The state trial court rejected this claim:

The defendant claims he was denied effective assistance of counsel for the following reasons: . . . [t]hat his trial counsel were ineffective because they failed to object to numerous <u>Caldwell</u> errors. The alleged improper statements were not improper and should not have been objected to because they were accurate statements of Florida law. In the case of <u>Harick v. Dugger</u>, 884 F.2d 1464 (11th Cir. 1988) (en banc) the

court held that accurate statements of the law do not violate the constitution and therefore no <u>Caldwell</u> error is committed.

. . .

The defendant claims that the trial court violated the principles of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985) because it permitted the prosecution to diminish the role the jury had in the proceedings. The court in <u>Atkins [v. Dugger</u>, 541 So. 2d 1165 (Fla. 1989)] held this type of claims could have been raised on direct appeal and was not to be raised in a 3.850 motion.

(Dkt. 10, Ex. D2, pp. 812, 816) (emphasis in original).  The Florida Supreme Court affirmed the

lower court's summary denial of this claim without discussion.  *Cooper v. State*, 856 So. 2d at 977

n.7.

In *Caldwell*, the Supreme Court stated that "it is constitutionally impermissible for a death

sentence to rest on a determination made by a sentencer who has been led to believe that the

responsibility for determining the appropriateness of the defendant's death lies elsewhere." *Caldwell*

*v. Mississippi*, 472 U.S. at 328-29.  To establish a *Caldwell* violation, a petitioner "necessarily must

show that the remarks to the jury improperly described the role assigned to the jury by local law."

*Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).  Comments such as those complained of, which

accurately describe the jury's role in a Florida death penalty case as advisory, do not constitute

*Caldwell* error.  *See Johnston v. Singletary*, 162 F.3d 630, 643-44 (11th Cir. 1998), *cert. denied*, 528

U.S. 883 (1999); *Provenzano v. Singletary*, 148 F.3d 1327, 1334 (11th Cir. 1998); *Davis v.*

*Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) ("[R]eferences to and descriptions of the jury's

sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge

as the final sentencing authority are not error under *Caldwell*. . . . because they accurately

characterize the jury's and judge's sentencing roles under Florida law.").  "The inquiry under

*Caldwell* is whether comments made at trial 'mislead the jury as to its role in the sentencing process

in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Stewart v. Dugger*, 877 F.2d 851, 854 (11th Cir. 1989) (quoting *Dugger v. Adams*, 489 U.S. 401, 409 (1989).

The trial court correctly instructed the jury as to its role and responsibilities during the penalty phase (Dkt. 10, Ex. A11, pp. 1603-10).[57]  The Florida Supreme Court has recognized these instructions as properly describing the jury's role in Florida.  *See Hodges v. Sec'y, Dep't of Corr.*, No. 8:03-cv-1591, 2007 WL 604982, at *31 (M.D. Fla. Feb. 22, 2007) (citing *Archer v. State*, 673 So. 2d 17, 21 (Fla.), *cert. denied*, 519 U.S. 876 (1996) (Florida standard jury instructions adequately describe role to jury); *Pope v. Wainwright*, 496 So. 2d 798, 805 (Fla. 1986), *cert. denied*, 480 U.S. 951 (1987)).  In light of these Florida authorities, Petitioner has not demonstrated that the prosecutor mischaracterized the jury's role in the penalty phase of Petitioner's trial or diminished its role in the sentencing process.  Consequently, counsel was not ineffective in failing to object to the prosecutor's comments.  Moreover, the state trial court correctly instructed the jury on its role in the sentencing process.  Counsel's performance was not deficient, and even if deficient, Petitioner has established no prejudice resulting from any deficiency.  Petitioner has not met his burden of proving that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in denying this claim.  *See* 28 U.S.C. § 2254(d)(1).

---

[57]  Section 921.41, Florida Statutes, provides in relevant part:

> (2)  **Advisory sentence by the jury.**  After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court . . . .

> (3)  **Findings in support of sentence of death.**  Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death . . . .

Fla. Stat. § 921.41(2), (3) (emphasis in original).

## GROUND B

Petitioner contends that the State violated his Sixth and Fourteenth Amendment rights by failing to disclose "all favorable and material evidence concerning, but not limited to, State witness Paul Skalnik's credibility and relationship with law enforcement officers."[58] The state court rejected this claim in Petitioner's Amended Rule 3.850 motion after an evidentiary hearing:

> Next, Defendant contends that the State intentionally failed to disclose that Paul Skalnik had previously supplied information to the State, and that Paul Skalnik was receiving consideration for his testimony. The Court interprets this claim to be a Brady claim - that is, Defendant is essentially alleging that the State intentionally failed to disclose favorable evidence that possessed some form of exculpatory value to Defendant. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
>
> In determining the effect of the State's failure to disclose exculpatory evidence, the test "is whether there is a reasonable probability that 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Duest v. Dugger, 555 So. 2d 849, 851 (Fla. 1990) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985)). In short, in order for the Defendant to establish a Brady violation, he would have to prove the following: (1) that the State possessed evidence favorable to him; (2) that the evidence was suppressed; (3) that he did not possess the favorable evidence nor could he obtain it with any reasonable diligence; and (4) that had the evidence been disclosed to him, a reasonable probability exists that the outcome of the proceedings would have been different. See Cherry v. State, 659 So. 2d 1069 (Fla. 1995); see also Hegwood v. State, 575 So. 2d 170, 172 (Fla. 1991).

---

[58] Petitioner argues in his petition:

> Documents that fill eight boxes of Skalnik dealings with law enforcement and Petitioner and other persons charged with crimes, are currently being held under seal in the Circuit Court and have never been provided to defense counsel. Information contained in said boxes on Skalnik is relevant and material to Mr. Cooper's assertion that Skalnik was an agent of the State, was deliberately in Mr. Cooper's cell to obtain incriminating statements, and is otherwise an untrustworthy witness.

(Dkt. 1, p. 36). In the course of these federal proceedings, this Court granted Petitioner's motion for discovery, affording him the opportunity to review the contents of the eight boxes of documents.(Dkt. 26).

First, trial counsel for Defendant, Ky Koch, testified at the evidentiary hearing that at the time of trial, he knew that Skalnik had previously operated as a "snitch" for the State. In fact, Skalnik's deposition testimony taken by Ky Koch at or about the time of trial reflects information to this effect. Second, there is a dearth of evidence in the record to suggest that Skalnik ever received anything of value from the State. The only indication that Skalnik ever received anything of value is offered in the form of pure speculation (i.e., conjugal visits, reduced sentence for three grand theft charges). Skalnik sufficiently explained at the evidentiary hearing that his trip outside the prison to eat dinner with his family was granted because he was not allowed the same contact visits as other inmates due to his solitary confinement, which was because of security reasons (death threats). Additionally, Skalnik himself offered unequivocal testimony that he did not receive anything of value from the State in exchange for his testimony.

In conclusion, Defendant has failed to even meet the first prong of a legally sufficient Brady claim - that is, that the State withheld information. See Cherry, 659 So. 2d at 1073-74. Even assuming the existence of this evidence, and the failure of the State to disclose it, Defendant has offered nothing to show that a reasonable probability exists that the outcome would be any different. See Rose v. State, 774 So. 2d 629, 634 (Fla. 2000) (expounding on the final prong of a legally sufficient Brady claim). The fact remains that Skalnik was called only as a penalty phase witness. Moreover, the jury heard evidence that Skalnik had previously worked as a "snitch," and from this testimony was able to draw many of the inferences that form the basis of Defendant's claim. For these reasons, this claim is denied.

(Dkt. 10, Ex. D15, pp. 2256-57) (court's record citations omitted) (emphasis in original).

The Florida Supreme Court affirmed:

Finally, in connection with his other claims regarding Skalnik's testimony for the State, Cooper contends that the State failed to provide the defense with information it could have used to impeach Skalnik, in violation of the precepts of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Cooper contends that the State withheld evidence that Skalnik received benefits in exchange for his testimony at trial. We have reviewed the record, and conclude that the trial court below was correct in its conclusion that "there is a dearth of evidence in the record to suggest that Skalnik ever received anything of value from the State. The only indication that Skalnik ever received anything of value is offered in the form of pure speculation." Cooper's *Brady* claim is meritless, and we therefore deny relief.

*Cooper v. State*, 856 So. 2d at 973-74.

The failure of a prosecutor to disclose evidence favorable to a defendant upon request violates due process where the evidence is material to either guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  To establish a *Brady* violation, Petitioner must prove: (1) that the government possessed evidence favorable to the defense; (2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence; (3) that the prosecution suppressed the evidence; and (4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense.  *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989).  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the proceeding.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  To meet this standard, Petitioner need not demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, insufficient evidence existed to convict him.  *See Taylor v. Singletary*, 122 F.3d 1390, 1395 (11th Cir. 1997).  Rather, Petitioner must show that the suppressed evidence, reasonably taken, puts "the whole case in such a different light as to undermine confidence in the verdict."  *Felker v. Thomas*, 52 F.3d 907, 911 (11th Cir. 1995) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Petitioner contends that the "eight boxes of Skalnik dealings" constituted *Brady* material and that the State improperly withheld this evidence from the defense.   Petitioner argues that various documents contained in those boxes were favorable impeachment evidence bearing upon Skalnik's credibility.   Specifically, Petitioner claims that the State's suppression of this evidence prevented the jury from learning that Skalnik had a "continuing interest in obtaining [Pinellas County law enforcement officers'] favor and Skalnik's testimony that he could not obtain a sentencing reduction or "anything along that line" in exchange for incriminating Petitioner was not credible.[59]   (Dkt. 53, p. 30).

As the state trial court pointed out, Koch testified that he knew of Skalnik's previous informing activity.   Koch testified at the evidentiary hearing:

| | |
|---|---|
| Counsel: | Are you familiar, and I won't try to pin you down at the time, but are familiar in general with Mr. Scallonik's [sic] activities and some of the issues surrounding him and that he has provided information for a number of people in the jail, and that's gone on to aide the State in prosecution and things of that nature? |
| Koch: | Yes, sir, I am. |
| Counsel: | What do you know, I'll get back to when you knew it, but what do you know about that now? |
| Koch: | Mr. Scallonik [sic] was a snitch. |
| Counsel: | Okay.   Short word but a lot of meanings.   Your understanding is that he did wind up testifying against a number of people? |

---

[59]   Skalnik testified on redirect examination:

| | |
|---|---|
| Q: | What is your understanding of the chances of you getting your sentence reduced or anything along that line? |
| A: | None. |

(Dkt. 10, Ex. A11, p. 1458).

Koch:        Yes, sir.

                      . . .

Counsel:     Do you know how many cases Mr. Scallonik [sic]
             testified in or in any way assisted the State?

Koch:        Twenty-nine or 30.  That was his answers [sic] to us in
             deposition and at the hearing.  And to the best of my
             recollection that comported with what we found out.

Counsel:     Okay.  Were your efforts with regard to Mr. Scallonik
             [sic] as far as investigation, preparing [Petitioner]'s
             case, directed to learning as mich as you could about
             Mr. Scallonik [sic]?

Koch:        I hope so.

Counsel:     And it's your recollection now that you've obtained an
             NCIC and took a deposition of Mr. Scallonik [sic]; is
             that true?

Koch:        Well, yes.  But the way you're saying that, you intimate
             that that's all I did.  I don't want you to understand that
             because I'm sure that's not true.

Counsel:     My next question would have been, what more did you
             do beyond that?

Koch:        We knew Mr. Scallonik [sic] was either going to testify
             at the trial or at the penalty phase or both.   The
             information that Mr. Scallonik [sic] had regarding
             [Petitioner] was extremely damaging.  I am certain that
             we did a thorough search and found as much about Mr.
             Scallonik as we could find.

(Dkt. 10, Ex. D7, pp. 1020, 1024-26).

In rejecting this claim after the post conviction evidentiary hearing, the trial court determined

that Petitioner failed to show that a reasonable probability existed that the outcome of the criminal

proceedings would have been different had trial counsel had access to the "eight boxes of Skalnik

dealings."   (Dkt. 10, Ex. D15, pp. 2256-57).   As the Florida Supreme Court noted, the State

"provided the entirety of the materials to the court below for in-camera review."  *Cooper v. State*,

856 So. 2d at 974.  In affirming the trial court's denial of relief on Petitioner's *Brady* claim, the

Florida Supreme Court determined that "the trial court below was correct in its conclusion that 'there is a dearth of evidence in the record to suggest that Skalnik ever received anything of value from the State.'" *Id.* This factual finding is entitled to deference and Petitioner fails to overcome this finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Now, having had the opportunity to review the eight boxes, Petitioner relies on certain documents Petitioner found in those boxes in support of his contention that this "crucial" evidence demonstrates that Skalnik received benefits from the State in exchange for his testimony. Petitioner's contention is unpersuasive.  These documents merely confirm what Koch already knew, that Skalnik acted as a government informant in many cases against many other defendants.[60] Moreover, none of the evidence Petitioner points to in support of Ground B demonstrates that Skalnik received a particular benefit in exchange for his testimony in Petitioner's case.  Finally, the jury knew, through Skalnik's own testimony, that Skalnik was an informant who had provided information to law enforcement about numerous defendants in other cases and that Skalnik was incarcerated when he testified during the penalty phase of Petitioner's trial.  (Dkt. 10, Ex. A11, pp. 1431, 1456).

The non-disclosure of the contents of the eight boxes of documents does not undermine confidence in Petitioner's convictions.  Petitioner fails to demonstrate a reasonable probability that

---

[60] Koch investigated Skalnik's history of cooperating with law enforcement.  In the state court post conviction hearing, Koch recalled that during Skalnik's pre-trial deposition and during the pre-trial suppression hearing, Skalnik confirmed he had cooperated in twenty nine or thirty cases, which "comported with what we found." (Dkt. 10, Ex. D7, pp. 1024-25).  At trial, Koch had a two inch thick file on Skalnik he intended to use in cross examination. (Id. at. Pp. 1047-48).

if those documents had been available to the defense, and presented to the jury during the penalty phase, that the outcome of would have been different. *Kyles v. Whitley*, 514 U.S. at 435. Petitioner has not shown that the evidence would have put the whole case in such a different light as to undermine confidence in the verdict. *See id.*; *Felker v. Thomas*, 52 F.3d at 911.

## GROUND C

Petitioner contends that Skalnik's testimony during the penalty phase regarding statements Petitioner made to Skalnik violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights. Petitioner contends that, at the time Petitioner made the statements to Skalnik, Petitioner's right to counsel had attached, Skalnik was performing as a state agent, and Petitioner did not knowingly and voluntarily waive his right to counsel. The state court denied relief on this claim:

> Defendant contends that the State, through its law enforcement agencies, intentionally housed Defendant in the same prison cell as Paul Skalnik, an ex-police officer turned jailhouse informant to whom Defendant confessed the details of the murders (Paul Skalnik was called as a State witness during the penalty phase of the proceedings only and not during the guilt phase). Defendant contends that by placing him in the same prison cell with Paul Skalnik, the State deliberately manufactured a situation that enticed or induced Defendant into making incriminating statements without the presence of counsel, in violation of <u>United States v. Henry</u>, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (citing <u>Massiah v. United States</u>, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)). A <u>Henry</u> violation occurs when the State, through its law enforcement agencies, improperly uses a jailhouse informant to elicit incriminating statements from a defendant in violation of his Sixth Amendment right to counsel. In <u>Henry</u>, the Court ruled that the right to counsel was violated where a cellmate was told not to question or initiate any conversation with Henry, who was represented by counsel, but merely to listen. The cellmate later testified in court as to what Henry said concerning the details of the crime. The right enunciated in <u>Henry</u> applies only during significant encounters between the prosecution and accused. <u>See</u> <u>Stewart v. State</u>, 549 So. 2d 171 (Fla. 1989) (citing <u>United States v. Ash</u>, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) and <u>United States v. Wade</u> 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).
>
> Specifically, Defendant maintains that: "it is not necessary that there be an express, well-defined agreement or meeting of the minds between the State and the informant to constitute a <u>Massiah</u>/<u>Henry</u> violation." Defendant also maintains that "where the

State knows by prior conduct that the inmate will obtain and provide information obtained from fellow inmates, and then selectively places that inmate in a position to obtain the information, the inmate is a de facto agent of the State because the State has chosen to intentionally create a situation likely to elicit incriminating responses."

In Rolling v. State, 695 So. 2d 278 (Fla. 1997), the Florida Supreme Court traced several cases where the use of a jailhouse informant allegedly violated Henry, and found that "on the whole, these cases demonstrate that the culpability of law enforcement is dependent upon the extent of their role in securing the confession indirectly.  That is, a violation of a defendant's right to counsel turns on whether the confession was obtained through the active efforts of law enforcement or whether it came to them passively." Id. at 291.  The Florida Supreme Court explained that "'passivity on the part of law enforcement' is the critical factor." Id.  In Rolling, the Florida Supreme Court also discussed Florida court decisions that addressed whether a confession was obtained in violation of the defendant's right to counsel.  See Sikes v. State, 313 So. 2d 436 (Fla. 2d DCA 1975); see also Muehlman v. State, 503 So. 2d 310, 314 (Fla.), cert. denied, 484 U.S. 882, 108 S.Ct. 39, 989 L.Ed.2d 70 (1987) (holding that the "deliberately elicited" standard had not been violated because the defendant's statements were not a product of a "stratagem deliberately designed to elicit an incriminating statement.") (quoting Miller v. State, 415 So. 2d 1262, 1263 (Fla. 1982)).

After carefully reviewing the case law and the record in the instant case, the Court finds Defendant's reliance on Henry to be misplaced; there is a significant distinction between the circumstances of Henry and those in the instant case.  Henry's cellmate was acting as a government agent; he was a paid informant specifically commissioned to obtain incriminating evidence and to deceive Henry for that purpose.  To the contrary, no such evidence has been presented to establish that such occurred in the instant case.

To begin with, trial counsel for Defendant, Ky Koch, testified at the evidentiary hearing that he had initially attempted to prove that Skalnik was expressly commissioned by the government to obtain incriminating statements (through a motion in limine/to suppress), but was unable to do so.

> State:     In your direct testimony, you said that you
>            were unable to prove that Skalnik was a plant
>            in the jail.  Just wasn't any evidence that you
>            could find to confirm, you know, the
>            suspicion that you had?
>
> Ky Koch:   Yes sir.  If I said that, I misspoke.  I knew that
>            Skalnik was in there for having violated the
>            law somewhere.  I knew that he wasn't simply

> there to obtain statements.  I was concerned
> about him being a plant in Richard's cell.
> And I was unable to independently verify that.

At the various evidentiary hearings on the matter, the prosecutor, Doug Crow, testified that Skalnik had not acted as a state agent, was never offered anything in exchange for his testimony, never asked for anything in exchange for his testimony, and was never induced in any manner, shape, or form.  Skalnik himself, whose credibility was admittedly called into question after the 1989 affidavits were submitted (but who later attributed the inconsistent statements made in the 1989 affidavits to deceptive efforts by Mark Evans of CCRC), testified that he was not a State witness, and that he did not think that Defendant was intentionally and purposefully placed in the cell with him.

Defendant bears the burden of adducing evidence in support if his claims; he may not merely make conclusory statements and expect the Court to flush out the details during an evidentiary hearing or a final order.  See Kennedy v. State, 547 So. 2d 912, 913 (Fla. 1989).  Because Defendant has failed to offer sufficient support to corroborate this otherwise conclusory claim, and because the evidence that was adduced at the evidentiary hearings refutes this claim, this claim is denied.

(Dkt. 10, Ex. D15, pp. 2253-56) (court's record citations omitted).

The Florida Supreme Court affirmed:

As an initial matter, Cooper's contention that Skalnik was a de facto state agent at the time of their conversation in jail is refuted by the record.  Under this Court's decision in *Rolling v. State,* 695 So. 2d 278 (Fla.1997), the Sixth Amendment to the United States Constitution prohibits law enforcement officers from prearranging the questioning of defendants by incarcerated informants.  *See id.* at 290.  The principle is self-evident: the police may not sidestep constitutional protections by employing jail residents as independent contractors to interrogate defendants without the presence of an attorney.  *See United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).  However, a violation of the dictates of *Rolling* is only shown where the defendant establishes that the informant and the authorities had a preexisting plan for the informing witness to obtain a confession.

In the instant case, the record refutes Cooper's contention that the State recruited Skalnik as an informant.  Indeed, the entirety of the evidence before this Court supports the State's contention that Skalnik was upset by Cooper's bragging regarding the murders, and he subsequently contacted the authorities of his own accord. Skalnik had, at one time, been employed as a police officer in Texas, and this also motivated him to report what Cooper had told him.  Because Cooper's claim that

Skalnik was an agent of the State at the time of their jailhouse conversation is refuted by the record, we deny relief based thereon.

*Cooper v. State*, 856 So. 2d at 972-73.

The Florida Supreme Court's findings of fact regarding Skalnik's relationship with law enforcement and that Skalnik, after hearing Petitioner brag about his involvement in the murders, "subsequently contacted the authorities of his own accord" are presumptively correct. Petitioner has not met his burden of establishing that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in denying this claim. *See* 28 U.S.C. § 2254(d)(1).

Petitioner contends that Skalnik had an ongoing relationship with law enforcement officials in Pinellas County and that Skalnik used his training as a police officer to secure incriminating statements from Petitioner (Dkt. 1, pp. 37-38). In his reply, Petitioner additionally argues:

> Mr. Skalnik sought information from Mr. Cooper pursuant to an implicit, continuous service agreement with the State. . . . The State, knowing that Mr. Skalnik hoped for favorable treatment, encouraged Mr. Skalnik to elicit information on an on-going basis from various prisoners, including Mr. Cooper. . . . [T]he State facilitated his cooperation, and Mr. Skalnik eagerly pursued the State's interests.
> . . .
>
> The State enabled Mr. Skalnik to pursue his informing activities by permitting him to remain in the county jail for unusually long periods of time, giving him access to inmates awaiting trial.
> . . .
>
> The State's suggestion that Mr. Skalnik was a mere listening post is further belied by the fact that Mr. Cooper had never discussed the crime in detail with any other inmates.

(Dkt. 18, Attach. 3, pp. 59, 66, 83).

"In order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent, and (2) that the inmate

deliberately elicited incriminating statements from the accused." *Lightbourne v. Dugger*, 829 F.2d

1012, 1020 (11th Cir. 1987) (citing *United States v. Henry*, 447 U.S. 264, 270 (1980)).   No

bright-line rule exists for determining whether an individual is a government agent for purposes of

the Sixth Amendment right to counsel.  *Depree v. Thomas*, 946 F.2d 784, 793-94 (11th Cir. 1991).

"At a minimum, however, there must be some evidence that an agreement, express or implied,

between the individual and a government official existed at the time the elicitation takes place."  *Id.*

(citing *Lightbourne v. Dugger*, 829 F.2d at 1020).

> [T]he primary concern of the *Massiah* line of decisions is secret interrogation by
> investigatory techniques that are the equivalent of police interrogation.  Since "the
> "Sixth Amendment is not violated whenever - by luck or happenstance - the State
> obtains incriminating statements from the accused after the right to counsel has
> attached," a defendant does not make out a violation of that right simply by showing
> that an informant, either through prior arrangement or voluntarily, reported his
> incriminating statements to the police.  Rather, the defendant must demonstrate that
> the police and their informant took some action, beyond merely listening, that was
> designed deliberately to elicit incriminating remarks.

*Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (internal citations omitted).

The state trial court conducted lengthy post conviction evidentiary hearings on Petitioner's

claims, including his claim that Skalnik was acting as a *de facto* state agent during the time when

Petitioner made statements to him about his participation in the murders.  In his attempt to rebut the

presumption of correctness attaching to the Florida Supreme Court's findings regarding Skalnik's

relationship with law enforcement and the circumstances under which Petitioner made statements

to Skalnik, Petitioner relies on certain documents he discovered in the eight boxes of documents he

had not had access to during the state court proceedings.[61]

---

[61]  During these federal habeas proceedings, Petitioner moved to discover eight boxes of documents that the
state court had determined were exempt from disclosure pursuant to Florida's Public Records Act. Petitioner's motion
was granted and his attorneys were able to review the contents of the eight boxes for documents supporting his contention
that the State misled the jury during the penalty phase of Petitioner's trial about Skalnik's relationship with the State.
(Dkt. 26).  Thereafter, the parties filed supplemental briefs on Petitioner's *Henry/Massiah* issue.  Petitioner attached
nearly 300 pages of documents to his supplemental brief (Dkt. 53).

During oral argument, Petitioner directed this Court's attention to portions of five specific documents which he contends demonstrates Skalnik's agency relationship with the State:[62]

(1) pp. 5-6:[63]      "Skalnik - in cell with Defendant since early June - - explain - bored, nothing to do - not uncommon for insiders to talk about their case - witness would listen, and where he had opportunity, would make notes of conversation while fresh in his mind"

Petitioner argues this excerpt shows that Skalnik was coached to make his testimony appear more credible.

(2) pp. 29-30:      "Skalnik - perjury - FBI"

Petitioner argues this excerpt shows that Skalnik offered perjured testimony.

(3) p. 82:      "High Point murders - - Skalnik worked w/ Halliday on that case"

Petitioner argues this excerpt shows that Skalnik worked with Detective Halliday, contrary to Skalnik's testimony that he did not work with law enforcement.

(4) pp. 101, 103: "We informed Skalnik to contact Detective Halliday *if* he hears any more information from Dailey." (p. 101) (emphasis added).

"We informed Skalnik to contact Detective Halliday *as soon as* he hears any more information from Dailey." (p. 103) (emphasis added).

---

[62]  This Court held oral argument on the *Henry/Massiah* claim on September 23, 2008.

[63]  These page numbers are the handwritten numbers at the bottom of the exhibits attached to Petitioner's supplemental brief (Dkt. 53).

Petitioner argues that the original typewritten version of this statement (p. 103) and the handwritten alteration (p. 101) show that Skalnik was receiving instructions on how to proceed with his informant activities and shows Skalnik's general pattern of informing.

    (5)  p. 151:        "Cooper - - CI (illegible word) 313"
                                        "5/10/83"
                                        "6/15/83"

Petitioner argues this excerpt evidences communication between law enforcement and Skalnik before Petitioner was placed in Skalnik's cell.

As Petitioner's counsel conceded during oral argument, all of these documents are of unknown origin.  Moreover, Petitioner admitted that most, if not all, of these specific documents were created after Petitioner's trial. Contrary to Petitioner's argument, considering the contents of these documents, they do not, individually or collectively, establish anything of evidentiary value. Petitioner's hypothesis as to what these documents demonstrate and the inferences to be drawn from them are, at best, speculative.  These documents merely confirm that Skalnik was a regular informant and that he communicated with Detective Halliday about Petitioner's case.  Petitioner's attorneys knew this.

More importantly, Petitioner presents no evidence demonstrating that any law enforcement officer, prosecutor or other state actor directed Skalnik to question Petitioner or take statements from Petitioner for prosecution purposes. *See Lightbourne v. Dugger*, 829 F.2d at 1020.  Although these documents confirm that Skalnik acted as a government informant in several cases against other defendants, Skalnik's status as a government "informant" does not necessarily equate to him acting as a government "agent" in Petitioner's case and therefore does not establish a *Henry/Massiah* violation.

> [T]he protections of the Sixth Amendment right to counsel enunciated in *Massiah* and *Henry* are inapplicable when, after the right to counsel has attached, statements by a defendant are made to an individual who is not an agent for the Government, although he may be a Government informant.  This is so regardless of whether the statements were "deliberately elicited."

*United States v. Taylor*, 800 F.2d 1012, 1015 (10th Cir. 1986).

The key inquiry to the agency requirement is whether Petitioner alleges facts which, if true, establish that at the time Petitioner made his incriminating statements to Skalnik (i.e., before Skalnik contacted state authorities about Petitioner's statements), the State had promised Skalnik consideration in exchange for reporting Petitioner's statements to the authorities.  *See Hall v. McDonough*, No. 5:06-cv-30, 2007 WL 4247652, at *21 (N.D. Fla. Dec. 3, 2007).  Skalnik's testimony and the testimony of the prosecutor, Doug Crow, at the evidentiary hearing on Petitioner's Amended Rule 3.850 motion refutes Petitioner's contention that Skalnik acted as a state agent. Specifically, Skalnik testified:

| | |
|---|---|
| State: | Were you ever promised anything by the State Attorney's   Office for your testimony in any case? |
| Skalnik: | Mr. Lewis, that's an issue that's been sorting [sic] me for a long time.  The State Attorney's office, through their individuals, never promised me anything.  And, in fact, it's probably been the contrary. |
| State: | When you say that, are you saying that you think that you were treated worse as a result of your testimony than you would have been if you hadn't even testified. |
| Skalnik: | Absolutely.  No doubt. |
| State: | We'll come to that in a just second.  But if you weren't promised anything by the State Attorney's Office, how about police officers or sheriff's deputies?   Ever promised anything by them? |
| Skalnik: | No, sir. |
| State: | Anybody promise you anything for your testimony back during those days? |

Skalnik:     No, sir.

State:       Now, after you testified in the penalty phase in Cooper, did  you eventually end up heading for prison?

Skalnik:     I did, sir.

State:       And was that on some cases that you had already pled to in the Spring of 1983?

Skalnik:     That is correct, sir.

State:       If the Cooper trial was held in January of 1984, does that mean that your cases would have been already resolved in the Spring of 1983, some nine months earlier?

Skalnik:     That's correct, sir.

                              . . .

State:       I want to go back to the days when you were in jail and Mr. Cooper ended up in your cell.  Was he actually in the same cell with you?

Skalnik:     Yes, sir.  It was in the old Pinellas County Jail and I want to say, sir, it was section 306 or third floor or whatever, and  they were all two-man cells, two bunks in each cell.  And he was in my cell, yes, sir.

State:       Did anybody from the State Attorney's Office or law enforcement - - sheriff's deputies, policemen, traffic cop, anybody like that - - judge - - anybody ask you to get information from Mr. Cooper so it could be used in his trial?

Skalnik:     No, sir.

                              . . .

State:       What caused you to give information  on the Cooper case?

Skalnik:     Probably,  sir,  his  brashness.  I'd  never,  to  my knowledge - - this is trying to remember back, sir.  Prior to meeting Mr. Cooper, I don't recall meeting anyone as bold and as brash and macho and having been so young to want to violently kill people - - never.

State:       And that was the reason you gave the information?

Skalnik:     That is the reason, yes, sir.

| | |
|---|---|
| State: | It's been alleged in motions and affidavits and other places that you testified in other cases; and that's true? |
| Skalnik: | It is true.  I just don't remember how many, sir. |

(Dkt. 10, Ex. D9, pp. 1471-72, 1476, 1492-93).

Crow testified at the evidentiary hearing,[64] in part, as follows:

| | |
|---|---|
| State: | During the prosecution of Richard Cooper, but before the case went to trial, did you become aware of an individual by the name of Paul Scalnick [sic], who claimed to have some kind  of information about the case? |
| Crow: | Yes. |
| State: | Can you just briefly give us the gist of what Scalnick [sic] claimed to know? |
| Crow: | My recollection was he was housed in the County Jail, Cooper was placed in an adjacent cell and made admissions to him concerning the killings in general. |
| | They related to the names of the people involved, the circumstances of the crime, how many shots he had fired, the fact that he had come back after being called back to kill one of the people and also some matters relating to what he intended to do in defense of the case. |
| | . . . |
| State: | By the way, did you ever offer Mr. Scalnick [sic] anything for testifying in this case? |
| Crow: | No. |
| State: | Did he ever ask you for anything? |
| Crow: | No. |
| State: | To your knowledge, did any other Assistant State Attorney or law enforcement officer ever offer or give Mr. Scalnick [sic] anything for his testimony? |
| Crow: | There was no offer and nothing given.  I'm sure there were discussions after the - - after he finished testifying about completing his sentence, but I don't believe there was any inducement or anything discussed with him prior to his testimony. |

---

[64]  Crow testified at the June 23, 2000, segment of the evidentiary hearing.

| State: | Did you become aware that 60 days to modify Mr. Scalnick's sentence had already run before he ever testified? |
|---|---|
| Crow: | Yes.  And I believe he testified to that, too. |
| State: | Now, let me jump ahead to the end of June of 1988, on or about the 28th of June, did you have occasion to learn that a Motion to Dismiss had been filed by an Assistant Public Defender, whose name is Mark Evans, and it was filed on behalf of Paul Scalnick [sic] and it suggested, at least, suggested, that Mr. Scalnick [sic] may have coached [sic] in the Cooper case and others, may have been promised some sort of reward for his testimony in the Cooper case and others and may have even testified untruthfully in the Cooper case or others? |
| Crow: | Yes[65] |

(Dkt. 10, Ex. D12, pp. 1821-22, 1830-31).

This testimony refutes any contention that Skalnik was promised or expected any benefit in exchange for his informant activities in Petitioner's case or that law enforcement directed him to elicit statements from Petitioner.  Even assuming that Skalnik expected something, the fact that he subjectively hoped to benefit from providing information against Petitioner is insufficient to transform Skalnik into a government "agent."  Skalnik's own expectation and motive for reporting Petitioner's statements to Detective Halliday, without more, do not render him a government agent even if the State knew and understood his motives were self-serving and related to his receiving favorable treatment while serving his sentence. *See, e.g., Cannon v. United States*, No. 07-20232, 2007 WL 4616281, at *6 (S.D. Fla. Oct. 16, 2007) ("[An informant's] motives alone cannot make him an agent of the government even if the government knew and understood that his motives probably were self-serving and related to getting cooperation or a reduction in sentence.").

---

[65] Skalnik admitted that he had testified truthfully in Petitioner's case and later recanted statements he had made indicating that he had received benefits from the State in exchange for his testimony (Dkt. 10, Exs. D9, pp. 1393-95; D10, pp. 1503-36; D12, pp. 1833-37).

Moreover, the evidence Petitioner advances to support this claim fails to demonstrate that

state authorities pre-arranged for Skalnik to deliberately elicit information from Petitioner or that

Skalnik engaged in questioning of Petitioner equivalent to a police interrogation. *See United States*

*v. Taylor*, 800 F.2d at 1015; *Stano v. Butterworth*, 51 F.3d 942, 977-78 (11th Cir. 1995); *Matteo v.*

*Superintendent, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999). Petitioner has not rebutted the state

court's findings of fact by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Florida

Supreme Court's determination that Petitioner failed to establish a Sixth Amendment violation

amounts to neither an unreasonable application of Supreme Court precedent nor an unreasonable

determination of the facts in Petitioner's case.[66]  28 U.S.C. § 2254(d)(1), (2).

Petitioner contends that he is entitled to an evidentiary hearing on his *Henry/Massiah* claim.[67]

Petitioner has the burden of establishing the need for an evidentiary hearing. *Birt v. Montgomery*,

725 F.2d 587, 591 (11th Cir.), *cert. denied*, 469 U.S. 874 (1984); *Townsend v. Sain*, 372 U.S. 293,

312 (1963). Unsupported conclusions and  speculative and inconcrete claims do not satisfy this

---

[66] The lengthy contentions and allegations presented in Petitioner's reply to support Ground C likewise fail to substantiate a *Henry/Massiah* claim.  (Dkt. 18, Attach. 3, pp. 58-85).

[67] Petitioner argues entitlement to an evidentiary hearing in conjunction with his argument that the State failed to provide him with information contained in the eight boxes of documents Petitioner's counsel gained access to in these federal habeas proceedings, arguing that his attorneys could have used that information to impeach Skalnik at trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  As discussed, the documents Petitioner identifies from the eight boxes have no evidentiary value.  The Florida Supreme Court affirmed the denial of Petitioner's *Brady* claim:

> We have reviewed the record, and conclude that the trial court below was correct in its conclusion that "there is a dearth of evidence in the record to suggest that Skalnik ever received anything of value from the State.  The only indication that Skalnik ever received anything of value is offered in the form of pure speculation."  [Petitioner's] *Brady* claim is meritless, and we therefore deny relief.

*Cooper v. State*, 856 So. 2d at 974.  Petitioner fails to establish that any of the documents from the eight boxes that he now relies upon were subject to disclosure under *Brady* because they are material to either guilt or punishment.  *See Strickler v. Greene*, 527 U.S. 263, 280 (1999).  Consequently, Petitioner fails to establish a *Brady* claim.  The state court's decision denying relief is neither contrary to nor an unreasonable application of clearly established federal law.

burden, however. *Dickson v. Wainwright*, 683 F.2d 348, 351 (11th Cir. 1982) (internal quotations omitted).  The record confirms that Petitioner had a full and fair evidentiary hearing on this issue in state court.  He has not carried his burden of establishing the need for a federal evidentiary hearing.

In rejecting Petitioner's contention that the eight boxes were improperly withheld from him, the Florida Supreme Court found:

> . . . [Petitioner] contends that despite repeated requests pursuant to chapter 119 of the Florida Statutes, the State has failed to provide him with public records relating to the various instances in which Skalnik has testified for the State.  Because the State has neither furnished the documents to him nor stated specific reasons why the material is exempted from disclosure, Cooper requests that this Court order the State to comply.  Our examination of the record on appeal belies Cooper's assertions.  As mandated by chapter 119, the State detailed the statutory exemptions it relied upon to shield certain documents, and provided the entirety of the materials to the court below for in-camera review.  The trial court reviewed the records, and concluded that the State's assertions regarding the exempt status of the documents were well founded.  The trial court did not err.  Indeed, Cooper makes no claim that he has not been fully and exhaustively informed regarding Skalnik's background as a State's witness.  Because the sole purpose for which Cooper seeks examination of these records is to research Skalnik's background, we can discern no scenario in which the limitation upon Cooper's access to these documents hampered his attorneys' postconviction discovery efforts.

*Cooper v. State*, 856 So. 2d at 974.

Petitioner has not demonstrated that the state evidentiary hearing was not a full and fair hearing.  *See id*.  Both Skalnik and the prosecutor testified that the State had not promised Skalnik any benefit in exchange for his testimony.  Petitioner had the opportunity to cross-examine Skalnik and the prosecutor about Skalnik's activities as an informant.[68]  As the record on this claim was fully developed in the state court proceedings and is sufficient for federal collateral review of the claim,

---

[68] Petitioner's reliance on the three affidavits of former law enforcement officers secured in 2005 is to no avail.  None of those affiants refer to Petitioner or the High Point murders.  Nor do those affiants profess to have any personal knowledge that Skalnik was acting as a state agent when he spoke with Petitioner or that Skalnik deliberately elicited statements from Petitioner at the request of law enforcement.

a federal evidentiary hearing in unnecessary. *See, e.g., Murrah v. McDonough*, 256 F. App'x 323, 325 (11th Cir. 2007).[69]

**GROUND D**

In Ground D, Petitioner presents a substantive claim that he was not competent to stand trial. Petitioner presented this claim to the state court in his Amended Rule 3.850 motion. Although the state court found this claim was procedurally defaulted, Petitioner is nevertheless entitled to federal review of his substantive competency claim. *Johnston v. Singletary*, 162 F.3d 630, 637 (11th Cir. 1998).

"A petitioner who raises a substantive competency claim must demonstrate his incompetence by a preponderance of the evidence." *Id.* at 637. "The point is that on this claim, 'the standard of proof is high and the facts must positively, unequivocally, and clearly generate legitimate doubt' about whether the petitioner was mentally competent when he was tried." *Wright v. Sec'y, Dept. of Corr.*, 278 F.3d 1245, 1259 (11th Cir. 2002) (quoting *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)). Petitioner cannot meet this standard.

---

[69] To the extent Petitioner argues entitlement to an evidentiary hearing because he has, for the first time, had the opportunity to review the previously undiscovered documents discussed during the September 23, 2008, oral argument, the same result is reached. As discussed, the documents which Petitioner argues support his *Henry/Massiah* claim lack sufficient evidentiary value. Further consideration and additional argument on these documents is unnecessary.

Moreover, the Florida Supreme Court's determination of state law is entitled to deference and its findings of fact are presumptively correct. That court reviewed the documents and determined, pursuant to state law, that the documents were exempt from disclosure. Petitioner has not demonstrated that this determination was error under state law or if erroneous, it was of constitutional magnitude. To the extent Petitioner argues that the state court's denial of access to the documents deemed exempt under state law was error of constitutional magnitude, the error was harmless. Under the harmless error standard articulated in *Brecht v. Abrahamson*, habeas relief is granted only if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1997) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Petitioner fails to show that any error in denying him access to the documents prevented him from developing background information on Skalnik or that the denial caused a substantial and injurious effect on the jury's verdict.

In 1983, Dr. Merin evaluated Petitioner before trial for, among other things, competency.[70] After considering his interviews with Petitioner, self-reports by Petitioner, psychological tests and other information, Dr. Merin made no finding that Petitioner was incompetent to stand trial.[71] Based on the battery of tests and information available to Dr. Merin, it can be inferred that Dr. Merin found Petitioner competent. Despite Petitioner's post-conviction challenges to Dr. Merin's findings, Petitioner presents no evidence demonstrating any inadequacy in Dr. Merin's evaluation or his conclusions. Petitioner likewise fails to present evidence that he lacked the ability to communicate with counsel or understand the charges against him at the time of trial.[72] Consequently, Petitioner fails to create a substantial and legitimate doubt regarding his competence to stand trial and fails to demonstrate any alleged incompetence by a preponderance of the evidence. *See Johnston v. Singletary*, 162 F.2d at 637; *Wright v. Sec'y, Dept. of Corr.*, 278 F.3d at 1259. This claim lacks merit and warrants no relief.

---

[70] At the evidentiary hearing on Petitioner's Rule 3.850 motion, attorney Koch testified:

> Q:     You had Dr. Merin take a look at this fellow. Did you have him look at him for all the possible issues, perhaps we use the word globally?
>
> A:     Yes, sir. I remember for certain that we were looking at Dr. Merin to provide us assistance perhaps on the insanity defense, perhaps as competency to stand trial. And certainly at a minimum to assist us in the penalty phase if we were to get there.

(Dkt. 10, Ex. D7, p. 1061). Dr. Merin evaluated Petitioner in December 1983. (Dkt. 10, Ex. D11, p. 1635).

[71] Dr. Merin reiterated his findings at the April 28, 2000, evidentiary hearing on Petitioner's Rule 3.850 motion.

[72] Although Petitioner points to Dr. Fisher's testimony at the evidentiary hearing on Petitioner's Rule 3.850 motion and his finding that Petitioner's intellectual and cognitive deficiencies rendered it difficult for Petitioner to understand the nature of the proceedings or the severity of the penalty he faced upon conviction, this evidence does not satisfy Petitioner's burden of proof on his substantive competency claim. Dr. Fisher evaluated Petitioner in 1989, nearly five years after Petitioner's trial. He testified at the evidentiary hearing in 1999, some fifteen years after Petitioner's trial. Dr. Fisher's report equivocally states that Petitioner "would *likely* lack sufficient ability to understand the adversary nature of the proceedings or the severity of the possible penalties under the best of circumstances." (Dkt. 10, Ex. D3, p. 354) (emphasis added). Dr. Fisher did not specifically testify at the evidentiary hearing about Petitioner's competence to stand trial. This evidence is not sufficient to demonstrate that Petitioner was incompetent to stand trial.

## GROUND N

In Ground N, Petitioner presents eight claims of ineffective assistance of appellate counsel (designated as claims (a)-(h)):[73]

a. failure to raise denial of motion for continuance of sentencing as a ground for appeal;

b. failure to raise a claim of improper consideration of the non-statutory aggravator "lack of remorse;"

c. failure to argue that the prosecutor's improper argument on lack of mitigators was an impermissible non-statutory aggravator;

d. failure to raise the sentencing court's failure to consider and weigh aggravators and mitigators and failing to prepare a timely written sentence of death;

e. failure to raise the issue of jury weighing invalid and constitutionally vague aggravating circumstances;

f. failure to argue on appeal that Cooper was denied consideration of all mitigating evidence and to challenge prosecutor's improper comments currying sympathy;

g. failure to raise the prosecutor's improper diminishment of the role of the jury; and

h. failure to raise a claim regarding the erroneous instruction concerning majority vote

(Dkt. 1, pp. 47-48).

*Strickland* governs these ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992). To show entitlement to relief, Petitioner must demonstrate that appellate counsel performed deficiently and that the deficient

---

[73] Petitioner presented each of these claims to the Florida Supreme Court in his state habeas petition (Dkt. 10, Ex. 40).

performance resulted in prejudice.  To demonstrate deficient performance, Petitioner must show that appellate counsel failed to discover non-frivolous issues and failed to file a merits brief raising those issues.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  To demonstrate prejudice, Petitioner must establish a reasonable probability of success on appeal of the claims appellate counsel failed to raise. *Smith v. Robbins*, 528 U.S. at 285-86; *Heath v. Jones*, 941 F.2d at 1132.  To evaluate whether appellate counsel rendered ineffective assistance by failing to present a specific issue on appeal, the merits of that issue must itself be evaluated.  *See Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988); *Heath v. Jones*, 941 F.2d at 1132.  Appellate counsel is not ineffective for failing to raise a claim "reasonably considered to be without merit."  *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir.), *cert. denied*, 469 U.S. 956 (1984).

Claim(a)

Petitioner asserts that appellate counsel rendered ineffective assistance by failing to challenge on appeal the trial court's denial of the defense motion for a continuance of the sentencing hearing to enable counsel to depose codefendant Jeff McCoy ("McCoy").  The Florida Supreme Court correctly applied the *Strickland* standards in rejecting this claim:

> In the first of Cooper's claims meriting discussion . . . he asserts that his appellate counsel performed in a constitutionally deficient manner because he did not raise the trial court's refusal to grant Cooper a continuance as an issue on appeal.  The record reveals that on the day of Cooper's sentencing hearing, the State notified him that it had completed plea negotiations with Jeff McCoy, one of Cooper's codefendants, and therefore, McCoy would be available to him as a penalty phase witness.  When Cooper requested a continuance to depose McCoy, the trial court denied the request.

> This Court has held that analysis of a claim of ineffectiveness of appellate counsel is bounded by the following considerations:

> When analyzing the merits of the claim, the criteria for proving ineffective assistance of appellate counsel parallel the *Strickland* standard for ineffective trial counsel. Thus, this Court's ability to grant habeas relief on the basis of appellate counsel's

ineffectiveness is limited to those situations where the petitioner establishes first, that appellate counsel's performance was *deficient* because the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and second, that the petitioner was *prejudiced* because appellate counsel's deficiency compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.  If a legal issue would in all probability have been found to be without merit had counsel raised the issue on direct appeal, failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective.  *Rutherford v. Moore,* 774 So. 2d 637, 643 (Fla. 2000) (footnote, citations, and internal quotation marks omitted).  This Court would have found this claim meritless on direct appeal.  Consequently, the failure of Cooper's appellate counsel to raise the issue does not constitute ineffectiveness.

Because Cooper's attorneys were in possession of McCoy's confession to police regarding the respective roles of the three codefendants, the lack of time to depose McCoy did not harm Cooper's case.  When Cooper elicited the testimony of McCoy during the hearing, McCoy related during the proceedings precisely what Cooper desired-testimony by a witness that Cooper was acting under the domination of J.D. Walton (the third codefendant) at the time of the crimes, and that Cooper was outside the house when the second shots were fired into the victims.  Because Cooper possessed McCoy's confession prior to trial, and was able to present McCoy's mitigating testimony, the trial court did not abuse its discretion in denying the motion for a continuance.  *See Lebron v. State,* 799 So. 2d 997, 1018 (Fla. 2001) ("The denial of a motion for continuance is committed to the sound discretion of the trial judge.").  Cooper's ineffectiveness claim is without merit because appellate counsel cannot be faulted for failing to raise a claim which would have been deemed meritless on appeal.  *See, e.g., Engle v. Dugger,* 576 So. 2d 696 (Fla. 1991); *Card v. State,* 497 So. 2d 1169 (Fla. 1986).

*Cooper v. State*, 856 So. 2d at 977-80 (emphasis in original).

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  When a motion for a continuance for the purpose of securing defense witnesses

is denied, a federal court considers the following factors to determine if the trial court abused its discretion in denying the motion:

> the diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony.

*Hicks v. Wainwright*, 633 F.2d 1146, 1149 (5th Cir. 1981) (quoting *United States v. Uptain*, 531 F.2d 1281, 1287 (5th Cir. 1976)).

The record establishes, as the Florida Supreme Court found, that Petitioner's attorneys were made aware of McCoy's availability before Petitioner's sentencing hearing (Dkt. 10, Ex. A3, pp. 394-96). The trial court denied the motion for continuance after the State withdrew McCoy as a witness. Citing *Lebron v. State,* 799 So. 2d 997, 1018 (Fla. 2001), the Florida Supreme Court noted that the grant or denial of a motion for continuance "is committed to the sound discretion of the trial judge." *Cooper v. State*, 856 So. 2d at 978. The court added that it "would have found this claim meritless on direct appeal." *Id.* That determination is entitled to deference. *See Van Poyck v. Florida Dept. of Corrections,* 290 So.2d 1318, 1326 (Fla. 2002), *cert. denied,* 537 U.S. 812 (2002), and *cert. denied*, 537 U.S. 1105 (2002). That court's rejection of this claim of ineffective appellate counsel was not unreasonable.

In his supplemental brief (Dkt. 64), Petitioner argues that "McCoy possessed enormously important evidence that would have repelled a key aggravating fact." Petitioner further argues that "McCoy *likely* would have told counsel - had they been permitted to conduct a brief interview with him - that [Petitioner] was outside the house when the second shots were fired." (Dkt. 64) (emphasis added). Petitioner's speculative assertion of what McCoy may have testified to does not establish

"specific substantial prejudice" arising from the denial of the motion for continuance. *Van Poyck v. Florida Dept. of Corrections, 290 So.2d* at 1326 (to establish that denial of a continuance was reversible error, defendant must show that the denial caused "specific substantial prejudice.").

Petitioner does not contend that the information he sought to elicit from McCoy was not contained in McCoy's confession.  According to the Florida Supreme Court, McCoy's confession was readily available to Petitioner at the time of the penalty phase and sentencing.  Petitioner does not challenge that finding and it is presumptively correct.

The Florida Supreme Court correctly determined that appellate counsel cannot be faulted for failing to raise this meritless claim on appeal.  Since the underlying claim lacked merit, Petitioner cannot establish that appellate counsel rendered ineffective assistance by failing to raise the issue on appeal.   The Florida Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard.  *See* 28 U.S.C. § 2254(d).

Claim (b)

In claim (b), Petitioner argues appellate counsel rendered ineffective assistance by failing to raise on appeal a claim of improper consideration of the non-statutory aggravator "lack of remorse." The Florida Supreme Court rejected this claim:

> Cooper's second basis for asserting that his appellate counsel's performance was constitutionally inadequate is that his counsel should have contended that the trial court erred in allowing the State to introduce evidence directed to Cooper's lack of remorse for his crimes.  The record reflects that the trial court did, over defense counsel's objection, allow the State to present the testimony of Skalnik, who related that Cooper "laughed and thought it was funny" and "thought it was no big deal . . . that he killed three people."  The trial court erred.  *See Walton v. State,* 547 So. 2d 622, 625 (Fla.1989) ("This Court has consistently held that lack-of-remorse evidence cannot be presented by the State as an aggravating circumstance in its case in chief.").

While the failure of Cooper's appellate counsel to assert this point on appeal may constitute less than proper performance, it is also clear that Cooper has not established the prejudice requirement with regard to his counsel's inaction. Certainly, appellate counsel's deficiency did not compromise "the appellate process to such a degree as to undermine confidence in the correctness of the result." *Rutherford,* 774 So. 2d at 643. It is apparent from our review of this case that the findings and result of the weighing process would not have been any different without the introduction of this lack of remorse evidence. Further, Cooper cannot demonstrate prejudice, because he introduced evidence during the penalty phase in an attempt to show his remorse for the killings, which would have opened the door to the State to introduce Skalnik's testimony regarding Cooper's lack of remorse. This claim of ineffectiveness does not warrant relief.

*Cooper v. State*, 856 So. 2d at 978.

Assuming *arguendo*, as did the Florida Supreme Court, that appellate counsel's performance was deficient for failing to raise this issue on appeal, Petitioner fails to establish prejudice. During the penalty phase, after the State presented Skalnik's testimony, Petitioner introduced into evidence a letter written by Petitioner to codefendant Jeff McCoy. (Dkt. 10, Ex. A10, p. 1481). The letter contains some discussion about Petitioner being "sorry." (Dkt. 10, Ex. A10, pp. 1483-84). Although defense counsel attempted to limit the evidentiary purpose of the letter, the trial court determined that the entire letter became evidence.[74] (Dkt. 10, Ex. A10, pp. 1485). Consequently, as the Florida

---

[74] Specifically, Koch argued:

> Court:   . . . The question is whether it's relevant evidence, and this is what the next question is going to be, okay. It's hearsay, it's relevant, it's going to be admissible. My next question is what - - you are trying to show some evidence of character I suppose because they are going to try to rebut anything that is in the letter. You understand that?

> Koch:    Judge, I want it specifically understood that that letter is not going in to prove remorse. There are references to religious beliefs on behalf of the defendant in there. There are references to his acquaintance to Jeff McCoy in that letter.

> Court:   The whole thing becomes evidence, so I will assume unless you tell me something to the contrary, it's evidence. They can rebut anything that it says.

(Dkt. 10, Ex. A10, p. 1485).

Supreme Court correctly determined, introduction of the letter would have "opened the door" for the State to introduce Skalnik's testimony about Petitioner's lack of remorse.  *See, e.g., Tanzi v. State*, 964 So. 2d 106, 115 (Fla. 2007); *Walton v. State*, 547 So. 2d 622, 625 (Fla. 1989).  Accordingly, even if this issue had been pursued on appeal, there was no probability of success on the merits.

Petitioner has not demonstrated a reasonable probability of success on appeal on this issue and therefore cannot show prejudice resulting from appellate counsel's failure to raise this claim. *See Smith v. Robbins*, 528 U.S. at 285-86; *Heath v. Jones*, 941 F.2d at 1132.  The state court's denial of this claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. *See* 28 U.S.C. § 2254(d).

Claims (c) and (f)

In claim (c), Petitioner argues that appellate counsel rendered ineffective assistance by failing to argue on appeal that the prosecutor's improper argument on lack of mitigators was an impermissible non-statutory aggravator.   In claim (f), Petitioner argues that appellate counsel rendered ineffective assistance by failing to argue on appeal that Petitioner was denied consideration of all mitigating evidence and by failing to challenge the prosecutor's improper comments currying sympathy.   The Florida Supreme Court rejected these claims:

> Cooper next contends that his appellate counsel performed inadequately by failing to assert on appeal that the State improperly commented on the absence of mitigating evidence before the jury in its penalty phase closing argument.  The objectionable statements cited by Cooper are:
>
> > Don't assume because you haven't heard good or bad things that it is a mitigating circumstance to consider because it is not an issue. They have not raised that as something they feel is mitigating.
> > . . .
> >
> > When their big chance came to establish mitigating circumstances what did you hear? One witness.

Because Cooper did not object to these statements at trial, appellate counsel will not be deemed ineffective unless the comments constitute fundamental error.  As this Court has stated in the past, fundamental error "is defined as the type of error which reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Downs v. Moore,* 801 So. 2d 906, 910-11 (Fla.2001) (internal quotation marks omitted). Because these comments merely reflect the prosecutor's view of the balance of the aggravating and mitigating circumstances, and were exceedingly brief, no fundamental error occurred. [FN9]  Therefore, this ineffectiveness claim is without merit.

> FN9. For the same reason, the isolated statements Cooper has identified regarding the jury placing themselves in the victims' shoes, and the proper level of sympathy and mercy for Cooper in sentencing, do not rise to the level of fundamental error.  Thus, appellate counsel was not ineffective for failing to argue that these unobjected-to comments vitiated the entire trial.

*Cooper v. State*, 856 So. 2d at 978-79.

In Florida, while "[w]ide latitude is permitted in arguing to a jury," *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982), that latitude does not permit improper argument.  *Gore v. State*, 719 So. 2d 1197, 1200 (Fla. 1998).   "Counsel must contemporaneously object to improper comments to preserve a claim for appellate review."  *Merck v. State*, 975 So. 2d 1054, 1061 (Fla. 2007); *Brooks v. State*, 762 So. 2d 879, 898 (Fla. 2000).   "The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that 'reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'"  *Brooks v. State*, 762 So. 2d 879, 898-99 (Fla. 2000).

In his petition and supplemental briefs, Petitioner does not delineate what improper argument or comment by the prosecutor he relies on to support claims (c) and (f).  Assuming that he relies on the same statements he challenged in his state habeas petition as quoted in the Florida Supreme Court's order affirming the denial of relief, claims (c) and (f) do not warrant federal habeas relief.

Improper prosecutorial remarks amount to a constitutional violation only if the remarks render the proceedings fundamentally unfair. *Cargill v. Turpin*, 120 F.3d 1366, 1379 (11th Cir. 1997). The relevant inquiry is whether the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 642). In making this assessment, a reviewing court must evaluate the allegedly improper comments in the context of both the prosecutor's entire closing argument and the trial as a whole.[75] *Branch v. Estelle*, 631 F.2d 1229, 1233 (5th Cir. 1980).

Taken in the context of the entire trial, the prosecutor's comments, even if improper, were not so egregious as to render the trial fundamentally unfair. Nor did they infect the trial with such unfairness that the resulting conviction amounts to a denial of due process. *See Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986), *cert. denied*, 480 U.S. 911 (1987) ("If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."). As noted by the Florida Supreme Court, defense counsel did not object when the prosecutor made the challenged statements. (Dkt. 10, Ex. A11, pp. 1576-77). Notwithstanding, none of the statements Petitioner presumably relies on are of such magnitude as to invalidate the entire penalty phase proceeding. The comments do not constitute fundamental error and appellate counsel was not ineffective in failing to raise these

---

[75] Federal law on closing argument is the same as Florida law. To determine whether a prosecutor's remarks are harmful, the comments must be analyzed "within the context of the closing argument as a whole and considered cumulatively within the context of the entire record." *Rivera v. State*, 840 So. 2d 284, 287 (Fla. 5th DCA 2003) (quoting *McArthur v. State*, 801 So. 2d 1037, 1040 (5th DCA 2001)).

unpreserved issues on appeal.  *See Brooks v. State*, 762 So. 2d at 898-99; *Medina v. Dugger*, 586 So. 2d 317, 318 (Fla. 1991).  Moreover, Petitioner has not rebutted by clear and convincing evidence the Florida Supreme Court's determination that the prosecutor's comments "merely reflect the prosecutor's view of the balance of the aggravating and mitigating circumstances and were exceedingly brief."  *Cooper v. State*, 856 So. 2d at 979.

Petitioner has not demonstrated a reasonable probability of success on appeal on these issues and therefore cannot show prejudice resulting from appellate counsel's failure to raise these claims. *See Smith v. Robbins*, 528 U.S. at 285-86; *Heath v. Jones*, 941 F.2d at 1132.  The state court's denial of this claim was neither contrary to, nor an unreasonable application of *Strickland*.  *See* 28 U.S.C. § 2254(d).

Claim (d)

In claim (d), Petitioner argues appellate counsel rendered ineffective assistance by failing to raise on appeal that the sentencing court failed to consider and weigh aggravators and mitigators and failed to render a timely sentencing order.  The Florida Supreme Court rejected this claim:

> In his next ineffective assistance of appellate counsel claim, Cooper contends that his counsel failed to provide adequate representation by not asserting that the trial court's sentencing order failed to comply with section 921.141(3) of the Florida Statutes in three ways.  First, Cooper argues that the trial court's failure to issue a written sentencing order contemporaneously with its oral pronouncement of sentence constitutes reversible error.  While the record reflects that the trial court did wait an extended period of time after it issued its oral sentence on the record to promulgate a written order memorializing its decision, the written findings were issued prior to certification of the record to this Court for direct appeal.  Therefore, any error was harmless.  *See Grossman v. State,* 525 So. 2d 833, 841 (Fla.1988).
>
> Cooper's second and third claims regarding appellate review of the propriety of the trial court's sentencing order may be addressed in a summary fashion.  The record reveals absolutely no substantive basis for Cooper's claim that the trial court improperly delegated the drafting of his sentencing order to the State.  Thus, Cooper has not presented this Court with a justiciable habeas corpus claim.  *See Cave v.*

> *State,* 529 So. 2d 293, 297 (Fla.1988).  Finally, Cooper's claim that the trial court
> failed to independently weigh the mitigating and aggravating circumstances of each
> victim's murder individually is contradicted by the face of the court's sentencing order
> itself.  These claims do not warrant relief.

*Cooper v. State*, 856 So. 2d at 979.

The record supports the Florida Supreme Court's denial of relief.  Petitioner's first

contention, that the sentencing court failed to consider and weigh aggravators and mitigators, lacks

merit.  The sentencing judge explicitly stated on the record that he had undertaken his own

evaluation of the mitigating and aggravating circumstances:

> The Court finds that each of the aggravating circumstances that were submitted to the
> jury were proven.  The Court has considered the mitigating circumstances and the
> evidence here today and has weighed them each against the other, and the Court finds
> that there really are no mitigating circumstances that outweigh the aggravating
> circumstances either individually, that is either separately or in toto.

(Dkt. 10, Ex. A4, pp. 462-63).  The trial court's written findings likewise reflect its independent

evaluation of the mitigating and aggravating circumstances.  (Dkt. 10, Ex. A2, pp. 243-48).  The trial

court complied with its obligation to "independently weigh the evidence in aggravation and

mitigation."  *Lambrix v. Singletary*, 520 U.S. 518, 535 (1997).  Petitioner presents no evidence to

the contrary.

Petitioner's second contention, that the sentencing court failed to prepare a timely written

sentence of death, likewise lacks merit.  Petitioner's sentencing hearing was held on March 14, 1984.

The trial court entered its written sentencing order on May 30, 1984.  Under Florida's rule at the time

of Petitioner's sentencing,[76] after orally pronouncing a death sentence, the trial court was required

---

[76] In *Grossman v. State,* 525 So. 2d 833 (Fla. 1988), the Florida Supreme Court established a procedural rule
requiring that "all written orders imposing a death sentence be prepared prior to the oral pronouncement of sentence for
filing concurrent with the pronouncement." *Grossman v. State,* 525 So. 2d at 841.  This new procedural rule became
effective in 1988, more than four years after Petitioner's sentencing.

only to enter the written sentencing order in a timely manner.  *Davis v. State*, 928 So. 2d 1089, 1135

(Fla. 2005).    In Petitioner's case, approximately eleven weeks elapsed between the oral

pronouncement of death and the entry of the trial court's sentencing order.  This was well within the

limits considered permissible by the Florida Supreme Court.  *See id.* (citing *Grossman v. State*, 525

So. 2d 833, 841 (Fla. 1988) (three-month time period between pronouncement of death sentence and

entry of written sentencing order was permissible); *Muehleman v. State,* 503 So. 2d 310, 317 (Fla.

1987) (permitting a death sentence to stand even though written findings were filed two and one-half

months after sentencing)).  Accordingly, appellate counsel was not ineffective in failing to raise this

meritless argument on appeal.  The state court's denial of this claim was neither contrary to, nor an

unreasonable application of, the *Strickland* standard.  *See* 28 U.S.C. § 2254(d).

Claim (e)

In claim (e), Petitioner argues that appellate counsel was ineffective in failing to raise as a

claim on appeal that the jury weighed invalid and constitutionally vague aggravating circumstances.

In his briefs, Petitioner fails to develop this claim, offering no legal or factual support.[77]

Notwithstanding, the claim has no merit. The Florida Supreme Court rejected this claim:

> Likewise, Cooper's claim that his appellate counsel rendered constitutionally
> deficient assistance by not asserting before this Court that the instructions given to
> the penalty phase jury regarding the HAC and CCP aggravators were
> unconstitutionally vague fails. "Because [Cooper] did not object to these instructions
> or request legally sufficient alternative instructions, these claims are procedurally
> barred. Further, . . . counsel cannot be deemed ineffective under the test set out in
> *Strickland* for failing to object to these instructions when this Court had previously
> upheld the validity of these instructions." *Harvey v. Dugger,* 656 So. 2d 1253, 1258
> (Fla.1995).  The jury instructions in this case did not amount to fundamental error,

---

[77]  This Court presumes, because Petitioner presents no factual or legal support for this claim, that he relies on
the same argument presented in his underlying state habeas petition relating to the allegedly "vague" instructions given
to the jury.  (Dkt. 10, Ex. D40).

and therefore appellate counsel's failure to raise the issue was entirely proper. [FN10].

> FN10. Cooper's claim that the trial court improperly utilized the same set of facts to serve as a basis for instructing the jury regarding the HAC and prior commission of a violent felony aggravators is also without merit. While the multiple murders justified instruction on the prior violent felony aggravating circumstance, it was the manner of the commission of the murders which was the basis for the HAC instruction.

*Cooper v. State*, 856 So. 2d at 979-80.

At the time of Petitioner's trial, Florida's standard HAV and CCP jury instructions had been approved by the Florida Supreme Court. Accordingly, there was no good faith basis on which either to object at trial or raise the issue on appeal. *See Harvey v. Dugger,* 656 So. 2d 1253, 1258 (Fla. 1995)(". . . trial counsel cannot be deemed ineffective under the test set out in *Strickland* for failing to object to these instructions when this Court had previously upheld the validity of these instructions.").

Moreover, as noted by the Florida Supreme Court, defense counsel did not object to the HAV and CCP jury instructions and as a result, the claim was subject to procedural default under Florida law, barring appellate review.[78]   The significance of the Florida Supreme Court's reliance on Petitioner's procedural default is demonstrated by its citation to *Harvey v. Dugger*, which discusses procedural default with respect to a failure to object to jury instructions in a Florida capital case. 656

---

[78] In denying this claim, the Florida Supreme Court relied in part on Florida's procedural rules. Defense counsel failed to object and thereby failed to preserve this issue for appellate review. That decision rests on an independent and adequate state procedural ground. Application of the state procedural bar renders the claim procedurally defaulted and precludes federal review. *See Baldwin v. Jackson*, 152 F.3d at 1317. To the extent a substantive claim may be read into Petitioner's argument, his procedural default forecloses federal habeas review absent a showing of cause and prejudice or a fundamental miscarriage of justice. *Mincey v. Head*, 206 F.3d at 1135. Petitioner neither asserts nor demonstrates that the cause and prejudice or fundamental miscarriage of justice exception applies. Thus, claim (e) is procedurally barred from federal habeas review.

So. 2d at1258 ("Because Harvey did not object to these instructions or request legally sufficient alternative instructions, these claims are procedurally barred.").[79]

Appellate counsel could not have been ineffective in failing to raise a claim which was barred from appellate review under Florida law because of a procedural default.   Similarly, appellate counsel was not ineffective in failing to challenge jury instructions which had been previously approved by Florida's Supreme Court.   Such a challenge would have been without merit.   Applying *Strickland's* standards, counsel cannot be faulted for failing to raise a claim which had no merit according to the state's highest court or in failing to anticipate a change in the law. *See Freeman v. Attorney General, State of Florida*, 536 F.3d 1225, 1233 (11th Cir. 2008)(attorney not ineffective in failing to raise a meritless claim); *Ladd v. Jones,* 864 F.2d 108, 110 (11th Cir. 1989); *Card v. Dugger,* 911 F.2d 1494, 1520 (11th Cir. 1990).   The state court's denial of this claim was neither contrary to, nor an unreasonable application of *Strickland*.   *See* 28 U.S.C. § 2254(d).

Claim (g)

Petitioner argues that appellate counsel rendered ineffective assistance by failing to raise on appeal a claim that the prosecutor and the trial court improperly diminished the role of the jury in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).   The Florida Supreme Court summarily rejected this claim:

> Likewise, Cooper's claim that the trial court's jury instructions unconstitutionally denigrated the advisory role of the jury during the penalty phase is meritless.

*Cooper v. State*, 856 So. 2d at 977 n.8.

---

[79] After Petitioner was sentenced, Florida's standard HAC and CCP instructions were found to be unconstitutionally vague. *See Jackson v. State*, 648 So. 2d 85, 90 (Fla. 1994).   That court noted, however, that failure to object to the CCP instruction would result in a procedurally barred claim. "Claims that the instruction on the cold, calculated, and premeditated aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal." *Id.*

As Petitioner correctly contends, "[t]he critical issue to this sub-claim . . . is whether [Petitioner]'s underlying *Caldwell* claim is in fact meritorious." (Dkt. 64, p. 3). Petitioner argues that the prosecutor improperly described the role of the jury under Florida law, allowing the jury to feel less responsible than it should have for its sentencing decision. Specifically, Petitioner points to the prosecutor's statement during voir dire:

> The Judge will tell you in Florida . . . [that] you weigh [aggravating and mitigating circumstances] to make a determination which is merely a recommendation. The final decision is made by Judge Walker.

(Dkt. 10, Ex. A5, p. 599). Petitioner also points to the prosecutor's statements during closing arguments in the penalty phase:

> [A]nd again all you do is recommend. If Judge Walker doesn't think it is the appropriate penalty, he wouldn't impose it.

> It's your Honor's decision as to whether to impose [the death penalty] and not the jury's.

(Dkt. 10, Ex. A11, pp. 1589, 1592).

Petitioner also relies on specific statements by the trial judge to support this claim. Following the prosecutor's statement that it was the judge's decision whether to impose the death penalty, the trial judge stated:

> The jury will be so instructed. Their recommendation, their verdict in this instance is a recommendation only and the instruction carefully carry that and you are so advised.

(Dkt. 10, Ex. A11, p. 1593). Petitioner also points to the trial judge's statements during the penalty phase:

> The final decision as to what punishment shall be imposed rests solely with the Judge of this Court.

> As you have been told the final decision as to what punishment shall be imposed is the responsibility of the Judge.

(Dkt. 10, Ex. A11, pp. 1429, 1604).

Petitioner asserts that the trial judge not only failed to correct the prosecutor's improper remarks, but openly agreed with them, confirming the prosecutor's inaccurate statement that the jury's sentencing decision was only a recommendation. Further, Petitioner claims that the trial judge improperly described Florida law. These errors, Petitioner contends, establish a *Caldwell* violation that appellate counsel should have argued on appeal and the Florida Supreme Court's denial of relief is both contrary to and an unreasonable application of federal law.

As discussed in Ground A(f), *supra*, Petitioner cannot present a meritorious substantive *Caldwell* claim because he has not demonstrated that the prosecutor mischaracterized the jury's role in the penalty phase or diminished its role in the sentencing process. Moreover, the state trial court correctly instructed the jury on its role in the sentencing process. Appellate counsel cannot be ineffective for failing to raise this non-meritorious claim on appeal. *Miller v. Dugger*, 858 F.2d at 1538; *Heath v. Jones*, 941 F.2d at 1132; *Alvord v. Wainwright*, 725 F.2d at 1291. The Florida Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. *See* 28 U.S.C. § 2254(d)(1), (2).

Claim (h)

In claim (h), Petitioner argues that appellate counsel was ineffective in failing to raise a claim regarding an allegedly erroneous instruction about the jury's majority vote. The Florida Supreme Court rejected this claim:

> Next, Cooper asserts that his appellate counsel's performance was defective, because he failed to argue on appeal that the trial court's instructions misinformed the jury regarding the number of juror votes sufficient to recommend life imprisonment. Specifically, Cooper argues that the jury was led to believe that a vote of six to six would result in a recommendation of death, when in fact, this vote recommends life

imprisonment. The trial court did, in two instances during his instructions, state that when a "majority of you" or "seven or more" of the jury members agreed, the panel could render its advisory verdict. However, these instructions were not objected to, and the trial court specifically instructed the jury as follows:

> [I]f by six or more votes, the jury recommends that Richard Cooper should not be sentenced to death, your advisory sentence should be, quote, the jury advises and recommends to the Court that it impose a sentence of life imprisonment upon Richard Cooper without the possibility of parole for 25 years.

We conclude that no fundamental error occurred, and therefore Cooper's present ineffectiveness claim is meritless.

*Cooper v. State*, 856 So. 2d at 980.

"Under Florida's capital sentencing scheme, a jury's recommendation that the death penalty be imposed need not be unanimous, but may be by a simple majority." *Bush v. Singletary*, 988 F.2d 1082, 1089 (11th Cir. 1993) (citing Fla. Stat. § 921.41(3) (1985)). In its penalty phase instructions, the trial court explained that the jury could recommend a life sentence "by six or more votes." (Dkt. 10, Ex. A11, p. 1609). Petitioner fails to demonstrate that the jury was confused or that the instructions misled the jury into believing that a majority vote was required to impose a life sentence. *See id.* Because this underlying claim lacks merit, appellate counsel was not ineffective in failing to raise this claim on appeal. *See Smith v. Robbins*, 528 U.S. at 285-86; *Heath v. Jones*, 941 F.2d at 1132; *Miller v. Dugger*, 858 F.2d at 1538; *Alvord v. Wainwright*, 725 F.2d at 1291.

Petitioner has not shown that the Florida Supreme Court's resolution of the claims presented in Ground N was "contrary to" or constituted an "unreasonable application" of clearly established federal law as determined by the United States Supreme Court. The Florida Supreme Court applied the correct standards governing an ineffective assistance claim, expressly citing *Strickland. See Cooper v. State*, 856 So. 2d at 977-80. Petitioner fails to establish by clear and convincing evidence that the Florida Supreme Court's factual determinations were unreasonable in light of the evidence

of record.  28 U.S.C. § 2254(d)(1), (2); (e)(1).  Accordingly, none of the eight claims of ineffective appellate counsel in Ground N warrant federal habeas relief.

**GROUND O**: **Staleness and Cruel & Unusual Punishment Claim**

Petitioner alleges that his death sentence violates the Eighth and Fourteenth Amendments, the Convention on Civil and Political Rights and the Convention Against Torture.  Petitioner contends that the conditions under which he has been forced to live for the past two decades on death row amount to cruel and unusual punishment.  The Florida Supreme Court denied relief on this claim in Petitioner's state habeas petition:

> [T]he length of Cooper's stay on death row does not constitute cruel and unusual punishment.  *See Rose v. State,* 787 So. 2d 786, 805 (Fla. 2001).

*Cooper v. State*, 856 So. 2d at 980.

Petitioner fails to cite a Supreme Court decision supporting his contention that prolonged confinement on death row violates a prisoner's federal constitutional rights, including the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Thompson v. Sec'y, Dep't of Corr.*, 517 F.3d 1279, 1283-84 (11th Cir. 2008)(thirty one year confinement not cruel and unusual punishment).   Given the absence of such precedent, Petitioner cannot establish a federal constitutional violation on this basis.  *See Lackey v. Texas*, 514 U.S. 1045 (1995).[80]

---

[80]  In *Lackey v. Texas*, 514 U.S. 1045 (1995), the Supreme Court denied a petition for writ of certiorari where the petitioner claimed that a seventeen-year confinement on death row violated his Eighth Amendment rights.  Numerous other courts have rejected *Lackey* claims. *see Thompson v. Sec'y, Dep't of Corr.*, 517 F.3d at 1279; *Allen v. Ornoski*, 435 F.3d 946, 956 (9th Cir. 2006), *cert. denied*, 546 U.S. 1136 (2006)); *Chambers v. Bowersox*, 157 F.3d 560, 568, 570 (8th Cir. 1998); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996) ("The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards. . . . White has benefitted from this careful and meticulous process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exist to protect him has violated other of his rights."); *Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring).(I write only to point out that I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed."

Petitioner also relies on two international agreements in support of federal habeas relief. First, Petitioner refers to the International Covenant on Civil and Political Rights ("ICCPR"), Dec. 19, 1966, 999 U.N.T.S. 171 (ratified June 8, 1992). The ICCPR guarantees a broad spectrum of civil and political rights to individuals within signatory nations. *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002). It is not, however, binding on federal courts:

> [T]he ICCPR does not create judicially-enforceable individual rights. Treaties affect United States law only if they are self-executing or otherwise given effect by congressional legislation. Articles 1[81] through 27 of the ICCPR are not self-executing. Nor has Congress passed implementing legislation. Therefore, the ICCPR is not binding on federal courts.

*United States v. Duarte-Acero*, 296 F.3d at 1283 (internal citations omitted). Moreover, the ICCPR does not prohibit imposition of the death penalty.[82] Accordingly, the ICCPR provides no basis for federal habeas relief. Second, Petitioner relies on the "Convention Against Torture."[83] The United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (the "Convention") is implemented in the United States by 8 C.F.R. § 208.18. Although Petitioner again fails to cite any relevant provision of the Convention that he believes entitles him

---

[81] Because Petitioner fails to delineate any applicable provision of the ICCPR to support his claim for relief, the Court assumes that he relies upon Article 6(1), which states in relevant part that "[e]very human being has the inherent right to life" that "shall be protected by law," and that "[n]o one shall be arbitrarily deprived of his life." International Covenant on Civil and Political Rights, *open for signature* December 19, 1966, 999 U.N.T.S. 171, art. 6(1), 6 I.L.M. 368, 58 Fed. Reg. 45934-01 (Aug. 31, 1993).

[82] Article 6(2) provides in relevant part:

In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime. . . . This penalty can only be carried out pursuant to a final judgment rendered by a competent court.

International Covenant on Civil and Political Rights, Dec. 19, 1966, art. 6(2).

[83] Petitioner fails to provide any citation for this authority. He apparently references the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.

to relief, the Court assumes that he refers to the provisions against torture.  Torture is defined in

relevant part as follows:

> Torture is defined as any act by which severe pain or suffering, whether physical or
> mental, is intentionally inflicted on a person for such purposes as . . . punishing him
> . . . for an act he . . . has committed . . . when such pain or suffering is inflicted by or
> at the instigation of or with the consent or acquiescence of a public official or other
> person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).  The regulations further provide that "[t]orture is an extreme form of cruel

and inhumane treatment," 8 C.F.R. § 208.18(a)(2), and that "[t]orture does *not* include pain or

suffering arising only from, inherent in or incidental to lawful sanctions."  8 C.F.R. § 208.18(a)(3)

(emphasis added).  Lawful sanctions include "judicially imposed sanctions and other enforcement

actions authorized by law, including the death penalty."  8 C.F.R. § 208.18(a)(3); *see also Wang v.

Ashcroft*, 320 F.3d 130, 134 (2nd Cir. 2003).  Accordingly, the Convention provides Petitioner no

relief from his death sentence.

Petitioner **fails** to demonstrate entitlement to relief.  He fails to show that the Florida

Supreme Court's denial of these claims resulted in either an unreasonable application of controlling

Supreme Court precedent or an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

Ground O of Petitioner's federal habeas petition warrants no relief.

It is therefore ORDERED AND ADJUDGED that:

1.      Petitioner's petition for a writ of habeas corpus (Dkt. 1) is **DENIED**.

2.      The Clerk is to enter judgment for Respondent and close this case.

**DONE AND ORDERED**  on this 17th day of December, 2008.

/s/James D. Whittemore
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:  Counsel/Parties of Record